UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 24-20008-CR-WILLIAMS/GOODMAN

UNITED STATES OF AMERICA

vs.

MICHAEL KARL GEILENFELD,

Defendant.
_____/

FILED BY _____ D.C.

FEB 07 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## APPEAL FROM THE MAGISTRATE JUDGE'S ORDER DENYING THE GOVERNMENT'S MOTION FOR PRE-TRIAL DETENTION

The United States of America respectfully appeals the magistrate judge's February 1, 2024, order denying the government's request for pretrial detention and granting Michael Geilenfeld's request for a bond. Because Geilenfeld is both a risk of flight and a danger to the community and another person, the magistrate judge's order should be revoked by this Court, and this Court should order the Defendant be detained pending trial.

**I. BACKGROUND**

   **a. Charges**

On January 18, 2024, a grand jury sitting in the Southern District of Florida returned an indictment against the Defendant, charging him with one count of Traveling in Foreign Commerce with the Purpose of Engaging in Illicit Sexual Conduct, in violation of 18 U.S.C. § 2423(b). *See* D. Colo. Case No. 24-mj-00012 (ECF No. 1)[1]. The charges stem from Geilenfeld's years' long sexual abuse of multiple minor boys entrusted to his care at the St.

---

[1] The Defendant's detention hearing occurred in the District of Colorado because he was arrested in Colorado. *See* D. Colo. Case No. 24-mj-00012 (ECF Nos. 1, 10, 11, 15)[1]. Accordingly, all citations to docket entries refer to the District of Colorado case number.

Joseph's Home for Boys, an orphanage that he ran in Port-au-Prince, Haiti. *See infra* 2-7.

### b. Arrest, Initial Appearance, and Motion for Detention

The Defendant was subsequently arrested in the District of Colorado on January 20, 2024, and had an initial appearance before a magistrate judge on January 22, 2024. *See* (ECF Nos. 1, 2, 4). The government sought to have the Defendant detained prior to trial as both a risk of flight and a danger to the community and another person under three statutory grounds: (1) Geilenfeld was charged with a felony that is not otherwise a crime of violence that involves a minor victim pursuant to § 3142(f)(1)(E); (2) there is a serious risk that Geilenfeld will flee pursuant to § 3142(f)(2)(A); and (3) there is a serious risk that Geilenfeld will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, a prospective witnesses in the case pursuant to § 3142(f)(2)(B). Because Geilenfeld was charged with a crime involving a minor victim, there is a rebuttable presumption that the Defendant is both a risk of flight and a danger to the community. *See* 18 U.S.C. § 3142(e)(3)(E).

### c. Detention Hearing[2]

On January 25, 2024, the magistrate judge commenced Geilenfeld's detention hearing. (ECF No. 10). However, shortly after the hearing began, Geilenfeld advised the court that he needed additional time to speak to his counsel. *Id.* Based on Geilenfeld's request, the magistrate judge continued the hearing to the following day. *Id.* On January 26, 2024, the detention hearing resumed. (ECF No. 11). During the hearing, the government proffered the following facts to the court:[3]

---

[2] The government has ordered the transcripts of the hearings in this case and will file them upon receipt.
[3] *See* (ECF No. 14 at 11-15) (Appendix to Government's Post-Hearing Memorandum in Support of Motion for Detention and Opposition to Defendant's Motion for Release).

1. For nearly all his adult life, the Defendant has had extensive connections to foreign countries, holding himself out as a missionary while using his position and privilege to sexually abuse young boys and cover up his crimes. Between the mid-1980's and continuing until roughly 2014, the Defendant, a U.S. citizen, operated multiple orphanages in Haiti, including the St. Joseph's Home for Boys. The majority of the residents were young boys who endured extreme poverty and came from families who had either abandoned them or could no longer care for them.

2. An investigation by HSI and the FBI has revealed that, between at least November 2006 and December 2010 (i.e., the time period in the indictment), the Defendant traveled to Haiti for the purpose of engaging in illicit sexual conduct, traveling from Miami International Airport to Port-au-Prince Haiti approximately 14 times.

3. During that time period, Geilenfeld engaged in illicit sexual conduct with numerous minor boys who resided at the St. Joseph's Home for Boys. For example, Victim 1, Victim 2, Victim 3, and Victim 4 ("the Victims")—who are purposedly referenced only generically at this hearing, to protect their privacy consistent with 18 U.S.C. §§ 3509(d) and 3771 and because of concerns with victim intimidation—collectively resided at St. Joseph's Home for Boys between 2006 and 2010. The Victims were between approximately 9 and 13 years of age, and reported to law enforcement that Geilenfeld sexually assaulted them in numerous ways, including anal penetration, attempted anal penetration, and forcible penetration of their

3

mouth with his penis; that Geilenfeld warned them not to disclose what happened; that Geilenfeld offered money and other benefits if the minors would engage in sexual activity with him; and that Geilenfeld threatened them if they did not do as Geilenfeld instructed.

4. In addition to the victims contemplated in the indictment's time period, numerous other individuals have reported that they were sexually abused by Geilenfeld, in the 1980s, 1990s, and 2000s. Law enforcement during this investigation has directly spoken with individuals who were not the subject of the civil defamation suit[4] (including but not limited to Victims 1-4), and they provided extensive details about their being sexually abused by Geilenfeld. Moreover, not all the victims at issue in the civil trial testified at that trial, so the jury there did not have access to the universe of information the Government has and intends to present in this case.

5. Multiple victims and potential witnesses have reported being threatened and retaliated against after reporting being abused by Geilenfeld or after being suspected by Geilenfeld of not being loyal to him, as well as having received payments from Geilenfeld in order to maintain their silence.

6. The investigation also revealed that Geilenfeld knowingly surrounded himself with other individuals who were a known and suspected

---

[4] In 2015, Geilenfeld initiated a defamation lawsuit against Paul Kendrick, a children's rights advocate. *See generally* D. Me. Case No. 13-cv-00039. A jury returned a judgment in favor of Geilenfeld. However, the judgment was later vacated based on a lack of jurisdiction. During the trial, several of Geilenfeld's accusers testified against him. As noted herein, the victims whose abuse is encompassed in the indictment are *not* the victims who testified in the civil lawsuit.

danger to the children. For example, in at least one instance reported to law enforcement, a person working with Geilenfeld ("Subject 1") offered a victim money in exchange for the victim's silence or denial of abuse. As Geilenfeld admitted under oath in 2022, another close associate ("Subject 2"), whom Geilenfeld classified as his "friend," stabbed one of the children, after which stabbing Geilenfeld continued to defend the associate and keep him around children. And Geilenfeld admitted under oath in 2022 that he allowed a reported pedophile to stay at the orphanage, despite having been alerted to the fact.

7. In approximately 2014, Haitian social services shut down the St. Joseph's Home for Boys as a result of child welfare concerns.

8. Geilenfeld was subsequently arrested and incarcerated in Haiti in connection with abuse allegations there. Haitian authorities released Geilenfeld from confinement in mid-2015. Though the defense may portray this as a dismissal/acquittal, U.S. law enforcement's investigation has determined that the circumstances surrounding the case's conclusion are unclear, and there is evidence of corruption, including statements made by Geilenfeld and "Subject 1" (regarding Geilenfeld being able to "bribe" people in Haiti, that "Money talk[s]", etc.). In any event, the victims at issue in that proceeding are not the same as the victims of the 2006-2010 time period alleged in the indictment.

9. In October 2015, Haiti issued a new arrest warrant for Geilenfeld (No. 394), based on new complaints, that he sexually abused other children.

Geilenfeld left Haiti and traveled to the Dominican Republic before Haitian authorities could apprehend him. In the Dominican Republic, Geilenfeld established a new "mission" (house) to "help with the education of…children" of single mothers; he "lived" in the Dominican Republic until the spring of 2019 when Dominican authorities sent him back to the United States. The investigation has uncovered no evidence that the arrest warrant was cancelled, despite Geilenfeld's say-so. And his contention that he has not returned to Haiti since 2015 further supports the conclusion that the arrest warrant remained in effect—given how extensively he had traveled there and spent time there until then.

10. In May 2019, U.S. CBP stopped Geilenfeld after he tried to fly back to the Dominican Republic. During this stop, the officer found Geilenfeld had approximately 11 hard copies of a 3-page photo array of victims/witnesses involved in the sexual abuse allegations (which the Government believes was to aid in intimidating and/or bribing them). Also during this stop in 2019, Geilenfeld told the officer that he was being expelled from the Dominican Republic and that his home was in Iowa—both of which are different locations than where he told Probation he was living in 2019 (i.e., in Colorado).

11. In a September 2022 deposition, Geilenfeld stated under oath that his intent is to return to the Dominican Republic: "All of my efforts is everyday to get back to the Dominican Republic because that is my wealth, that is my life, that is my everything."

12. Geilenfeld speaks Creole fluently, and in addition to his

extensive ties to Haiti and the Dominican Republic, traveled extensively to other countries before founding the orphanages in Haiti. He also traveled repeatedly to Haiti before and after the time period alleged in the indictment.

13. Geilenfeld does not have any known present ties to the Southern District of Florida. His filing yesterday contended that he would not be able to appear for trial there, for financial reasons. And if released, he would need to travel across the country, exposing him to children, and without adequate supervision—e.g., sitting beside minors on a plane/bus, staying in hotels/motels.

14. Geilenfeld has extensive financial resources. For example, over the course of decades he fundraised throughout the United States to keep open the orphanages, and he received financial assistance from church and other communities and individuals in the United States. From 2020-2022, Geilenfeld transferred tens of thousands of dollars to individuals in the Dominican Republic and Haiti, including numerous payments to "Subject 2" (i.e., the individual who stabbed the child resident); his current landlord, the "verifier" for Probation, was involved in some of these payments. Geilenfeld has also retained private counsel in this case (and had private counsel since 2010). These financial resources were not disclosed to Probation and are inconsistent with his suggestion to Probation that he is impoverished.

15. As for Geilenfeld's life in Colorado, he stated under oath in 2022 that he "live[s] a very hidden existence." This past week he reported his jobs as being a self-employed dogwalker and lawn mower—positions for which no one

7

supervises him and through which he can easily come into contact with children. These are also positions requiring physical fitness, and there is no indication of any health problems.

16.     To the extent the defense suggests Geilenfeld was cooperative during his arrest and questioning on Friday, that is not the whole story: Geilenfeld did not initially know that he had been indicted on a sexual abuse charge, and once Geilenfeld learned what he was charged with, his demeanor changed from amiable to angry, yelling, and what the arresting agent described as passive physical resistance to going with law enforcement.

17.     Geilenfeld has repeatedly attempted to portray his accusers as incredible, pointing in particular to their poverty and vulnerability in Haiti as purported motivators for their reports of abuse. But Geilenfeld purposely sought out children who had these characteristics, and the fact is that approximately 20 different individuals have reported being sexually abused by Geilenfeld over the years.

18.     This proffer is not the full universe of incriminating facts.[5] Geilenfeld's counsel proffered that Geilenfeld was 72 years old,[6] had dedicated his life to service, had no criminal history, mental health, or substance abuse issues, and had resided in Colorado since 2019. *See generally* (ECF No. 13) (Defendant's Supplement to "Motion for

---

[5] The government later proffered, in response to a question by the magistrate judge, that Geilenfeld had not only abused children in Haiti but that two individuals had directly reported to law enforcement that Geilenfeld had sexually abused them when they were children in the United States, and that the abuse occurred in a house and in a hotel room. *See* (ECF No. 14 at 3).

[6] Geilenfeld is 71 years old.

Release on Personal Recognizance" Doc. 8). Notably, Geilenfeld did not submit to the Court that he had *any* ties to the Southern District of Florida. Geilenfeld's counsel also **erroneously** advised the court that a grand jury in North Carolina issued a no bill after being presented with an indictment against Geilenfeld. *See id.* at 2. At the conclusion of the hearing, the magistrate judge advised that he was taking the decision under advisement and ordered probation to do an inspection of Geilenfeld's home.

Thereafter, on February 1, 2024, the magistrate judge resumed the detention hearing for a final time. (ECF No. 15). At the hearing, the court denied the government's motion for pretrial detention, and ordered Geilenfeld to reside at a halfway house on home detention with a GPS ankle monitor. *Id.* In doing so, the magistrate judge found that the home Geilenfeld had resided in prior to his arrest was not a suitable place for him to reside while on bond because of Geilenfeld's access to children. The government now appeals because the magistrate judge erroneously concluded that Geilenfeld was neither a risk of flight or a danger to the community, and that the government failed to prove that no condition or combination of conditions would reasonably assure Geilenfeld's appearance as required and the safety of any other person and the community.

## II.   LEGAL STANDARD

Upon motion by the government, a district court is permitted to review a magistrate judge's release order. *See* 18 U.S.C. § 3145(a)(1). The district court must conduct a *de novo* review of the release decision. *See United States v. Hurtado*, 779 F.2d 1467, 1481 (11th Cir. 1985); *United States v. Niles*, 874 F. Supp. 1372, 1374 (N.D. Ga. 1994) (citing *United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988)). Review by the district court contemplates an "independent consideration of all facts properly before it." *United States v. Gaviria*, 828 F.2d

667, 670 (11th Cir. 1987) (citing *Hurtado*, 779 F.2d at 1480-81). If the district court concludes after a careful review of both the parties' papers and the evidence presented at the detention hearing that the evidence supports the magistrate judge's findings of fact, and if the district court concludes that the magistrate judge correctly applied the law, "[t]he court may then explicitly adopt the magistrate's pre-trial [release] order." *King*, 849 F.2d at 490. However, if necessary, to the resolution of an essential issue of fact, the district court may marshal further evidence by convening a hearing. *Id.* at 491.

In moving for pretrial detention, the government must establish that the defendant is a danger to the community by clear and convincing evidence *or* a flight risk by a preponderance of the evidence. *King*, 849 F.2d at 489-491. The government need only demonstrate one or the other to justify detaining the defendant pending trial. *Id.* at 488. "The [Bail Reform] Act provides a rebuttable presumption of risk of flight or danger to the community when a defendant has been indicted for certain crimes." *United States v. Quartermaine*, 913 F.2d 910, 915 (11th Cir. 1990). "A grand jury indictment provides the probable cause required by the statute to trigger the presumption." *Id.* at 916. "Once the statutory presumption [is] raised, the defendant carries the burden of production to come forwards with evidence to rebut [it]." *Id.* "If the defendant fails to rebut either part of the statutory presumption (i.e., the risk of flight or danger to the community), pretrial detention is warranted." *United States v. Rivera*, 90 F. Supp. 2d 1338, 1342 (S.D. Fla. 2000), *aff'd*, 273 F.3d 397 (11th Cir. 2001). However, even if the defendant produces evidence "sufficient to rebut the statutory presumption, the presumption 'remains in the case as an evidentiary finding militating against release, to be weigh[ed] along with other evidence relative to factors

listed in section 3142(g).'" *Quartermaine*, 913 F.2d at 916 (quoting *United States v. King*, 849 F.2d at 488).

In determining whether there are conditions of release that will reasonably assure the defendant's appearance as required and safety of the community, the court must consider several factors, including the nature and circumstances of the offense charged; the weight of the evidence against the defendant; the defendant's history and characteristics; and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

## III. ARGUMENT

The evidence presented at the detention hearing firmly established that Geilenfeld is both a risk of flight and a danger to the community and another person and should be ordered detained pending trial. At the outset, the government notes that the grand jury charged Geilenfeld with Traveling in Foreign Commerce with the Purpose of Engaging in Illicit Sexual Conduct, in violation of 18 U.S.C. § 2423(b), triggering the rebuttable presumption that he be detained. *See* § 3142(e)(3)(E). Thus, Geilenfeld had the burden of producing evidence to rebut the presumption. Here, the record demonstrates that Geilenfeld failed to produce evidence to overcome the presumption, and, to the contrary, the government produced an abundance of evidence to sustain it.

### a. Risk of Flight

As established during the previous proceedings, Geilenfeld poses a serious risk of non-appearance based on his lack of ties to the Southern District of Florida, the significant prison sentence that he is facing if convicted, his prior history of evading Haitian law enforcement, his extensive foreign contacts, and his history of foreign travel. As to the first point, the

magistrate judge failed to consider Geilenfeld's lack of ties to *this district*, and the record does not support a finding that Geilenfeld has *any* ties to this district. "Ties to the community is one of the indicia that courts look to in evaluating the flight risk of a defendant." *Rivera*, 90 F. Supp. 2d at 1343 (citing 18 U.S.C. § 3142(g)(3)(A)). "The relevant community is, of course, the community in which the defendant faces prosecution." *Rivera*, 90 F. Supp. 2d at 1343.

Here, Geilenfeld only proffered facts to establish his ties to communities other than the Southern District of Florida. For example, in his initial motion for bond, Geilenfeld asserted that "he has insufficient funds to defend in Florida" and requested the case be transferred to Colorado. (ECF No 8 at 4). Moreover, in his subsequent filing and at the detention hearings, he proffered that he has resided in Colorado since 2019 and provided the court with character references from individuals residing in Colorado. *See* (ECF No. 13 at IV. Mr. Geilenfeld's Residence in Colorado and Ties to the Community). He also noted that he had a brother in Iowa. *Id.* However, as to this district—the *only* district relevant to the analysis—Geilenfeld did not proffer that he owned property here, regularly visited, had friends or family here, or provide *any* information that demonstrates that he has even minimal ties to this district. *See also United States v. Rodriguez*, No. 11-02454-MJ, 2011 WL 1467221, at *2 (S.D. Fla. Apr. 18, 2011) (noting that the defendants did not present "evidence of a single relative or business interest in the Southern District of Florida" and finding that their "ties to Orlando do not serve to rebut the presumption that they are flight risks from this district").

Likewise, Geilenfeld has significant ties to both the Dominican Republic and Haiti and has previously attempted to evade Haitian law enforcement. Specifically, prior to being indicted, Geilenfeld spent decades abroad in Haiti (and became fluent in Creole). In 2014, Haitian authorities arrested the Defendant and confiscated the Defendant's passport after

receiving complaints that the Defendant sexually abused children. A second arrest warrant issued in 2015. Rather than remain in Haiti to face further proceedings, the Defendant fled to the Dominican Republic in 2015 and has not returned to Haiti since. *See, e.g.,* (ECF No. 14-3 – Mandat D'Amener [Arrest Warrant] No. 394 (Oct. 29, 2015) (showing Geilenfeld being sought for rape and sexual assault); (ECF No. 14-4 – Customs & Border Patrol Flight Records showing Geilenfeld's flights out of the Dominican Republic to the United States and back beginning in 2015, whereas his flights for the fourteen years before 2015 had been out of and back into Haiti); (ECF No. 14-5 – Certificat de Greffe (June 2, 2017) with accompanying report stating that Arrest Warrant No. 394 was still in effect in June 2017); *see also* (ECF No. 14-2, Tr. of Deposition of Geilenfeld 94:20-95:25 (Sept. 14, 2022) stating that after he surrendered his passport to the Haitian court in connection with his abuse charges there, he got a new passport, took a bus to the Dominican Republic, and flew out of the Dominican Republic rather than trying to fly out of Haiti).[7]

Geilenfeld has also stated under oath as recently as September 2022 that he wants to return to the Dominican Republic: "all of my efforts is [sic] everyday to get back to the Dominican Republic because that is my wealth, that is my life, that is my everything." *See* (ECF No. 14-2 – Tr. of Deposition of Geilenfeld 45:15-19 (Sept. 14, 2022)). Geilenfeld's

---

[7] The Government has received a subsequent Certificat de Greffe, dated April 16, 2018, indicating that Arrest Warrant No. 394 was suspended on November 16, 2015. Other documents that the Government has obtained (and which it is in the process of obtaining approval to disclose), however, indicate that Geilenfeld was still subject to a Haitian arrest warrant, and the Government does not believe it has ever received a copy of the referenced "suspension" order among the voluminous set of French-, Creole-, and other-language documents it has received. Moreover, Geilenfeld's travel pattern—as reflected in his flight records and in his statement to this Court that he has not traveled to Haiti since 2015, see Def. Mot. For Release & Change of Venue, para. 10 (ECF No. 8)—reinforce that he was fleeing justice in Haiti.

13

ability to flee is not theoretical: Geilenfeld has extensive foreign contacts and has recently transferred large sums of money to individuals in the Dominican Republic and Haiti, including an individual who reportedly stabbed a victim in this case. Further, Geilenfeld maintains a network of loyal supporters in Colorado and across the United States, including his current landlord who facilitated some of his payments to foreign contacts.

Moreover, Geilenfeld faces a substantial prison sentence if convicted in the instant case—a factor which should be considered by this Court when determining whether he is a risk of flight. *See United States v. Burstyn*, No. 04-CR-60279-ALL, 2005 WL 2297605, at *4 (S.D. Fla. Mar. 18, 2005) ("The Court further notes that the potential penalty faced by a defendant is an incentive to consider flight."); *United States v. Allen*, 891 F. Supp. 594, 598 (S.D. Fla. 1995) ("The lengthy sentence presumptively provides [the defendant] with a strong incentive to flee."). Here, violations of 18 U.S.C. § 2423(b) are punishable by up to 30 years' imprisonment, and the government anticipates Geilenfeld's guideline range is life. The Defendant is also 71 years old, making a potential sentence a life sentence. Accordingly, the record establishes by a preponderance of the evidence that Geilenfeld is a risk of flight and that no condition or combination of conditions will reasonably assure his appearance as required.

### b. Danger to the Community and Another Person

Furthermore, the record conclusively demonstrates by clear and convincing evidence that Geilenfeld is a danger to the community and another person. Geilenfeld's crime is one of the most grievous in the criminal justice system—a crime involving the sexual abuse of children. *See* § 3142(g)(1) (enumerating the nature and circumstances of the offense, including whether it involves a minor victim, as a factor to be considered in bond determinations). As

proffered by the government, the nature and circumstances of the instant offense charged in the indictment involve Geilenfeld sexually assaulting *at least* four minor males who had been entrusted to his care.

Moreover, the victims and witnesses with whom the investigative/prosecution team has spoken have disclosed being threatened and bribed to, at best, maintain their silence and, at worst, recant their reports of abuse. The victims'/witnesses' fears of retaliation are well-founded, considering, among other things, that one of Geilenfeld's close associates ("Subject 2") stabbed one of the child residents, that the Defendant has continued to place Subject 2 in a position of power over children at his Dominican "mission" and continued to send Subject 2 money while the Defendant resided in Colorado, and that U.S. Customs and Border Patrol found the Defendant in possession of 11 hard copies of a photo array of victims/witnesses associated with the abuse allegations when he was turned away from the Dominican border in 2019.

Staying at a halfway house (or any other location short of a government-operated detention facility) is insufficient to reasonably assure Geilenfeld will not threaten, bribe, or otherwise unduly influence the victims and witnesses in this case, or harm other children.

Accordingly, because the government has demonstrated that the Defendant is both a risk of flight and a danger to the community, and that no condition or combination of conditions will reasonably assure his appearance as required and the safety of any other person and the community, this Court should revoke the magistrate judge's order pursuant to

18 U.S.C. § 3145(a)(1), and order that the Defendant be detained pending trial.

                                      Respectfully submitted,

                                      MARKENZY LAPOINTE
                                      UNITED STATES ATTORNEY

By: *[signature]*
                                      Lacee Elizabeth Monk
                                      Assistant United States Attorney
                                      FL Bar No. 0100322
                                      99 N.E. 4th Street, Fifth Floor
                                      Miami, FL 33132
                                      Telephone (305) 961-9427
                                      Lacee.Monk@usdoj.gov

                                      Jessica L. Urban
                                      Eduardo Palomo
                                      Trial Attorneys
                                      Child Exploitation and Obscenity Section
                                      U.S. Department of Justice
                                      1301 New York Avenue NW
                                      Washington, DC 20005
                                      Telephone: 202-305-1698
                                      E-mail: Jessica.Urban@usdoj.gov
                                      Email: Eduardo.Palomo2@usdoj.gov

                                      Attorneys for Government