```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
 3              CASE NUMBER 24-20008-CR-LEIBOWITZ
 4
       UNITED STATES OF AMERICA,
 5
                    Plaintiff,              Courtroom 12-2
 6
          vs.                               Miami, Florida
 7
       MICHAEL KARL GEILENFELD,             April 16, 2024
 8
                    Defendant.
 9
===============================================================
10        STATUS CONFERENCE and HEARING ON MAGISTRATE JUDGE'S ORDER
          DENYING THE GOVERNMENT'S MOTION FOR PRETRIAL DETENTION
11              BEFORE THE HONORABLE DAVID S. LEIBOWITZ
                      UNITED STATES DISTRICT JUDGE
12
===============================================================
13     APPEARANCES:
14     FOR THE GOVERNMENT:        EDUARDO A. PALOMO, AUSA
                                  United States Department of Justice
15                                1301 New York Avenue NW
                                  Washington, DC 20005
16                                              202-305-9635
17                                LACEE E. MONK, AUSA
                                  United States Attorney's Office
18                                99 Northeast Fourth Street
                                  Miami, Florida 33132
19                                              305-961-9000
                                           Fax: 305-530-7976
20
       FOR THE DEFENDANT:         R. D'ARSEY HOULIHAN, III, AFPD
21                                Federal Public Defender's Office
                                  150 West Flagler Street
22                                Suite 1700
                                  Miami, Florida 33130
23                                              305-530-7000
                                           Fax: 305-530-7120
24
       ALSO PRESENT:              HAROLD IGLESIAS, Probation Officer
25                                United States Probation Office
```

1  **REPORTED STENOGRAPHICALLY**
   **BY:**                    **GILDA PASTOR-HERNANDEZ, RPR, FPR, FPR-C**
2                             Official United States Court Reporter
                              Wilkie D. Ferguson Jr. US Courthouse
3                             400 North Miami Avenue - Suite 12-2
                              Miami, Florida  33128  305.523.5118
4                             gphofficialreporter@gmail.com
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**TABLE OF CONTENTS**

Page

Reporter's Certificate .................................... 57

**EXHIBITS**

| Exhibits | Marked for | | Received | |
| Description | Identification | | in Evidence | |
| | Page | Line | Page | Line |

(None)

1          (The following proceedings were held at 10:15 a.m.:)

2               THE COURT:  Good morning, again.  Please be seated.

3               Okay, Alex, thank you.

4               THE COURTROOM DEPUTY:  Calling Case Number 24-CR-20008,

5     the United States of America versus Michael Karl Geilenfeld.

6     Counsel, please state your appearance, beginning with the

7     Government.

8               MR. PALOMO:  Good morning, Your Honor.  Eduardo Palomo

9     and Lacee Monk on behalf of the United States.

10              THE COURT:  Good morning.

11              MR. HOULIHAN:  Good morning, Your Honor.  D'Arsey

12    Houlihan, Assistant Federal Defender, on behalf of

13    Mr. Geilenfeld, who's present before you.

14              THE COURT:  Good morning, Mr. Houlihan.  We have quite

15    a bit to do today in this matter.  I'm aware that, I believe it

16    was four or five days ago, five days ago, the grand jury

17    returned a Superseding Indictment.  Has the defendant been

18    arraigned on the superseder?

19              MR. PALOMO:  No, Your Honor.

20              THE COURT:  Okay.  So let's do that first.

21              Alex, if you would please swear the defendant.

22              THE COURTROOM DEPUTY:  Yes, Your Honor.

23              Mr. Geilenfeld, if you could please stand and raise

24    your right hand?

25         (The defendant was sworn in by the courtroom deputy.)

```
 1              THE DEFENDANT:  Yes, I do.

 2              THE COURTROOM DEPUTY:  Thank you, sir.  Please be

 3   seated.

 4   BY THE COURT:

 5   Q.  If you would please be seated and be comfortable and pull

 6   the microphone near you, sir.

 7              Mr. Geilenfeld, if you would please state your full

 8   name and spell your last name for the record?

 9   A.  Michael Karl Geilenfeld, G-e-i-l-e-n-f-e-l-d.

10   Q.  Thank you, Mr. Geilenfeld.  The same thing happens to me

11   with the microphone.  Feel free to adjust as needed.

12              How old are you, sir?

13   A.  72.

14   Q.  How far did you go in school?

15   A.  High school.

16   Q.  And you're obviously communicating with me in English.  Are

17   you able to speak and understand English?

18   A.  Yes.

19   Q.  Have you currently, or have you recently been under the care

20   of a physician or a psychiatrist, or have you been hospitalized

21   or treated for any narcotics addiction?

22   A.  No.

23   Q.  Have you taken any drugs, medicine or pills, or drunk any

24   alcoholic beverage in the past 24 hours?

25   A.  A high blood pressure pill.
```

1   Q.   Have you taken any medicine for that in the last 24 hours?

2   A.   Just whatever they gave me, one pill a day.

3   Q.   Okay.  Do you feel okay today, sir?

4   A.   Yes.

5   Q.   And you're hearing me okay and understanding me okay?

6   A.   Yes.

7   Q.   Okay.  And Mr. Houlihan, to your right, has been appointed

8   to represent you.  Are you aware of that, sir?

9   A.   Yes.

10          THE COURT:  Mr. Houlihan, any reason for me to at all

11  question the competency of us to go forward, that he understands

12  what we're doing here today?

13          MR. HOULIHAN:  No issues, Your Honor.

14          THE COURT:  Thank you.

15  BY THE COURT:

16  Q.   Mr. Geilenfeld, have you received a copy of the Superseding

17  Indictment which was returned by the grand jury on April 11,

18  2024?

19  A.   Yes.

20          THE COURT:  If you could place a copy of that --

21  Mr. Houlihan, do you have a copy?

22          MR. HOULIHAN:  Yes.

23          THE COURT:  If that could be placed in front of him.

24  BY THE COURT:

25  Q.   That document, sir, have you had time to consult with your

1   attorney about that document?

2   A.   Yes.

3   Q.   Do you want me to read that Indictment in open court or do

4   you want to waive the reading?

5   A.   I can waive the reading.

6   Q.   Okay.  How do you plead to the five counts contained in the

7   Superseding Indictment?

8   A.   Not guilty.

9        THE COURT:  Okay.  I'm going to direct my courtroom

10  deputy to please ensure that a plea of not guilty is entered

11  with respect to all five charges, five counts of the superseding

12  Indictment.  So thank you for that, Mr. Geilenfeld.  That's the

13  end of the arraignment.

14       Now, the next thing we need to do, on the Southern

15  District of Florida -- oh, I'm sorry, Mr. Houlihan.  Please.

16       MR. HOULIHAN:  Your Honor, just so it's clear, with

17  regard to the Superseding Indictment, we request entry of the

18  standing discovery order, demand trial by jury.

19       THE COURT:  Oh, yes, absolutely, Mr. Houlihan.  Same

20  discovery order and trial by jury, absolutely.  Thank you for

21  that.

22       So on Docket Entry 6 of the Southern District of

23  Florida docket, the United States has appealed the bail

24  determination in the District of Colorado.  I'm going to do that

25  now.  It's the Government's appeal and let me just -- before I

1  give both sides the opportunity to argue and submit anything

2  that they want, I just want to make sure that the record is very

3  clear in terms of the timeline in this case, and when I'm all

4  done, counsel can correct me if there is any error or

5  clarification that should be made in your presentation.

6          So the defendant was indicted on January 18th in a

7  one-count Indictment charging a violation of Title 18, United

8  States Code, 2423(b), as in boy.  The defendant was arrested in

9  the District of Colorado on the 20th of January.  At that time

10  he waived an identity hearing and there was a bail/detention

11  hearing held before the United States Magistrate Judge between

12  the dates of January 25th and February 1, 2024.

13          On February 1st, the magistrate judge issued a bond.

14  I'm not going to recite all of the conditions of the bond.  The

15  two high-level headline conditions were home detention at a

16  halfway house with GPS monitoring.  At that time the Government

17  requested a stay of that release order, and the stay was given.

18  On the 7th of February the United States appealed that release

19  order.  On the 20th of February the defendant was committed to

20  the Southern District of Florida.

21          Somewhere around the middle of March, he was still in

22  the District of Colorado, and on the 15th of March, the

23  Government in the Southern District of Florida -- there is an

24  entry on the docket -- they moved to stay that magistrate

25  judge's order.  Judge Williams granted that stay on the 15th of

 1 | March and the defendant, according to what I could tell from the
 2 | docket, arrived in the Southern District of Florida and was
 3 | arraigned by Magistrate Judge Reid on the 29th of March.
 4 |         So my record shows that he arrived in the Southern
 5 | District of Florida in late March.  He was arraigned on the
 6 | Indictment by Magistrate Judge Reid on the 29th of March and the
 7 | Federal Defender was appointed at that time.
 8 |         On the 8th of April this case was reassigned to me for
 9 | all purposes, and I set this hearing on the 11th of April.  That
10 | paperless order is on the docket.  I don't need to recite it.
11 | And then later that day, I believe the grand jury returned the
12 | superseder that Mr. Geilenfeld was just arraigned on.
13 |         With that, it's the Government's appeal.  I'll hear
14 | from the Government.
15 |         MR. PALOMO:  Your Honor, does the Court prefer that we
16 | address the Court from the podium?
17 |         THE COURT:  Whatever you're more comfortable doing in
18 | these kinds of hearings.  I think what's really important is
19 | that you're comfortable, both sides are comfortable, and that if
20 | you need to give anything to my courtroom deputy, maybe you want
21 | to be closer.
22 |         MR. PALOMO:  Just because I have got notes, Your Honor,
23 | and this thing comes up a bit higher.
24 |         THE COURT:  Not a problem.  Take your time.
25 |         MR. PALOMO:  I will do it from here.

1          THE COURT:  Take your time.

2          MR. PALOMO:  Good morning, Your Honor.  May it please

3  the Court.

4          Between the mid 1980's and approximately 2014, the

5  defendant, who's a U.S. citizen, operated an orphanage in Haiti

6  for impoverished, homeless and orphaned boys, and I don't know

7  how much the Court knows about the general conditions of Haiti.

8  It's one of the poorest countries in the western hemisphere, and

9  this is where the defendant operated his orphanage.

10          So the boys that he took in were the poorest of the

11  poor in already the poorest country.  He took them in and these

12  were people that turned to the defendant really as their last

13  hope in life for the most basic needs of life; food, shelter,

14  community.  The defendant used this position of trust for

15  decades to perpetrate very serious crimes against multiple minor

16  boys.

17          So over the course of the decades, beginning in the

18  kind of mid to late 1980's until approximately 2014, the

19  defendant sexually abused approximately 20 boys that lived with

20  him.  They were minors when he sexually abused them, and he

21  sexually abused them by penetrating their anuses with his penis

22  and penetrating their mouths with his penis.

23          In 2012 -- this is a fact that the Government is going

24  to reference a number of times to show the defendant's

25  willingness to influence witnesses.  In 2012, one of the

1    defendant's close associates, a man named Brunel Exza, stabbed

2    Minor Victim 2, it's referenced in the Superseding Indictment,

3    in the chest.  This was after that minor victim had reported

4    that the defendant had sexually abused him and after the

5    defendant had told that victim not to say anything.

6           This is part of the defendant's pattern.  He would

7    sexually abuse these children, he'd tell them, don't say

8    anything.  He would offer them money to not say anything.  He

9    would offer them other favors, and ultimately, if they said

10   something, he said, I'm going to cast you back out into the

11   street.

12          THE COURT:  If you could slow down, counsel.  I've read

13   quite of bit.  You're referencing a stabbing --

14          MR. PALOMO:  Yes, Your Honor.

15          THE COURT:  -- in 2012, and I think it's referenced in

16   the papers as being done by, quote, "Subject 2."

17          MR. PALOMO:  Yes, Your Honor.

18          THE COURT:  You gave that person a name.

19          MR. PALOMO:  That's right.

20          THE COURT:  Could you spell that name for the record?

21          MR. PALOMO:  It's got a number of different spellings.

22   The one that I see most commonly, the first name is B-r-u-n-e-l.

23   The last name is -- I have it spelled as Exza, E-x-z-a.

24          THE COURT:  That's fine.  That's fine for now.  I just

25   want to make sure that I'm following you.  You are referring to

1    what is referenced in the papers as Subject 2?

2           MR. PALOMO:  That's right, Your Honor.

3           THE COURT:  Later on, I believe after that stabbing

4    there are representations in the papers that money was sent to

5    Subject 2.

6           MR. PALOMO:  That's correct, Your Honor.

7           THE COURT:  Could you tell me about that?

8           MR. PALOMO:  So between 2015 and 2022, the defendant

9    sent Western Union wire transfers amounting to about $27,000 to

10   Brunel.

11          So the history between Brunel and the defendant is that

12   Brunel lived in the orphanage with the defendant for a while and

13   over time gained the defendant's trust and the defendant put him

14   in positions of responsibility in the orphanage.  Positions of

15   responsibility means responsibility in some loose form over the

16   children that lived in that orphanage.

17          So after the orphanage was shut down by Haitian Social

18   Services in 2014, the defendant crossed the border from Haiti

19   into the Dominican Republic and opened some form of humanitarian

20   mission there where he purported to provide aid to struggling

21   mothers and other vulnerable people.

22          THE COURT:  Before we get to the Dominican Republic,

23   counsel, and I apologize, you'll have -- all sides will have all

24   the time they need to make their presentation, but I just want

25   to make sure I'm following.

1          The Superseding Indictment includes dates -- counts

2    with dates from 2006 to 2010, and includes substantive counts in

3    2007, 2009, 2008, and 2008 [sic].  So I just want to make sure

4    that I'm following you.  With respect to Subject 2 and the

5    events you were relaying, you were saying 2012.

6          MR. PALOMO:  Yes, Your Honor.

7          THE COURT:  So is that conduct coming into the case

8    that's before us, or no?  It's only used for bail and detention

9    today?

10          MR. PALOMO:  We're going to file motions under 404(b)

11   and 414 as the case progresses.  It's likely that we will try to

12   reference that.  I think that that needs to be kind of sorted

13   out in briefing.

14          THE COURT:  Of course.

15          MR. PALOMO:  We haven't really polished that up yet,

16   but we do anticipate bringing it up at trial if the Court allows

17   it.

18          THE COURT:  Okay.  I just wanted to make sure.  That's

19   why we're going -- all sides, we're going to go really, really

20   slow today so that I understand.  But you're saying that 2012

21   conduct is potentially a motion under 404(b) of the Federal

22   Rules of Evidence, so it is part of this case.  It's not simply

23   going to a factor for bail and detention.

24          MR. PALOMO:  That's right, Your Honor.

25          THE COURT:  Okay.  Please continue.  Thank you.

1          MR. PALOMO:  And to expand on that a little bit more,

2    the defendant's characterization of what Brunel Exza did was --

3    I think it's in our attachment -- "to slash the throat or cut

4    the throat of one of these victims."  Now, Brunel ultimately

5    ended up stabbing this person in the chest.  He had to go to the

6    hospital, he was bleeding a lot.  He still has scarring from

7    that attack.

8          And after this happened, the defendant brings Brunel

9       over to the Dominican Republic with him to set up this

10      orphanage, and in his deposition basically says, "I

11      understand that Brunel attacked one of my victims like this,

12      or at least somebody that had reported that I had sexually

13      abused them, nevertheless I'm still going to trust this

14      person to operate my humanitarian mission in the Dominican

15      Republic caring over vulnerable people."

16          THE COURT:  Counsel, this is now around the time period

17    of 2015 --

18          MR. PALOMO:  To 2019, yes, sir.

19          THE COURT:  -- to 2019 in the DR and that I believe, if

20    I'm following the Government's argument -- and you'll let me

21    know if I'm not -- this is after, 2015 is after the Government

22    of Haiti issued an arrest warrant for the defendant related to

23    the St. Joseph's Home.

24          MR. PALOMO:  That's right, Your Honor.  Not to bounce

25    around too much, but staying in 2015, or let's say 2013 to 2014,

1    there were reports made by a separate group of victims who are

2    not contemplated in our Superseding Indictment who reported that

3    the defendant sexually abused them.  They report to Haitian

4    authorities, the defendant is arrested, and during a hearing,

5    the victims failed to show.

6          Now, the victims were never notified of this hearing

7    and the defendant was subsequently released.  His interpretation

8    is -- we can gather from the depositions that he's given, is

9    that this case was dropped or that he was somehow exonerated,

10   but these victims later on appealed this dismissal because they

11   were never provided the proper notice.

12         THE COURT:  Just to be clear, counsel, this is a

13   Haitian prosecution pre-2015, correct?

14         MR. PALOMO:  That's right, Your Honor.

15         THE COURT:  And we're going to get to this later, so we

16   might as well get to some of it now, and again, what this all

17   goes to is that the Court, under 3142(g), is going to consider

18   the four factors, and so I just want to make sure that I have

19   the Government's proffer very, very clear.

20         The victims or witnesses that were involved in what

21   you're now referencing as the Haitian prosecution, are any of

22   those people the four victims that are referenced as Victim 1

23   through Victim 4 in the Superseding Indictment?

24         MR. PALOMO:  No, Your Honor.

25         THE COURT:  Okay.  Completely different people.

1          MR. PALOMO:  That's right, Your Honor.

2          THE COURT:  Okay.  Please continue.

3          MR. PALOMO:  After his release from jail in Haiti, the

4    defendant made quick way to the Dominican Republic.  He didn't

5    come back to the United States.  He didn't cross over back to

6    the U.S. and then go to the Dominican Republic.  He took a bus

7    and crossed the land border into the Dominican Republic.

8          THE COURT:  How do you know that?

9          MR. PALOMO:  From investigation that was conducted by a

10   private investigator connected to a series of lawsuits for

11   defamation.

12         THE COURT:  Is that the main defamation case?

13         MR. PALOMO:  That would have been -- I don't want to --

14   I'm not sure which case it was attached to, Your Honor.

15         THE COURT:  Is it the defamation case where ultimately

16   the Court found that there was no jurisdiction for the

17   defamation case?

18         MR. PALOMO:  I'm not sure specifically which one.

19   There is currently a pending defamation case in the state of

20   Georgia against Ms. Valerie Dirksen.  The prior one that you're

21   referencing, Your Honor, was against Paul Kendrick, so...

22         THE COURT:  That's the one I'm referencing.  That's

23   right.

24         MR. PALOMO:  I'm not sure which one it was.  Because

25   the facts of these cases are very similar, they're pretty

1  closely tied, it's sometimes tough for me to remember.  If we

2  talk about discovery later on, discovery in this case is

3  voluminous, so I don't remember exactly which.

4        THE COURT:  So let me tell you why I'm doing this and

5  why I'm always interrupting counsel as you go through, is that

6  what I want to make sure that the record is very clear about at

7  all times is your case now, this Superseding Indictment, and its

8  evidence and its witnesses versus the other litigations that may

9  have been out there.

10        So with Haiti you said different victims and witnesses.

11  With respect to the Kendrick case, with respect to the Georgia

12  case, any overlap with your victims?

13        MR. PALOMO:  Not with the victims named in the

14  Indictment, Your Honor.  As this case progresses to trial,

15  there's a possibility that we would call some or all of those

16  people as 414 witnesses, so...

17        THE COURT:  Like modus operandi?

18        MR. PALOMO:  414 would just be other sexual abuse of

19  minors, and the rule says for any purpose.

20        THE COURT:  Okay.

21        MR. PALOMO:  I generally offer that under the purposes

22  outlined in 404(b), but this would show plan, motive, intent,

23  design.  So there's a good possibility, without committing to a

24  Witness List today, that those witnesses would testify at this

25  trial.

1          THE COURT:  I hear you and I'm not committing you to

2    anything today.  What I want to underscore is that what changed

3    in this Court's eyes five days ago is this Superseding

4    Indictment.  The Government is now -- unless you tell me

5    differently, you are now proffering that as part of this case,

6    four separate human beings are going to testify about the

7    conduct you described in this trial.

8          MR. PALOMO:  That's right, Your Honor.

9          THE COURT:  And those four human beings -- at minimum,

10   four human beings who are alleged to be victims of serious,

11   serious violent conduct in the Indictment, they are not people

12   who have testified before in these other litigations that you're

13   referencing.  It's okay if they have.  I just want to know if

14   they have.

15         MR. PALOMO:  They have not testified before, Your

16   Honor, and I'll note that Minor Victim 2 was the one that was

17   stabbed by Brunel Exza.

18         THE COURT:  Okay.  Please continue.

19         MR. PALOMO:  So while the defendant was in the

20   Dominican Republic, he set up his humanitarian mission there.

21   In 2019, he was in the United States and he was flying back to

22   the Dominican Republic and he was turned away by the Dominican

23   Republic at the request of U.S. law enforcement.

24         When he was stopped at that border, he had in his

25   possession this dossier --

1           THE COURT:  Yes.

2           MR. PALOMO:  -- with the faces and names and other

3    information about other witnesses in these various legal

4    proceedings.  Now, this is before the Indictment that we're here

5    for today or the superseder.

6           THE COURT:  Yes, this is in May of 2019, when the photo

7    array is on his person and pulled by CBP?

8           MR. PALOMO:  That's right, Your Honor.

9           THE COURT:  So you know where I'm going, counsel.  Any

10   of the four victims referenced in the Superseding Indictment,

11   are any of them in the photo array?

12          MR. PALOMO:  May I confer with counsel briefly?  I just

13   want to make double sure.

14          THE COURT:  Yes.  Take your time.

15          MR. PALOMO:  I'm going to briefly confirm, Your Honor,

16   I believe that two of them were, but I can confirm that very

17   quickly --

18          THE COURT:  Take your time.

19          MR. PALOMO:  -- I think.

20          THE COURT:  I am allowed, under cases like Gaviria to

21   proceed by proffer.  As Mr. Houlihan and the United States

22   Attorney's Office well knows, that has been the case in the

23   Eleventh Circuit for decades, but I can assure you, whether I'm

24   a new judge or an old judge, I intend to hold counsel to their

25   proffers very, very precisely.  So take your time because I'm

1    allowed to proceed by proffer.

2        MR. PALOMO:  Your Honor, out of the interest of time,

3    as I said earlier, discovery is relatively voluminous here.  I

4    can find that, but I think right now kind of under the gun, it

5    might be probably a bit more time than would be reasonable.

6        THE COURT:  I appreciate that counsel will withhold a

7    proffer rather than give a wrong proffer.

8        MR. PALOMO:  That's right.

9        THE COURT:  So please continue.  The photo array is

10   pulled off of him by CBP in May of 2019.

11       MR. PALOMO:  Correct, Your Honor, and the conclusion to

12   be drawn from that is, he was attempting to investigate his

13   civil lawsuit, but more appropriately, he's traveling there

14   alone, not in the presence of counsel, not with a private

15   investigator.  The conclusion that the Government draws from

16   that is, he intended to contact these victims directly, or to

17   have one of his associates in the DR, an associate in Haiti

18   reach out to these people to talk to them.

19       Given his prior exhortations to victims to not report,

20   offering them money, with these threats that they be evicted

21   from the orphanage, with the attack that Brunel Exza

22   perpetrated, it's reasonable to conclude that his purpose in

23   assembling that dossier and bringing it to the Dominican

24   Republic with him was to intimidate victims to not testify

25   against him.

1              Now, he was turned away from the Dominican Republic in

2    2019.  He had been living there for four years.  Where was he

3    going to go next?  This is a point in the argument where we

4    think about the defendant's ties to the community.

5              So he went to Iowa for a little bit, but ultimately

6    settled in Colorado.  He didn't purchase real estate there, he

7    didn't sign a rental agreement, he didn't have stable

8    employment.

9              He went to live with one of his supporters.  So this

10   supporter that he lived with was somebody that had been giving

11   him money for quite a number of years who he met in Haiti.  When

12   he comes back to the United States, he reaches out to his

13   community of supporters to find somebody that will take him in,

14   and he does.  He lives with this woman for the next three to

15   four years until he's arrested.

16             Now, when he was giving a deposition for his Georgia

17   case, he said that all of his efforts -- and I'll quote from

18   that -- "All of my efforts every day is to keep working to get

19   back to the Dominican Republic because that is my wealth, that

20   is my life, that is everything."

21             THE COURT:  That's the September 2022 deposition,

22   right, counsel?

23             MR. PALOMO:  That's correct, Your Honor.

24             THE COURT:  And that was in connection with, I believe,

25   what you called the Kendrick's defamation case?

1           MR. PALOMO:  That's the Valerie Dirksen suit, Your

2    Honor.

3           THE COURT:  Thank you.  So in a different defamation

4    case in Georgia, that's the sworn statement.

5           MR. PALOMO:  That's right, Your Honor.

6           THE COURT:  Okay.

7           MR. PALOMO:  He says this while he's living in

8    Colorado.  His stated aim is to get back to the Dominican

9    Republic.

10          Now, as the Court knows, there's a presumption in this

11   case in favor of detention, but in addition to that presumption,

12   the nature and circumstances of this offense are inherently

13   aggravating.  We're talking about the sexual abuse of four

14   victims in this Indictment over the course of approximately 30

15   years of sexual abuse of nearly 20 children.

16          This speaks to the strength of the case, that we have

17   multiple, multiple people reporting that the defendant had

18   sexually abused them in essentially the same way.

19          Now, his risk of nonappearance, in the Government's

20   view, is substantial.  In addition to stating that his goal is

21   to return to the Dominican Republic, since 2015 he has

22   transferred over $400,000 on Western Union to various

23   individuals in other countries, including that $27,000 to Brunel

24   Exza.

25          Now, I'm not really sure how this squares with the

1   defendant's statement that he lacks funds.  He has access to

2   substantial funds and his bank records show that.

3          THE COURT:  Can you give me a sense of -- let's talk

4   about that for a second.

5          Do you have any, even a conservative summary of the

6   number and amount -- number of times funds were transferred and

7   the amount that was transferred over the course of this case?

8          MR. PALOMO:  Approximately 700 transfers from 2015

9   until 2022, totaling about $400,000.  Some of those transfers

10  are in Haitian gourdes, so it's tough for me to get the number.

11  I estimate between 4 and $500,000.

12         THE COURT:  And just to be clear, because of the time

13  period that you gave, those are transfers to people in Haiti or

14  people in the DR?

15         MR. PALOMO:  Both, Your Honor.

16         THE COURT:  Both.  Okay.  Thank you.

17         MR. PALOMO:  To Brunel he transferred, I think,

18  approximately $27,000 over 70 transactions.  He's frequently

19  sending money to these people and this makes sense because he

20  is -- Brunel is operating his mission in Haiti, continuing that

21  work in Haiti, continuing to be plugged into that network of

22  supporters in Haiti -- I'm sorry, in the Dominican Republic.

23         Now, the defendant has fled criminal prosecution

24  before.  The circumstances under which he left Haiti are very

25  questionable.  He claims that this arrest warrant was withdrawn.

1    The Government is not aware of an arrest warrant being

2    withdrawn.  I think quite the opposite.

3          As attached to the Government's pleadings in Colorado,

4    Exhibit 3 shows an arrest warrant that appears to be active, and

5    then the statements of that private investigator in Exhibit 5 to

6    that pleading indicate that that arrest warrant is and was

7    active.  And this squares with what the defendant has said about

8    not wanting to return to Haiti because he fears that he'll be

9    arrested, or to put a different spin on it, he's afraid that

10   he'll have to appear for prosecution.  Instead of appearing to

11   hear those charges and to meet them, he fled to the Dominican

12   Republic.

13         Now, the Court should consider what he left in Haiti in

14   2015 when he went to the Dominican Republic.  He left his life's

15   work in Haiti.  He had been working there for almost 30 years --

16   more than 30 years.  He operated an orphanage and had

17   substantial contacts in Haiti, and all of that goes away when

18   he's under threat of criminal prosecution.  He's not going to

19   return to Haiti because he fears prosecution there.

20         To this district, though, how different is that?

21         Does he leave behind a life's work in Miami?  Does he

22   have the substantial network of supporters here?  Does have any

23   ties to this district at all?  No.  He has no family here.

24   There are no social ties.  He's not employed here.

25         Coupled with his history of fleeing prosecution and his

1   stated interest to go back to the Dominican Republic, and the

2   number of money transfers going to various people that support

3   him around the world, this presents a substantial risk of

4   nonappearance, Your Honor.

5           THE COURT:  Counsel, while we're on Miami, the five

6   counts of the Superseding Indictment, I'd just like to get a

7   general sense of let's call it venue proof.

8           MR. PALOMO:  Yes, Your Honor.

9           THE COURT:  Obviously, the Indictment shows that he's

10  flying in and out of Miami International Airport.  Apart from

11  that, is there any other evidence that is, let's call it

12  Southern District of Florida specific, or is that it?

13          MR. PALOMO:  That's it, Your Honor.  The travel,

14  especially with respect to Count 1, the 2423(b) count, that

15  would be the unit of prosecution; for the (c) counts, it would

16  be the travel and hands-on sexual abuse.

17          So his ties to the district, the Southern District of

18  Florida, Your Honor, are just that he traveled out of here.  He

19  doesn't have any other ties keeping him in this district, and

20  he's represented before, through counsel, that he lacks the

21  funds to defend a case in Miami.

22          Again, that's kind of difficult to square with the

23  amount of money that he's moving on Western Union, but the point

24  remains that he believes that he's not financially able to

25  travel from Colorado to Miami.  In view of the Court's

1  preference that the defendants appear in person, this makes it

2  very difficult for the defendant to appear in person for

3  hearings in this matter.

4       THE COURT:  If you know, what was the date of the last

5  transfer?  How recent is the last transfer?

6       MR. PALOMO:  It was in late 2022, Your Honor.

7       THE COURT:  Okay.  Let me ask you what -- and then I'll

8  ask you to sum up.  I notice in the Government's recent response

9  to the standing discovery order filed at document 22 -- let's

10 see -- Part F, you state that the defendant was identified in a

11 photo array by victims and witnesses, and you cite, from my

12 count, seven different photo arrays in that case.

13      MR. PALOMO:  Yes, Your Honor.

14      THE COURT:  I'd like to get a sense, not holding you to

15 it -- the defense is going to have their turn and there may, in

16 fact, be litigation about those arrays in this case, I don't

17 know, but I just would like to get a sense of when those arrays

18 were done.

19      MR. PALOMO:  I can't remember off the top of my head,

20 Your Honor.

21      THE COURT:  Let me say it this way:  Were they more

22 recent or were they old arrays?

23      MR. PALOMO:  These were probably older in -- I'd say

24 they are 2019 or before.  These were photo arrays that were

25 shown to victims that were interviewed in maybe 2019 or 2020.

1          THE COURT:  Are any of the arrays shown to Victim 1

2    through 4?

3          MR. PALOMO:  I believe so, Your Honor.

4          THE COURT:  Okay.  Thank you.  You can sum up.

5          MR. PALOMO:  So going to the magistrate judge's

6    hearings in Colorado, the Government believes that the

7    magistrate judge was persuaded by a number of misrepresentations

8    by defense counsel.

9          THE COURT:  The No True Bill, for example.

10         MR. PALOMO:  Right.  So I struggle to believe how

11   someone that's been practicing law for as long as that attorney

12   had doesn't know the difference between a True Bill, a No Bill,

13   or just a grand jury subpoena.

14         THE COURT:  Yeah.  It's a North Carolina case that was

15   referenced, I think, before a magistrate.

16         MR. PALOMO:  That's right, Your Honor.

17         THE COURT:  Just to be very fair, Mr. Houlihan didn't

18   do that, that was predecessor counsel, but to be clear, it is

19   the Government's now emphatic position that there was no such

20   thing as a No True Bill out of the District of North Carolina.

21         MR. PALOMO:  That's correct, Your Honor.

22         THE COURT:  Okay.

23         MR. PALOMO:  So prior counsel also referenced facts

24   like this case started in 2011.  The defendant's sexual abuse

25   began in 1987 or earlier.

1    In his deposition, he acknowledges that he has been

2  accused of sexually abusing children in 1987, 1990, 1995, 2004,

3  2006 and 2007, in addition to the sexual abuse that forms the

4  basis of the Superseding Indictment.

5    The magistrate judge was concerned about delay in this

6  case, and that's not a factor that shows up in 3142.

7    I'm troubled by this idea that delay should always

8  somehow militate against a finding of detention, or that it

9  should imply that the Government didn't care, or that the

10 Government doesn't believe that the defendant is a flight risk

11 or a danger to the community.  That ignores the realities of

12 disclosures of sexual abuse.  That ignores very specific

13 circumstances in this case.

14    The fact of the matter is, the Government charged this

15 case when we believed that we had proof beyond a reasonable

16 doubt so that we could convict the defendant at trial.  We

17 weren't going to jump the gun and indict this man so that we

18 would have a better argument at detention.  Right now the facts

19 that we're proffering are sufficient to enable this Court to

20 order that the defendant be detained.  Specifically, that

21 there's no combination of conditions that would reasonably

22 assure his presence.

23    This idea of a halfway house in Colorado, at minimum,

24 doesn't solve the issue of getting him to Miami.  That seems to

25 be a relatively extraordinary measure that's inapposite to the

1  facts of this case.

2         So we are also not even sure that this arrangement was

3  ever confirmed in Colorado.  I have not seen any docket entries

4  or any communications from the Court there or from Pretrial

5  Services that there are beds available at a halfway house or

6  what that would even look like.

7         This also suggests that he would travel back and forth

8  from Colorado to Miami without supervision.  There's no

9  provision saying that he would be supervised or unsupervised

10  when he's traveling.  If he's experiencing financial hardships

11  and he's traveling by bus, who is to say that he wouldn't be

12  sitting next to a child there?

13         There's really no reasonable way to monitor him under

14  that arrangement for a trial that's going to proceed in the

15  Southern District of Florida.

16         So to sum up, Your Honor, the Court should take

17  seriously the defendant's stated desire that all of his effort

18  every day is to get back to the Dominican Republic.  That's his

19  wealth, that's his life, that's his everything.  He presents a

20  serious risk of nonappearance, and the Court should revoke the

21  magistrate judge's order ordering the defendant released and

22  order the defendant detained.

23         THE COURT:  Thank you, counsel.

24         MR. PALOMO:  Thank you, Your Honor.

25         THE COURT:  Just before I get to Mr. Houlihan -- and,

1  Mr. Houlihan, take your time setting up, sir -- I just want to

2  make sure from the Government, and it's also to Mr. Houlihan,

3  too, but he's about to get started, so he'll incorporate this if

4  he wishes; but in my order setting this hearing, in addition to

5  whatever was submitted in the District of Colorado, I invited

6  both sides to submit any additional memoranda, evidence, or even

7  live witnesses if they wanted to do so.

8       There's nothing wrong with simply proceeding by

9  argument and proffer, just as Government counsel just did, but I

10 just want to make clear, I invited both sides to do that, and

11 having not heard anything other than argument and proffer from

12 the Government, I'm going to assume that there is no additional

13 exhibits or witnesses that will be forthcoming in this hearing.

14      So with that, Mr. Houlihan, please proceed, sir.

15      MR. HOULIHAN:  Your Honor, we have a gentleman here who

16 is 72 years old, who has no prior contacts with the criminal

17 justice system, no convictions, no charges.  He's dedicated his

18 life to serving the poor and the indigent starting with his

19 employment working with Mother Teresa's organization.

20      You know, the amount of information involved in this

21 case is substantial and, unfortunately, I've only had a limited

22 time to become or to start to become familiar with it.  After

23 the case was assigned to Your Honor, there was some

24 consideration in my office that the case was going to be

25 reassigned to a lawyer in Broward.  Ultimately, the

1  determination was made not to do that, but that sort of

2  confusion has created some problems.  I've got a ton of material

3  to review and, candidly, I'm still reviewing it.

4          As Your Honor is aware, there were allegations against

5  Mr. Geilenfeld previously.  Rather than just ignore it, as

6  someone who presumably was guilty of the offenses would do, he

7  filed a lawsuit, and ultimately the case was reversed, but there

8  was a trial.  There was voluminous discovery taken by both

9  sides.

10         THE COURT:  This is the Kendrick defamation case in

11  Maine?

12         MR. HOULIHAN:  The Kendrick defamation case, and he was

13  represented by counsel vigorously.  He had an insurer who was

14  going to be on the hook for a substantial sum of money.  So it's

15  not like this was, you know, sort of a one-sided affair.

16         He had an attorney.  They investigated.  They took

17  depositions.  The case went to trial.  The jury heard it and the

18  jury returned, as I understand it, one of the largest, if not

19  the largest defamation award in the history of Maine, over 14

20  million dollars.

21         THE COURT:  Until it was brought to zero.

22         MR. HOULIHAN:  Correct, Your Honor, and it was reversed

23  based on a lack of diversity.  So there was a trial, witnesses

24  were presented, a jury heard those witnesses.  A jury made that

25  determination that this individual should pay 14 million dollars

1   as a result.

2          My understanding is that subsequently, based on

3   jurisdictional grounds, not on the facts of the case or anything

4   like that, it was reversed.  However, Mr. Geilenfeld's attorneys

5   filed suit in State Court and ultimately the case was settled.

6          THE COURT:  Maybe you can help me, counsel, and I

7   understand and greatly respect that you have not had attachment

8   to this case for as long as the Government attorneys, but the

9   defamation case, Kendrick himself -- was Kendrick in the

10  defamation case, if you know?  Was he alleged to be a victim?

11  Was he saying, I'm a victim of the kind of crimes that are being

12  alleged here by four others, or was he -- in other words, what

13  was the defamation about?

14         MR. HOULIHAN:  The defamation, as I understand it, is

15  that Mr. Kendrick was putting allegations out on the Internet

16  that Mr. Geilenfeld was engaged in sexual misconduct in Haiti,

17  and Mr. Geilenfeld vigorously denied it.  I believe he had

18  communication, I don't know how significant, with this

19  individual, but the abuse and harassment continued until the

20  lawsuit was filed.

21         THE COURT:  So let me elucidate why I'm asking very

22  specifically about that case because you brought it up, and I

23  understand why you brought it up.  It's makes sense, but there's

24  nothing in that record, even putting aside that the award was

25  taken to zero because of lack of diversity, even on its face,

1   there's nothing in that record, even it was fully credited, that

2   I can tell has anything to do with the four victims that are at

3   the crux of Counts 2 through 5 in this case.

4         So in other words, even if Kendrick was getting, you

5   know, straight statements from other people from the St.

6   Joseph's Home in Haiti, and was saying exactly what they said,

7   and then the inference would be that was defamatory, I am not

8   aware of any connection that that would have even given all of

9   that inference to the Kendrick case.

10        I am unaware how it touches the four victims at the

11  heart of the counts in this case, and I say that because if I'm

12  wrong, you should tell me.  If he was getting information from

13  one of these four victims and those statements were held by the

14  jury to be defamatory, obviously that's going to be fodder for

15  the criminal trial in this case, but more importantly, for today

16  that has bearing.

17        If you don't know the answer to that, that's fine, but

18  I would be remiss if I didn't ask it.

19        MR. HOULIHAN:  I don't know the answer to that.  If

20  Your Honor is saying that unless it's the same individuals who

21  were making these previous allegations, then it's not relevant

22  to the current case.

23        THE COURT:  What I'm saying, counsel, is that the

24  Government five days ago -- and I want to be very fair to you,

25  Mr. Houlihan, again, because you're stepping into the case later

1    in the day.  So I want to be fair to Mr. Geilenfeld and his

2    current counsel.  It is a very different story for purposes of

3    today if you were coming up here saying, well, you know, in

4    these counts, they were at the bottom of -- or at least some of

5    them were at the bottom of the defamation cases that were held

6    to be defamatory.  That's very different than just saying, well,

7    there was a case about people saying things about the St.

8    Joseph's Home for Boys, had nothing to do with these four

9    people, but that stuff in Maine was held to be defamatory.  I

10   just want to make sure I am being clear.

11          In other words, you would be essentially saying this is

12   a relitigation.  I don't hear that that's what you're saying,

13   and just like I did for counsel for the Government, I expect

14   proffers to be very, very precise because we're going to go by

15   proffer here.

16          So I just want to make sure -- it's not your fault,

17   Mr. Houlihan, if you can't answer that or don't know the answer

18   to that, or if the answer is just no, but I just want to make

19   sure that -- you know, people throw around the Georgia case and

20   a Maine case and, frankly, the Government says things like 20

21   people have said.  All that is very interesting and I'm sure

22   will be a part of pretrial litigation, but for purposes of

23   today, I just want to make sure that you understand where I'm

24   coming from.

25          We have specific charges that, in my experience when I

1    was sitting in the AUSA's chair, they are specifically

2    proffering that four human beings are going to come in, and

3    they're going to point the finger at your client about what can

4    only be described as extremely violent acts.  That, as far as I

5    understand from the record, has nothing to do with Maine, has

6    nothing to do with Georgia.

7         Now, if I'm wrong, please, right?  But I'm saying this

8    for your benefit, Mr. Houlihan.

9         MR. HOULIHAN:  I understand, Your Honor.  As Your Honor

10   points out, the Superseding Indictment came down on Thursday.  I

11   had an opportunity to discuss the allegations for the first

12   time, with Mr. Geilenfeld, in the Superseding Indictment

13   yesterday.  There's no way for me to know.

14        THE COURT:  That's fine, Mr. Houlihan, and I respect

15   that.  Like Government counsel, you're only going to proffer

16   what you know and what you can be precise about, and if

17   circumstances change, under the Bail Reform Act, if the

18   Government's proffer turns out to be not worth the paper it's

19   printed on, that's a changed circumstance and you'll learn more

20   about the case, and if it is a material change, you can bring it

21   to the Court's attention.

22        But for purposes of today, I appreciate that you are

23   bringing up defamation cases, but you are not proffering that

24   those defamation cases, to your knowledge today, have a

25   connection to the five counts of the superseder.

1          MR. HOULIHAN:  No, no, Your Honor.  Again, it's

2     difficult to be precise given the posture.  I haven't received

3     discovery yet but, you know, my understanding is these

4     allegations have been made -- were made by an individual in

5     Maine.  If they are not, you know -- if the allegations of other

6     people are not relevant to these particular charges, I

7     understand, and that's certainly an argument that I'll be making

8     should the Government file a 404(b) notice.

9          THE COURT:  I'm sure.

10          MR. HOULIHAN:  But there is some information, I want to

11     be clear that, you know, there's a certain amount of --

12     speculation is probably the wrong word but, you know, we don't

13     have direct information at this point, but the allegations

14     against Mr. Geilenfeld seem to stem from two individuals in the

15     United States who have a connection, the gentleman in Maine and

16     this woman in Georgia.

17          They have been making allegations against

18     Mr. Geilenfeld for many years, and the only time that these

19     allegations have been put to the test was in Maine.

20          THE COURT:  Understood.

21          MR. HOULIHAN:  So I think that's important to consider.

22          Mr. Geilenfeld, you know, he does not have a -- he

23     doesn't have a normal job.  He was offered a place to live by a

24     pastor who resides in the Denver area.  He's been living for

25     several years in a studio apartment in the home of a woman who's

1    a parishioner at that pastor's church.

2         He's been taking care of his landlady who is elderly

3    and has diminished mobility.  He assists -- he has been

4    assisting her with her daughter who has significant physical

5    disabilities.  He goes to church every day.  He assists the

6    family that he lives with.  He walks dogs and he does odd jobs.

7    You know, this is a gentleman who does not have significant

8    means.

9         With regard to his transportation from Denver to Miami,

10   what we would suggest is release to a halfway house in Miami.

11   He's going to need to be here in Miami, particularly since the

12   Government has sought a protective order that prevents him from

13   having even a copy, a single page of the thousands of pages of

14   discovery.  So in order for him to prepare for trial, he's going

15   to have to be close.

16        I've had cases like this where -- well, I shouldn't say

17   like this, but I have had situations where individuals are

18   homeless, for example, and have gotten a bond that allows them

19   to reside at a halfway house when they don't have a stable

20   residence of their own.

21        He's elderly.  He would surrender his travel documents.

22   The Government has already demonstrated that they have the

23   ability to reach out to foreign countries and bring him back to

24   the United States.  They've done it before.  As they indicated

25   in their proffer, they reached out to the Dominican Republic and

1  requested that he not be allowed to enter, and he wasn't, and he

2  was returned to Miami and he was questioned.

3      Given his lack of priors, given his age, you know,

4  given the difficulty that he would face in attempting to flee,

5  Judge, I think that the magistrate judge who heard the evidence

6  in Colorado came to a reasonable conclusion and set a bond that

7  would assure that he was present as requested, and we would ask

8  that the Court set the same bond with the same conditions that

9  the magistrate judge set in Colorado, with the modification that

10 he be placed in a halfway house in Miami and, of course, we

11 would not seek to have him released until probation was able

12 give the Court the name of the facility and that a bed was

13 available.

14      I've had that sort of thing done in other cases where

15 judges have released individuals to drug programs, for example.

16 They remain in custody until the bed becomes available, and they

17 get transported directly there.  It's something that we do with

18 regularly here and can be done in this case.

19      THE COURT:  Thank you, counsel.  Anything else?

20      MR. HOULIHAN:  No, Your Honor.

21      THE COURT:  Thank you very much, sir.  Very briefly

22 from the Government.

23      MR. PALOMO:  Yes, Your Honor.  I just pulled up that

24 dossier that he had and at least two of the victims contemplated

25 in the Superseding Indictment were on this.  There are at least

1   another three other people who likely, if we can get them to the

2   U.S., will be witnesses, in addition to a number of other people

3   that have played various roles in the prior civil litigation.

4        And just the last thing to point out, the defamation

5   lawsuits that the defendant was litigating in Maine and in

6   Georgia involve statements made by third parties who are not

7   going to be witnesses in this trial.  It's really a red herring

8   here.  These are statements that other people made.  I don't

9   know what they knew at the time that they made those statements,

10  but that's beside the point.

11       What we have today are four victims that have reported

12  to U.S. law enforcement that the defendant sexually abused them.

13  There is no --

14            THE COURT:  Thank you, counsel.

15            MR. PALOMO:  Yes, Your Honor.

16            THE COURT:  Thank you.  Okay.  Yes, sir.

17            MR. HOULIHAN:  I'm sorry.  I can't see you so --

18            THE COURT:  That's okay, counsel.  I'm glad you did it.

19  Up in Fort Lauderdale they don't have such fancy contraptions.

20            MR. HOULIHAN:  Judge Moreno is very proud of his two

21  podiums.

22            THE COURT:  Is that better, sir?

23            MR. HOULIHAN:  Yes.

24            THE COURT:  I am pretty short, so you have to struggle

25  but -- okay.

1          So the record is clear, and because this started in

2  another district, I want to make sure that the record is clear.

3          Prior to today, I have reviewed the transcripts of the

4  detention hearing held in the District of Colorado from January

5  25th to February 1st.  Those are docketed on the Southern

6  District of Florida case number at Docket Entry Number 8.  I've

7  reviewed the Pretrial Services Reports prepared in the Southern

8  District of Florida and in the District of Colorado.  To the

9  best that I can tell, the District of Colorado report is

10 docketed on the Colorado magistrate docket.  It might be Docket

11 Number 16, but I can't tell for sure, but I want the record to

12 show that wherever it's docketed or not docketed, I have

13 reviewed the Pretrial Services Report in both districts.

14         I've also reviewed the Government's post-hearing

15 Memorandum in Support of the Motion for Detention.  That was

16 docketed at Docket Entry Number 14 on the District of Colorado

17 docket.  For the record, that's 24-MJ-12-MH.  I've also reviewed

18 Defense Motion for Release on Personal Recognizance and

19 Determination of Venue.  That's docketed at Docket Entry Number

20 8 on the District of Colorado docket.

21         In addition to that, I have, of course, considered the

22 arguments of both sides today at this hearing, and as well, I

23 have considered the Government's appeal docketed at Docket Entry

24 Number 6 in the Southern District of Florida as well.

25         As all the parties know, this is a review of a release

1    order that the Government sought under 18 U.S.C. 3145.  Under

2    Section 3142(e), detention is only to be ordered if the Court

3    finds no combination of conditions will reasonably assure the

4    appearance of the person and the safety of the community.

5            The Government initially has the burden to establish by

6    a preponderance of the evidence risk of flight, or by clear and

7    convincing evidence, danger to the community.  My understanding

8    very clearly -- the clear understanding of today is that the

9    Government is seeking detention based on both grounds.

10           Now, in this case, this is what is known under Federal

11   law as a presumption case.  The Bail Reform Act, 18 U.S.C.

12   3142(e)(3)(E) states because this Superseding Indictment charges

13   an offense "involving a minor victim" in relevant part under

14   Section 2423 of Title 18, this is a presumption case, so the

15   presumption shifts, the burden, to the defendant in this case.

16           So subject to rebuttal by the defendant, under

17   3142(e)(3), it shall be presumed that no condition or

18   combination of conditions will reasonably assure the appearance

19   of the person as required and the safety of the community.

20           I note under case law that these learned counsel are

21   well aware of, they go back to the 1980's and it's basically a

22   catechism in this district and circuit, that my review is de

23   novo and I am conducting an independent appraisal of all of the

24   evidence.  I have considered all of the documents and

25   submissions, and under cases such as Hurtado in the Eleventh

1  Circuit, Gaviria in the Eleventh Circuit, I am perfectly

2  permitted under the law to proceed by proffer, but the

3  Government has also submitted some exhibits that were helpful in

4  their memorandum.

5       Finally, even if the defendant overcame the

6  presumption, the presumption remains as a factor in the analysis

7  under 3142(g), the four-factor analysis that I have considered

8  in this matter as to whether there is any combination of

9  conditions that will reasonably assure the appearance of the

10  defendant and the safety of the community.

11       Those 3142(g) factors are:  The nature and

12  circumstances of the offenses charged -- let me just do each one

13  of the factors briefly.  The Superseding Indictment charges five

14  extremely serious crimes.  Each count carries a statutory

15  maximum of 30 years.

16       Without even hearing from counsel and only looking at

17  the very surface of the charges and the papers submitted, the

18  guideline calculation is conservatively between 34 and 36

19  without considering any enhancements that may be argued in this

20  case except the ones that literally lie on the face of the

21  charges.  That means that even though Mr. Houlihan is right,

22  that we are dealing with a defendant who is 71 years old and has

23  no criminal record, we are considering charges that after

24  conviction would carry an advisory guideline range of 188 to 235

25  months.

1          That means that any sentence that could be virtually

2    contemplated, and practically contemplated at this stage, is

3    effectively a life sentence.  That gives incentive to flee.

4          The weight of the evidence in this case is what really

5    changed from when this was presented initially in the District

6    of Colorado.  I am going to focus on four pieces of evidence,

7    but there's much more.

8          First and most fundamentally, the Superseding

9    Indictment, as I mentioned during the hearing, and the

10   Government's very precise proffer, which I rely on in making

11   these findings, states that four separate adults, now adults,

12   will testify in this case to horrific criminal activity

13   committed by the defendant.  They were children at the time, but

14   they will, the Government says, come into court and testify to

15   conduct that occurred in the neighborhood between 2006 and 2010.

16         I think it is not a stretch to say that in Federal

17   Court, at least in this Court's experience, this Judge's

18   experience, it is rare to have that kind of separate

19   individualized proof that is going to come into this case.  That

20   is, even more to the point, very different than what the

21   District of Colorado Magistrate Judge heard when it was a single

22   count and there was not a single victim identified on the face

23   of the Indictment.  And I give that, on the factor of 3142(g) on

24   the weight of the evidence, a lot of weight.

25         Obviously, as I said to Mr. Houlihan, if evidence

1  changes, and therefore, those representations start to fall

2  away, under the Bail Reform Act, modification or seeking this

3  Court's review is permitted if circumstances change, but based

4  on today, that's very powerful.

5        I will also say, importantly, that this Court also

6  accepts the proffer, and Mr. Houlihan was in no place to rebut

7  it today, that those four victim witnesses are not tied at least

8  now there is no other litigation where they were undermined that

9  was brought to this Court's attention.

10        Next, the Court also noticed what counsel for the

11  Government highlighted in his presentation, and that is the

12  photo array in May of 2019 pulled by CBP.  One need not credit

13  the inference offered by Government counsel to give that fact

14  significant weight.  The mere fact that a photo array in May of

15  2019 would have any one of the faces of one of the four victims

16  alleged in the Indictment, that alone -- and it was proffered by

17  the Government -- that alone, even if nothing else was ever

18  brought into the case, that is highly relevant evidence when in

19  the District of Colorado the age of the case, the age of the

20  conduct, was really emphasized.  That is a photo array that was

21  pulled in May of 2019.

22        Next, the third factor is the history and

23  characteristics of the person.  This is where Mr. Houlihan has

24  really some of the only mitigating and pro-bond evidence that he

25  can cite and it is important to state it.  This is a man in his

1    early 70's with no criminal record.  That is certainly true.  If

2    that was not the case, we might not even be having this hearing

3    today, but it is certainly true that this Court wanted to make

4    sure to have a full hearing today mostly because of those two

5    facts.

6          However, when it comes to the history and

7    characteristics of the person before me, there was really no

8    rebuttal when it comes to anything beyond that, beyond age and

9    beyond the lack of criminal record.  There was a very small

10   amount of ties to the District of Colorado.  It was basically

11   not rebutted today what was stated in the District of Colorado,

12   that this person's ties to the District of Colorado only go back

13   to 2019.

14         I also place great emphasis on the fact that it is

15   basically unrebutted that this defendant has extensive ties to

16   the foreign counties, the Dominican Republic and Haiti.  That's

17   very important when it comes to risk of flight.  The Court also

18   agrees that in the September of 2022 deposition, the "all of my

19   efforts" comment "are to get back to the Dominican Republic" --

20   I'm paraphrasing -- "which is where my wealth is," that is

21   highly probative of someone who is a risk of flight.

22         There are also even less ties to the Southern District

23   of Florida, which case law states is important.  Ties to the

24   district of prosecution are in the case law even more important

25   in many cases for me to consider and there's even less ties

1    there.

2          Fourth, without belaboring the point, the nature and

3    seriousness of the danger to any person of the community that

4    would be posed by the defendant's release:  I need not repeat

5    what I have already said.  I need not reemphasize -- and I

6    credit very much -- I think it's important to state what also I

7    think Government counsel noticed about the District of

8    Colorado's proceedings, maybe it was because they couldn't

9    proffer as fulsomely there as they could today, but this Court

10   does not place much weight at all in charges that may be old.

11         The Congress of the United States has decided that in

12   cases such as this, the Statute of Limitations should be longer

13   than the normal five-year Statute of Limitation.  Old charges

14   can have excellent proof, old charges can have very poor proof

15   that age can be the subject of significant cross-examination.

16   We will see which one this case is, but on its face, I do think

17   it was fair for Government counsel to point out that in the

18   District of Colorado the magistrate judge did seem to emphasize

19   the age of the alleged sexual acts and the age of the

20   investigation.

21         I do not place the same emphasis and, therefore, given

22   the nature of the victims coming forward to make these

23   allegations and support the Government's case, given the

24   extreme, the extreme heinous nature of the acts if they are

25   proven to be true, I find that the fourth factors certainly

1    counsels in favor of both risk of flight and danger to the

2    community.

3         In conclusion, after consideration of all of the

4    submissions and arguments of the parties, I find that there is

5    no condition or combination of conditions that will reasonably

6    assure the appearance of the defendant as required and the

7    safety of the community.

8         This is a presumption case under 3142(e)(3)(E) and I

9    find that the presumption was not rebutted by the showing of the

10   defendant.  I also find alternatively that even if it were, my

11   assessment of the 3142(g) factors lead me to conclude that there

12   is no combination of conditions that would assure appearance and

13   safety.

14        It is ordered, therefore, that the defendant be

15   detained prior to trial.  The bond which was stayed in the

16   district of arrest is hereby revoked.

17        Let me just state for the record, under 3142(i), there

18   will be written findings of facts and a written statement of

19   reasons for detention in addition to the ones stated here on

20   this record.  I will issue that within the next week.  These are

21   the four requirements of 3142(i).  I'm going to issue that order

22   within one week.

23        Second, I'm directing that the defendant be committed

24   to the custody of the Attorney General for the confinement in a

25   corrections facility separate to the extent practicable from

1   persons awaiting or serving sentences or being held in custody

2   pending appeal.

3        Third, I'm directing that the defendant be afforded

4   reasonable opportunity for private consultation with counsel

5   while detained.

6        And fourth, I'm directing that the person in charge of

7   the corrections facility in which this defendant is confined

8   always deliver Mr. Geilenfeld to a United States Marshal for the

9   purpose of appearing in connection with this case.

10       I want to also state what I think I might have said,

11  but I want to make it very clear to Mr. O'Houlihan [sic] having

12  said all that, I take proffers very seriously and I take the

13  fact that Mr. O'Houlihan [sic] is coming into this case late.

14  If there are changed circumstances, if evidence falls away, the

15  Bail Reform Act allows for reconsideration.  If things would

16  change and they are material in that change, Mr. O'Houlihan

17  [sic] is an experienced attorney, and I don't know if that will

18  happen, but if it does, he need only seek another hearing in

19  front of me if circumstances would change.  That's also ordered.

20  The defendant is ordered detained pending trial.

21       With that, let's move on to the case.  Counsel, some

22  preliminaries, ECF 21, the Motion for Protective Order, that's

23  granted.  I think I signed it.  I think I signed an order last

24  night.  I don't know if it's been docketed yet.  It has been, my

25  courtroom deputy tells me.  I want to note for the record that

1    that Protective Order is the type of order that Her Honor Ursula

2    Ungaro, United States District Judge, has issued before.  Other

3    judges have issued such an order before, and for the reasons

4    stated in the Government's motion, I believe it's appropriate in

5    this case.

6         Obviously, Mr. O'Houlihan [sic] will let the Court know

7    if that is leading to an inability to consult with his client.

8    If accommodations and measures need to be considered that allow

9    for the proper defense of his case, you know, I'm sure he won't

10   hesitate to notify the Court, but I've signed that order.  ECF

11   21 is granted.

12        Okay.  Now, I guess I'll hear from the Government.  I'd

13   like a basic sense of the scheduling of the case, the amount of

14   time that you need to provide further discovery.  I'll hear just

15   a general report from the Government.

16        MR. PALOMO:  Yes, Your Honor.  Now that the Court

17   signed the Protective Order, we're going to give a thumb drive

18   with discovery to defense counsel today.  Discovery is pretty

19   voluminous in this case and I don't want to estimate for defense

20   counsel how long it will take to review that and go over it with

21   his client, but I'm estimating, you know, potentially 100,000

22   pages of discovery with all the attendant lawsuits.  It's just a

23   lot to go through.

24        So with that in mind, I would say that within, you

25   know, the next month or so we should be able to get all of that

1  stuff appropriately redacted, Bate stamped and sent to the

2  defense.  After that, it's really tough to predict how much time

3  they would need to go over it, so I'll let defense counsel deal

4  with that.

5          THE COURT:  Let me stop you there, counsel.  You know,

6  especially because a superseder was just filed, you know, the

7  Government has the right to continue investigation, you know,

8  all the way up to and through trial, but I want to get a sense

9  from the Government in terms of putting some flesh on what you

10 just said.

11         First, the Government went to the grand jury and has

12 brought a case that involves four victims at the core, what I

13 will say appears to be the core of the case.

14         With respect to that core, how long does the Government

15 need to be able to represent to this Court that discovery is 100

16 percent provided with respect to the core of the case?

17         MR. PALOMO:  With respect to the core of the case, they

18 will have the witness statements and interviews today, Your

19 Honor.

20         THE COURT:  And that thumb drive that you represented,

21 when they get it, that is also the core of the case?

22         MR. PALOMO:  Yes, Your Honor.

23         THE COURT:  So is it fair to say if I gave the

24 Government five weeks from today, is there any sense that you

25 would not be able to represent that all Rule 16, all local rule,

1  all standing order, all Brady, Giglio, Napue -- you're done five

2  weeks from today, is that fair?

3          MR. PALOMO:  That's fair, Your Honor.

4          THE COURT:  Alex, what date is that, if you would, sir?

5          THE COURTROOM DEPUTY:  Judge, that is May 21st.

6          THE COURT:  Okay.  So I'm going to include in my

7  forthcoming scheduling order that the Government by May 24th --

8  excuse me -- May 21, 2024, is going to be finished with

9  discovery as to what I'm calling the core of this Superseding

10  Indictment, and I say it that way because I don't know if it's

11  going to happen, but if the Government, for instance, would come

12  up with a Victim 5, you know, or something that would change the

13  trajectory of the timing of this case beyond the core, I am

14  going to expect that the Government will plainly state that, you

15  know, well before May 21st.  I'm expecting, based on what's been

16  said, that on May 21st defense counsel has everything that they

17  need to be able to assess, defend, and prepare to try this

18  Superseding Indictment.

19          If that changes between, you know -- I expect the

20  Government to tell the Court and defense counsel by May 15th.  I

21  don't want to be surprised, and this man is now detained, so I

22  want to give Mr. O'Houlihan [sic] all the time he wants with his

23  client to prepare and defend the case, but the Government now is

24  going to be held to what I'm calling the core case unless it

25  tells me differently and tells me differently by the middle of

1  May.

2          Is that clear, counsel?

3          MR. PALOMO:  Yes, Your Honor.

4          THE COURT:  Any problem with that?

5          MR. PALOMO:  No, Your Honor.

6          THE COURT:  Okay.  So, Mr. O'Houlihan [sic], given

7  that, I'm not going to make you tell me today how long you need

8  because of what was represented and your own representation

9  today that you need a fair amount of time to be able to review

10 all of this and to consult and review with your client.  So

11 unless you have anything else for me, sir, I was going to put

12 this down for a status conference in June where all parties

13 could come back to me and let me know where they are, but I'll

14 certainly hear from you, sir, if you wish to add anything to

15 this schedule that I'm contemplating.

16          MR. HOULIHAN:  That's fine, Your Honor.  The Protective

17 Order prevents me from providing any of the confidential

18 discovery to my client, which complicates, you know, my ability

19 to be prepared.  And as I understand it, the confidential

20 portion of the discovery is every single page.

21          THE COURT:  Well, that's a great point and let's deal

22 with that.  That's a great point, Mr. O'Houlihan [sic].

23          MR. HOULIHAN:  It's just "Houlihan," Your Honor.

24          THE COURT:  I'm sorry.  I'm sorry.

25          MR. HOULIHAN:  That's okay.

1      THE COURT:  Mr. Houlihan.  I apologize.  I'm learning a
2 lot of names.
3      MR. HOULIHAN:  That's okay.  What people do to my first
4 name is --
5      THE COURT:  Believe me, with a name like Leibowitz, I
6 understand.
7      I guess the way I would leave it is this:  I think it
8 is fair -- I entered the order, I signed the Protective Order
9 because of the statutes that govern cases such as this and their
10 sensitivity.  I do think it is fair what Mr. Houlihan says,
11 which is, I think that as you start to get discovery, I think --
12 my guess, let me say it that way, is that it may very well be
13 that not every page of discovery should be governed by the
14 Protective Order.
15      And for now, I think that, to be fair to the Government
16 and the sensitivity of the case, and to be fair to
17 Mr. Houlihan's point, I think we should use this time between
18 now and the status conference -- I would like to make sure, you
19 know, if it's documents that were in the public record and in
20 the sunlight that are part of that thumb drive, we should put
21 Mr. Houlihan in a place where he and the Government can report
22 that to the Court and we can relax portions of discovery that
23 are otherwise now subject to the Protective Order.
24      I think that Mr. Houlihan makes a great point.  I am
25 blinded more than the parties, and I want to be very careful.  I

1   don't know if there was going to be large or small discovery.

2   I'm learning today it is larger.

3          So I'm going to leave it to counsel to meet and confer,

4   and one of the things we will do in June is, I will hear from

5   Mr. Houlihan when he is getting discovery -- he will have

6   already gotten a lot of it and he will be able to make his own

7   case to me as to why the Protective Order may be too protective,

8   and the Government will, of course, be heard as to things that

9   should be only given and kept by counsel.

10          So Mr. Houlihan, I appreciate you saying that, but I

11   have a feeling, given what was represented to me all morning,

12   that I'm going to guess that we will be able to relax a lot of

13   Bates numbers.  I mean, the Maine case and the Georgia case, as

14   far as I'm concerned, those are public cases, so if that's part

15   of it, I'd like to hear from the Government next time as to why

16   that should be under a Protective Order, you know, as an

17   example.  I doubt that they'll take that position, but maybe I'm

18   missing something.

19          So other than that, Mr. Houlihan -- Alex, what do we

20   have in June, in late June, on a Tuesday or a Thursday?

21          THE COURTROOM DEPUTY:  So I have the 25th of June,

22   Judge.  That's a Tuesday.

23          THE COURT:  So how does June 25th at 10:00 a.m. work

24   for the parties?

25          MR. PALOMO:  One moment, Your Honor.

1           THE COURT:  Take your time.

2           MR. PALOMO:  You said June 25th, was it, Your Honor?

3           THE COURT:  June 25th.  Tuesday, June 25 at 10:00 a.m.

4           MR. PALOMO:  It's good for the Government, Your Honor.

5           THE COURT:  Mr. Houlihan?

6           MR. HOULIHAN:  It's fine for me, Your Honor.

7           THE COURT:  Okay.  So there will be a status conference

8  on June 25th in Miami.  I guess this is the time where I should

9  make sure that all parties know because it's not done -- all

10 District Judges do different things, and that's fine, but I'm

11 the new judge here, so I want all parties to know that criminal

12 cases will be heard presumptively in the courthouse, in the

13 station that they are filed.

14          So I'm going to make every effort for a case such as

15 this to be here in Miami and not make you all come to me in Fort

16 Lauderdale.  I can't always do that, but I believe it's

17 important and consistent with the Federal rules to do everything

18 I can.  There's usually a reason.  In this case, it is Miami

19 International Airport.  There's a reason why cases are filed

20 where they're filed, so I just want repeat players to know that

21 that's my practice.

22          So we will be here on June 25th at 10:00 a.m.  I don't

23 have a courtroom for you yet, because Judge Moreno has a right

24 to his courtroom when he returns and has more than a right.

25 It's very nice of him to let me borrow it while he's away, but

1   we'll let you know the courtroom.

2           And so with that, for all the reasons stated by

3   Mr. Houlihan and Government counsel, I intend to exclude from

4   the computation under the Speedy Trial Act the time from today

5   till June 25, 2024, under 3161(h)(7), in the interest of

6   justice.  I intend to do that because it has been represented to

7   me that there is voluminous discovery, age discovery, and

8   potentially foreign discovery that needs to be provided in this

9   case.  Mr. Houlihan needs to have enough time to review it,

10  consult with his client about it and prepare a strategy and

11  pretrial motions in this case.

12          For all those reasons, I will exclude the time in the

13  interest of justice under 3161(h)(7)(A) and (B) because I

14  believe that the continuance to June 25th, the next status

15  conference in this case, outweighs the need of the public and

16  the defendant in a speedy trial.  So I intend to order that the

17  time be excluded under the Speedy Trial Act.

18          Any objection, Mr. Houlihan?

19          MR. HOULIHAN:  None, Your Honor.

20          THE COURT:  Any objection, counsel from the Government?

21          MR. PALOMO:  No, Your Honor.

22          THE COURT:  Okay.  So that time is excluded.  Anything

23  else that we need to take up today?

24          MR. PALOMO:  Not from the Government, Your Honor.

25          MR. HOULIHAN:  Not from the defense.

1          THE COURT:  Okay.  Thank you, everybody, and have a

2    good day.  We are adjourned.

3          THE COURT SECURITY OFFICER:  All rise.

4      (The hearing was concluded at 11:45 a.m.)

5

6              C E R T I F I C A T E

7      I hereby certify that the foregoing is an accurate

8    transcription of proceedings in the above-entitled matter.

9

10   __07-16-24_____     _____
         DATE            GILDA PASTOR-HERNANDEZ, RPR, FPR, FPR-C
11                       Official United States Court Reporter
                         Wilkie D. Ferguson Jr. U.S. Courthouse
12                       400 North Miami Avenue, Suite 12-2
                         Miami, Florida  33128     305.523.5118
13                       gphofficialreporter@gmail.com

14

15

16

17

18

19

20

21

22

23

24

25