<pre>
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
                    CASE NO. 1:24-cr-20008-DSL-1
 3

 4   UNITED STATES OF AMERICA,              Miami, Florida

 5        Plaintiff,                        December 5, 2024

 6            vs.                           2:00 p.m. - 5:46 p.m.

 7   MICHAEL KARL GEILENFELD,

 8        Defendant.                        Pages 1 to 99
     _____

 9

10                        DAUBERT HEARING
              BEFORE THE HONORABLE DAVID S. LEIBOWITZ
11                  UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13
     FOR THE PLAINTIFF:        LACEE ELIZABETH MONK, ESQ.
14                             U.S. Attorney's Office - SDFL
                               99 NE 4th Street
15                             Room 612
                               Miami, FL  33132
16                             Lacee.monk@usdoj.gov

17
                               JESSICA URBAN, ESQ.
18                             U.S. Department of Justice
                               1301 New York Ave, NW
19                             Washington, DC  20005
                               Jessica.urban@usdoj.gov
20

21                             EDUARDO ALBERTO PALOMO, ESQ.
                               U.S. Department of Justice
22                             1301 New York Ave, NW
                               Washington, DC  20005
23                             Eduardo.palomo2@usdoj.gov

24

25
</pre>

```
 1   APPEARANCES (Cont'd):

 2

 3   FOR THE DEFENDANT:        RAYMOND D'ARCEY HOULIHAN, ESQ.
                               Federal Public Defender's Office
 4                             150 West Flagler Street
                               Miami, Florida 33130-1556
 5                             D'arsey_houlihan@fd.org

 6

     STENOGRAPHICALLY REPORTED BY:
 7
                               SHARON VELAZCO, RPR, FPR
 8                             Official Court Reporter
                               United States District Court
 9                             400 North Miami Avenue
                               9th Floor
10                             Miami, Florida 33128
                               (305) 523-5356
11

12                         I N D E X

13

14
                                 Direct   Cross    Red.
15
     WITNESSES FOR THE PLAINTIFF:
16
     Dr. Sharon Cooper
17   By Mr. Palomo            6
     By Mr. Houlihan                              32
18

19
                             —      —      —
20

21

22

23

24

25
```

```
 1                  (The following proceedings were had:)
 2             THE COURTROOM DEPUTY:  All rise.
 3             THE COURT:  Please be seated.  Thank you.  Good
 4   afternoon.
 5             THE COURTROOM DEPUTY:  Calling the matter of the United
 6   States versus Michael Karl Geilenfeld, Case No. 24 Criminal
 7   20008.
 8             Counsel, please announce your appearances for the
 9   record, beginning with the Government.
10             THE GOVERNMENT:  Good afternoon, your Honor, Jessica
11   Urban on behalf of the United States, and with me are
12   co-counsel Eduardo Palomo --
13             MR. PALOMO:  Good afternoon.
14             MS. MONK:  Good afternoon.  Lacee Monk.
15             THE COURT:  Good afternoon to the three of you.
16             MR. HOULIHAN:  Good afternoon, your Honor.  D'Arsey
17   Houlihan here on behalf of Mr. Geilenfeld, who is present
18   before the Court.
19             THE COURT:  Mr. Geilenfeld, good afternoon.
20             Mr. Houlihan, good afternoon.
21             We are here for a 702 Daubert hearing.  Who is your
22   first witness?
23             MR. PALOMO:  Dr. Sharon Cooper, your Honor.
24             THE COURT:  I think it is important to state -- I guess
25   let me ask it this way.
```

1        Mr. Houlihan, you have put in your papers, and we had

2    a -- we had a hearing, somewhat, about this back in -- I

3    forget, like, a little less than a month ago.

4        The most important thing for me to make sure that we do

5    is to have the Government educe the proffered opinions of the

6    witness that they are seeking to admit at trial, and then to

7    give Mr. Houlihan a sufficient amount of time to cross-examine

8    the proffered expert so that a final argument can be made as to

9    whether those proffered opinions are coming into the case or

10   not.

11       I say it that way because the Court already tipped its

12   hand last time that it was much more concerned about the

13   proffered, some of the proffered opinion testimony that the

14   Government is seeking with respect not to Dr. Cooper, but to

15   Dr. Accilien.  So, I just want to make sure that I said all

16   that because it is 3:30, and I will stay here between 60 and

17   90 minutes.  But, that is for both witnesses.

18       So, I want to make sure that the parties have conferred

19   so that there is split up of time sufficient so that

20   Mr. Houlihan gets his crack at both.

21       MR. PALOMO:  Your Honor, with respect to the number of

22   witnesses, we have Dr. Cooper, but Dr. Accilien was not

23   available for this hearing.  So, we had e-mailed with the

24   courtroom deputy about trying to find another date before trial

25   where we could have a hearing like this for Dr. Accilien.  But,

1   when the Court scheduled it for the 5th, she was just not

2   available at this time.

3            THE COURT:  Okay.  So, we are only going to do one

4   witness today?

5            MR. PALOMO:  That's correct, your Honor.

6            THE COURT:  Okay.  Well, then that is fine.  That

7   certainly takes off the time pressure.  But, let me be very

8   clear.  That means that after today, the only witness that for

9   sure is going to come into the case is Dr. Cooper, you know,

10  barring the outcome of the hearing, hearing from

11  Mr. Houlihan -- you know, Dr. Cooper's qualifications speak for

12  themselves in what has been provided.  She has testified in

13  trials just like this one, and the Court is well aware of her

14  history, her pedigree.

15           What I want to make sure is, for purposes of today,

16  then, that her proffered opinions and their helpfulness for the

17  jury and the reliability of those opinions are fairly tested

18  and sussed out by Mr. Houlihan, to the extent that he wishes to

19  do so, that is the primary purpose of the hearing today, given

20  that there is not a second witness.

21           And, I guess I would be remiss if I did not say the

22  Government should not expect that Dr. Accilien is coming into

23  the case at all until a similar hearing like this for her

24  occurs.  And so, I just -- I wanted to make sure that is on the

25  record.

1         So, with that, Ms. Urban...

2         MS. URBAN:  Mr. Palomo will be doing this witness.

3         THE COURT:  Mr. Palomo, call your witness.

4         MR. PALOMO:  The Government calls Dr. Sharon Cooper,

5    your Honor.

6    Thereupon:

7                    SHARON W. COOPER, M.D.

8    was called as a witness and, having been duly sworn, was

9    examined and testified as follows:

10        THE WITNESS:  I do.

11        THE COURTROOM DEPUTY:  Please state your full name for

12   the record, and spell your last name.

13        THE WITNESS:  My name is Sharon W. Cooper, C-O-O-P-E-R.

14        THE COURTROOM DEPUTY:  Thank you, Ms. Cooper.

15        You may be seated.

16        THE COURT:  Dr. Cooper, good afternoon, ma'am.  If you

17   would make yourself comfortable in the chair, do your best to

18   make sure the microphone is always close to where you speaking

19   so that everyone can hear you.

20        And, with that, Mr. Palomo, your witness.

21        MR. PALOMO:  Thank you, your Honor.

22                    DIRECT EXAMINATION

23   BY MR. PALOMO:

24   Q.  Good afternoon, Dr. Cooper.

25        Can you please introduce yourself to the judge, beginning

1   with your profession?

2   A.   Certainly.  My name is Sharon Cooper, and I am a

3   developmental and forensic pediatrician.

4   Q.   What is a developmental and forensic pediatrician?

5   A.   A developmental and forensic pediatrician is an individual

6   who has had subspecialty for training in child development,

7   being defined as zero to 26 years of age because of the

8   maturation of the brain that we understand now.

9        And, so, we see patients that are normal or atypical or

10  abnormal development.  And, we not only take care of their

11  medical problems, but also their psychological problems, and

12  facilitate family issues for children with those types of

13  difficulties.

14  Q.   How long have you been a developmental and forensic

15  pediatrician?

16  A.   Since 1986 is when I finished my fellowship in

17  developmental, just in developmental pediatrics.  My forensics

18  began in 1980.

19  Q.   So, you are a medical doctor then?

20  A.   Yes, I am.

21  Q.   Can you describe just the beginning of your career with the

22  military and the types of patients that you treated?

23  A.   Yes.  Certainly.  I graduated from college and medical

24  school, and volunteered to join the United States Army.  And I

25  did my internship and residency at Tripler Army Medical Center

1    in Honolulu, Hawaii, and spent the next 22 years in various

2    installations, both on the continental United States and

3    outside the continental United States.

4         In 1980, the Army decided that they needed to have

5    specific, designated pediatricians to work in child abuse.  So,

6    they gave me that assignment.  I was assigned to do this when I

7    was stationed at Lerman Army Medical Center in San Francisco,

8    California.  So, I began receiving significant pointed

9    training, specifically in child maltreatment.  And, I have

10   continued in that area until I had gone to every military

11   course, because there are lots of dynamics that occur when you

12   have child maltreatment occurring outside the United States,

13   when you have overseas installations, et cetera.

14   Q.   And, Dr. Cooper, you said military course.  Would this be

15   military course through the military's medical program?

16   A.   Part of it was from the AMED -- Center and School of --

17   Army Medical Education Center and School, but many of our

18   courses were from the universities, because the -- we had to

19   pay attention to the Uniform Code of Military Justice, but we

20   also had to pay attention to being up to date on the latest

21   research in child maltreatment, generically.

22   Q.   As part of your position in the military, did you actually

23   treat the victims of sexual assault who were children?

24   A.   Hundreds of them.  Yes.  I did.

25   Q.   And, just in brief, can you describe how that would work,

1  how your treatment progressed, how you received those patients?

2  A.   Correct.  Very often, a child might make a disclosure,

3  although that is not the typical way that we would see child

4  sexual abuse cases occurring.  But, they might make a

5  disclosure.  They may express a fearfulness of being around a

6  certain member of the family, or some other individual, and the

7  parent might become very concerned about that, and would bring

8  the child into a clinic setting.

9       On the other hand, it is not uncommon for us to see

10  patients in the emergency room setting where there has been an

11  acute sexual assault, and the patient has multiple injuries

12  associated with the sexual assault.

13       We also have -- would be called sometimes by law

14  enforcement, by the criminal investigative division because we

15  may have a deceased child that is brought into the emergency

16  room, for example, and there is evidence of child sexual abuse

17  in addition to the fact that they have had other injuries.

18  Q.   Can you put a number on the number of child sexual abuse

19  victims that you have treated?

20  A.   I would say I have treated well over a thousand over these

21  many years.  Once I became designated in 1983, the Army sent me

22  to all of the trainings that were made available, and

23  eventually not just the Army, the Department of Defense, and, I

24  was sent overseas to do training for commanders so that they

25  would have a better understanding about how to react to

    1    different types of child maltreatment; and, if there was a
    2    concern, how much evidence needed to be present in order for a
    3    commander to make a decision about that soldier and/or family
    4    remaining overseas, because you don't have local law
    5    enforcement and civilian in communities who are part of that
    6    investigative process.
    7            THE COURT:  Let me stop you there, Mr. Palomo.
    8            Mr. Houlihan, any objection to her qualifications?
    9            MR. HOULIHAN:  No, your Honor.
   10            THE COURT:  So, I completely agree we are dealing with
   11    one of the nation's foremost experts, given her CV.  So, we can
   12    get to the reliability and helpfulness and the proffer.
   13            MR. PALOMO:  Understood, your Honor.  And just one last
   14    question that goes into her experience.
   15    BY MR. PALOMO:
   16    Q.  As part of your experience, have you also published
   17    research?
   18    A.  Yes, I have.  In 2005, I was the lead editor of the
   19    two-volume textbook on child sexual exploitation, and I wrote a
   20    second book in 2015 entitled Prospectus on Missing Persons
   21    Cases, which really had a lot to do with children who are also
   22    victims of crimes, because there wasn't really a good book out
   23    there on that particular topic.
   24            And, I do and have written many other documents for and
   25    speak at national and international conferences on still a

1  regular basis.

2  Q.  So, on the subjects -- we will start with delayed

3  disclosure.  Do you consider yourself to be familiar with

4  current research on delayed disclosure?

5  A.  Yes, I do.

6  Q.  Can you tell the judge what delayed disclosure actually is,

7  what it means?

8  A.  Yes.  Delayed disclosure is sort of counterintuitive.  If a

9  child has been sexually abused, we would expect the child to

10  just tell somebody about that.  And, parents very often will

11  speak to a child, depending upon their age, and warn them "If

12  anybody ever touches you or does something to you, you need to

13  tell somebody.  Tell me."

14       But, that is absolutely the opposite of what happens.  What

15  we know now, based upon the research -- and there is a

16  tremendous amount of research now for us to know -- that the

17  average age of disclosure for a child sexually abused is

18  52 years of age.  That is a very significant delay.

19       We have learned this through big bodies of investigations,

20  predominantly through the Boy Scouts of America and the

21  Catholic church cases; in addition, not just in the United

22  States, but there is international literature which also

23  supports this profoundly.

24       Some of the research, your Honor, goes with 11,000 children

25  as P equals, and over 40 percent of those children never told

1    in childhood they had been sexually abused.

2            THE COURT:  By childhood, when you say the average age

3    of disclosure is 52, that is for someone that the conduct

4    occurred?

5            THE WITNESS:  Prior to 18.

6            THE COURT:  Prior to 18?

7            THE WITNESS:  Yes, that's correct, sir.

8            THE COURT:  Thank you.

9            Counsel.

10   BY MR. PALOMO:

11   Q.   Are those studies peer-reviewed?

12   A.   Yes, they are.

13   Q.   Do you know the people that actually put those studies on?

14   A.   Yes, I do.  And, it gives me goose bumps, a little bit,

15   because they are such really well-known people.  The one person

16   I would really want to lift up is Dr. Karl Svadine, who is from

17   Sweden, and who has actually an entire hospital just for

18   children who have been victims of maltreatment.

19   Q.   Did these studies involve reproducible data?

20   A.   Yes, they do.

21   Q.   And, just kind of pulling back, is this idea of delayed

22   disclosure as a broad concept, is that even remotely

23   controversial in your profession?

24   A.   It isn't anymore.  It used to be, because we didn't have

25   this literature.  But, the University of Pennsylvania, after

1    the Sandusky case, had significant research done under the

2    guidance of Professor Marcy Hamilton.  And, this is how we got

3    this body of literature together that has now been out since

4    about 2018.

5         And, as I said, one study with 11,000, the end being 11,000

6    children, many of these studies had very large quantities of

7    subjects, so that we, now, feel very confident that statutes of

8    limitations need to be revised because it is uncommon for

9    children to actually make a disclosure when they are actually

10   still children.

11   Q.  Are there some other factors that have been studied that

12   play into a delayed disclosure, or that are related to delayed

13   disclosure?

14   A.  There are some.  For example, when children do tell, they

15   tend to tell peers rather than adults.

16        So, therefor, they may make a disclosure, but it is not a

17   disclosure that we would normally be looking for as far as an

18   investigation, leading to an investigation.  That's one of the

19   factors that comes into play.

20        Another factor is the communication of a threat.  If an

21   individual tells the child, "If you tell anybody, I'm going to

22   kill you or your family or others," these children will most

23   assuredly not tell, most of the time.

24        And, also, if the child has been fairly young -- and young

25   would be less than 13 or so -- they may not understand the

1    nature of the sexual contact that an adult is giving to them

2    because adults will say, "This is what people do when they

3    really like each other, and I really like you.  So, this is

4    what I want to do to you," and they might not understand that

5    is an abusive act.

6    Q.   Are there studies that examine the developmental level of a

7    victim, or their communication skills?

8    A.   Absolutely.  One thing we do know for sure is that there

9    are certain types of children who are at a higher risk to be

10   abused, and one of the types -- especially sexually abused --

11   one of the types is children who have developmental delay.

12        So, if you have a child who has developmental delay -- and

13   typically, that's going to be manifested by delayed

14   communication skills -- they will be at higher risk to be

15   victims of child sexual abuse.

16   Q.   Are there also studies that get into the impact of

17   psychological or physical trauma as it relates to delayed

18   disclosure?

19   A.   Most assuredly.  What we know about delayed disclosure is

20   that many times, children don't have the words to be able to

21   describe what is happened to them, and so, therefor, they may

22   have body language, but that's so nebulous.  It is hard for

23   parents and caregivers, necessarily, to recognize what's going

24   on.

25        And then if a child comes from an extremely chaotic

1    background, multiple foster care settings or exposure to many

2    adversities in their lives, such as neglect and physical abuse

3    and other types of -- exposure to domestic violence, being

4    taken out of their home or being in foster care, being

5    institutionalized, any of these kind of dynamics can make it

6    much more difficult for a child to be able to make a

7    disclosure.

8    Q.   Are there studies that also talk about the difference

9    between disclosure rates and, therefor, delays in disclosure of

10   child sexual abuse victims who are male compared to child

11   sexual abuse victims who are female?

12   A.   Yes.  The literature does support the fact that females are

13   more likely to make -- to make disclosures as compared to

14   males.

15        We think, because many parents and caregivers are more

16   protective of girls when they are concerned about sexual abuse,

17   and they don't think that boys would be at risk for sexual

18   abuse, and so that's one of the reasons why we believe that

19   males do not necessarily make a disclosure so readily.

20        But, there is another reason for males -- for males, they

21   may feel that the abuse is their fault, and they may become

22   confused about their sexuality, and whether or not making a

23   disclosure might infer that they have some differences in their

24   sexual orientation.

25        So, these are some of the dynamics that can interfere with

1    children who -- especially males, who have been sexually

2    abused.

3    Q.   And are these observations that come from these studies?

4    A.   Yes, they are.

5    Q.   Are those studies and, therefore, the observations, things

6    that are commonly relied upon by professionals in your field?

7    A.   Yes, they are.

8    Q.   And, does what we just talked about -- in general, do the

9    observations of those findings align with your professional

10   experience?

11   A.   Yes, they do.  But, we --  almost always, for those of us

12   who have to come to court, we almost always have to educate the

13   jury because these seem to be counterintuitive facts.

14        Most parents still believe that if they say to their

15   ten-year old or 12-year old or 14-year old, "If anybody does

16   anything or touches you, you have to tell me right away" --

17        But, of course, that isn't usually what happens.  Many

18   times, children don't recognize that the sexual contact is not

19   affection, and is not something that someone is expressing how

20   much they care for that child.  So, they may be confused with

21   respect to the motive of that kind of contact.

22   Q.   I'm going to shift to the topic of anal penetration.  Is

23   that something that you are familiar with by virtue of your

24   profession?

25   A.   Yes.  Very much so.

1   Q.   Why is that?

2   A.   Because anal penetration is not uncommon in child sexual

3   abuse, particularly when the victim is a male.  And, when we

4   haves the history of anal abuse, we now know from serial

5   photography of victims come in, daily photography, we now know

6   that the possibility of physical findings are very small.

7        The anus is very patulous.  It can expand just like it

8   would if you had a big bowel movement.  And so, therefore, if a

9   child was penetrated anally, it is very possible that two hours

10   later, the patient could be brought into the emergency room and

11   we would not see any evidence of tearing or excoriations or

12   anything of that nature.  So, it is imperative for us to have a

13   better understanding of the necessity of recognizing that you

14   may not have positive findings.

15       What we also know is that if you do have positive findings,

16   that often infers that the anal penetration has been far more

17   traumatic than we would typically think.

18   Q.   How do you know these things?

19   A.   Dr. McCann is a doctor who has made an atlas for us where

20   he has examined children daily and taken photographs.  And, so,

21   we -- he is not the only person who has made atlases for us.

22   There are other researchers from other countries that are doing

23   the same thing so that when children come in, having been

24   sexually assaulted, witnessed, so everybody knows that really

25   happened, we may do a coloscopic examination.  We will do one

1   in the emergency room setting, and then Dr. McCann would

2   continue photographing these children every day to see how long

3   it would take for that healing process to take.

4       That's why we know now that the majority of our patients

5   are not going to have positive physical findings, because they

6   don't tell you right away.  That is the main reason.

7   Q.  Are there other factors that -- both in the research and

8   your clinical experience -- impact the type of physical effects

9   that might manifest from penetration of the anus by an adult

10  penis?

11  A.  Yes.  If you have a child who has been penetrated by an

12  adult penis, you may not have physical findings, but they may

13  have sensory findings.  The child may have pain on defecation.

14  They may have -- worry when they go to the bathroom.  They may

15  have had bleeding initially.

16      And, now that stopped, but the child is always checking

17  because they think they are going to bleed again when they have

18  a bowel movement.  They can become very anxious about their

19  just normal bodily functions.

20  Q.  In your experience, is the -- I guess the way the anus

21  responds to penetration, is that something that you believe is

22  well understood by lay persons?

23  A.  No. I don't think so at all; because, unfortunately, if you

24  have a patient, even an adult patient, and you are just going

25  to put a suppository into the anus, typically speaking, an

1  adult patient will become a little distressed, just a little

2  bit, and the anus will tighten a bit.  It is sort of a

3  reflexive reaction.  So, therefore, when that happens to a

4  child, especially if they are being penetrated by a much larger

5  child or an adult, the probability of significant discomfort is

6  going to be high for those patients.

7  Q.  Do you think that there are other physicians that would

8  disagree with anything that you just said?

9  A.  There is always the -- yes.  There are always individuals

10  who would like to deny the issue of delayed disclosure.  That

11  is one of those issues.

12  Q.  I guess what I mean -- specifically, under the subject of

13  anal penetration is what I mean.  Is that something that is

14  controversial in the medical profession?

15  A.  I don't think it is anymore.  It used to be.  But, now that

16  we have had an opportunity to study this more carefully, I

17  believe that the majority of individuals who work in this field

18  are on the same sheet of music.

19  Q.  And have you, personally, done these examinations of sexual

20  assault victims where you observe a range of injuries to the

21  anus?

22  A.  Yes, I have.  We typically will see them in the emergency

23  room setting when they come to -- when they come to the

24  hospital.  We don't schedule them as a routine examination.  We

25  see them right away.

1    And, we now have really excellent photography capabilities

2    as well as different types of dyes to be able to see the

3    presence of trauma to the tissue that you wouldn't see with a

4    naked eye.

5    Q.   Last, I would like to shift to the subject of conditions

6    that make minors uniquely susceptible or compliant to sexual

7    abuse, and circumstances that give offenders opportunities to

8    sexually abuse children.

9        So, just to start with, kind of the broad term, can you

10   define for the judge what the term "grooming" means?

11   A.   Yes.  Grooming is a term that relates to how an individual

12   who has an intent to sexually abuse a child, this is the

13   term -- grooming -- is how to convince the child -- and the

14   child's family, if the family is, in part, related to this --

15   there are grooming guides.  Some of them are 200 pages long. I

16   have testified in court cases where I have been given some of

17   the grooming guides that are available online.

18       And, it starts with grooming the family to trust that

19   individual and become Mr. Nice Guy or Ms. Nice Person in that

20   family structure so that the child will have trust in that

21   family (sic), and so will the family of a potential

22   perpetrator.

23       There are those individuals who are brutal rapists who

24   aren't going to groom a child.  They are just going to brutally

25   assault them and walk away.  But, most of the time, if an

1   individual prepares a child, they are going to have the child

2   be compliant to what they want to do to them so they can do

3   this repetitively.

4   Q.  So, if I understand this correctly, grooming has a

5   two-sided approach where, one, it informs the intent of the

6   offender, but, on the other, it creates a compliant victim.  Do

7   I have that right?

8   A.  Yes, there's correct.  And, the point about the first thing

9   you just said is that the offender usually looks for high-risk

10  children; children who may have had sadnesses in their lives,

11  or may have traumas in their lives, and the offender will

12  present themselves as, "I understand that things have been hard

13  for you.  I am going to look out for you."

14       They are going to befriend the child, but not just be a

15  friend.  They are going to be a protector.  They are going to

16  come across as someone the child should be able to trust.  And,

17  by doing so, the "grooming to compliance" is the terminology

18  that sometimes in the literature, the grooming to compliance is

19  a gradual phenomenon usually in the individuals.  It is not

20  just a, you know, rapist in the neighborhood who is going to

21  sexually assault a child on a one-time basis.

22  Q.  So, you just said "the literature."

23       Has this actually been studied?

24  A.  Tremendously.  Yes.  There are several researchers.  I

25  would think of David Finklehor, from the Crimes Against

1   Children's Research Center in New Hampshire, who has helped us

2   tremendously, over the years, look at thousands of children and

3   different dynamics that occur; but, also, there are those of us

4   who have been keeping abreast of the literature with respect to

5   Internet crimes against children and child sexual exploitation,

6   which is a newer form of child maltreatment.

7   Q.  So, I will tick down the specific, I guess, circumstances.

8   And, if you can, tell me whether they have been studied or

9   whether they are present in some of these research materials

10  that you are talking about.

11      So, first, is grooming associated with giving rewards to a

12  child?

13  A.  Very common.  It starts, particularly with young children,

14  when you have two, three, four-year olds, you give them a

15  reward for sitting in your lap, and then you give them a reward

16  for some other -- some other tactile contact, the goal being to

17  desensitize the child, to not be afraid when they are going to

18  then be asked to disrobe and maybe, "Let's take a bath

19  together.  Let's do some other things."

20      So, they usually, with young children, will gradually

21  convince the child that whatever is happening between that

22  adult and child is perfectly okay.

23  Q.  And, has this technique of grooming also been studied with

24  respect to pubescent or peripubescent children?

25  A.  Absolutely, yes.

1   Q.   I just learned "peripubescent" today when we were talking.
2   Can you tell the judge what that means?
3   A.   Yes.  Peripubescent is when you are just beginning to enter
4   into puberty, and you may have axillary hair, and you may have
5   a little bit of pubic hair, but you are not completely sexually
6   mature.
7         And, the challenge, of course, is that the onset of puberty
8   has fallen, the age of onset puberty has fallen since this has
9   been studied.  It was first studied starting in the 1960s by
10  Dr. Henry O'Tanner, and he gave us Tanner stages.  But, since
11  the '60s to present, for every decade, children have been
12  entering into puberty one year earlier.
13        And, so now, we have puberty in girls at the age of eight
14  and nine, instead of 12 and 13.
15  Q.   Sorry.  That kind of detoured.  I just never heard that
16  term before.
17  A.   Yes, yes.
18  Q.   Is there some research about rewards given to pubescent and
19  peripubescent children as part of grooming?
20  A.   Yes.  Typically, what happens is that a groomer is going to
21  want to befriend that age group and be the type of person that
22  "We can do things together."
23        So, for example, contacting them digitally is a very common
24  methodology that is used today.  But, it has not always been
25  that way.  Just spending time with children will be a potential

1   method of grooming that child, because then the child trusts

2   that individual, and will want to be in their space.

3   Q.   Is there research about grooming in an institutional

4   setting?

5   A.   Yes.   Yes.   We have a lot of information regarding

6   institutional child sexual abuse.   And, what we do know in that

7   setting is that, unfortunately, children, especially if they're

8   in psychiatric settings, for example, unfortunately, in that

9   situation, children are pawns.   They are not often as groomed

10  as much as like "I love you, and you are so important to me."

11       It is not that way.   In an institutional setting,

12  especially hospitals or psychiatric hospitals, what happens is

13  that this is a power and control dynamic.   The person who is

14  going to be the offender has power over that child, and they

15  will tell them and sometimes threaten them that "You are going

16  to do what I tell you to do or something bad is going to happen

17  to you."   And so, therefor, in an institutional setting, there

18  is a totally different kind of grooming.   The children just try

19  to go along to get along.

20  Q.   Does that research align with your clinical experience,

21  having treated thousands of victims of child sexual abuse?

22  A.   Yes, it does, particularly when children are in residential

23  treatment -- in residential treatment settings, as compared to

24  clinical settings.

25       In residential settings, children will start to try to

1   become the teacher's pet as opposed to speaking.  So, they

2   become more compliant when there is an individual who is paying

3   attention to them, potentially, as a form of grooming.

4        And, so, that can cause the children to want to be first,

5   want to be with that particular individual, not recognizing

6   that that is a very distinct possibility that they will be

7   sexually assaulted.

8   Q.  And, from your review of the research concerning

9   grooming --

10  A.  Yes.

11  Q.  -- do you believe that it is reliable work?

12  A.  Yes.  Yes, I do.

13  Q.  Why is that?

14  A.  Because when I look at the extraordinarily consistent

15  findings from country to country -- because lots of the

16  research now is international, and we see the same facts in

17  other countries that we see in our country -- and, these are

18  not individuals who know each other, necessarily, with respect

19  to their research.  And, so that's one of the reasons that the

20  2020 paper from Child U.S.A. on delayed disclosure -- I think

21  it's one of the most helpful, because it has 40 or 50 different

22  bodies of research which, if you put all of the numbers of

23  subjects of children who were evaluated, you get into the

24  100,000 range.

25  Q.  So, going back to the reliability of some of this work,

1   were some of these studies actually -- or, some of this body of

2   research, I should say, were they verified by, like,

3   post-polygraph interviews of offenders?

4   A.   Not necessarily.  Not -- we do see some post-polygraph, for

5   example, when we think about the child pornography literature

6   that talks about how incarcerated individuals who were

7   collecting child pornography or producing child pornography

8   profoundly underrated, underestimated the number of victims

9   that they had.  And, in fact, after they had been in treatment

10  and then had repeat polygraphs, they became much more verbose

11  with respect to the number of victims that they had.  That is

12  one component.

13  Q.   I guess what I should say -- maybe I asked the wrong

14  question there.

15       With respect to collection of data for the points about

16  grooming that you discussed, what were the sources of that

17  information?

18  A.   Oh, I am sorry.  I apologize for not understanding your

19  question.  We now know more about grooming of children from

20  offenders.  That is one of the ways in which we have really

21  gotten a lot of information.  And, this is not just in the

22  United States.  This has been worldwide, because these are

23  already incarcerated offenders, and they are about the business

24  of talking about things with respect to while they are in the

25  offender treatment.  So, that has been one of the big things

1    that has made a big difference for us.  And, there are some

2    very reputable evaluators and researchers in numerous countries

3    now.  I have been to Australia to listen to that research, to

4    the UK, to Ireland, to Canada; and, certainly, we have good

5    researchers here in the United States, as well.

6    Q.   Are these principles that you talked about in grooming --

7    is that something that is commonly relied upon by professionals

8    in your field?

9    A.   Yes.  It is necessary for us to understand -- when a child

10   does make a disclosure, it is necessary for us to tease out

11   what that child says they have experienced, because we do know

12   quite a bit about behavior of sex offenders.  And, many times,

13   if children tell us certain things, we will recognize that this

14   is a very common strategy in the purpose of grooming a child.

15   Q.   And, last question, have you reviewed -- or, maybe last

16   question -- have you reviewed any materials from this case?

17   A.   No, I have not.

18   Q.   Okay.  One moment.

19         MR. PALOMO:  This should be the last couple of

20   questions.

21   BY MR. PALOMO:

22   Q.   So, let's go back to delayed disclosure.  Is there research

23   pertaining to delayed disclosure that deals with a child

24   victim's ability to clearly recall the timing or the order,

25   details of an event?

1    A.   No. Children have difficulty, at times, with respect to

2    being able to say, "This happened first.   This happened next.

3    This happened this" -- because it depends upon whether or not

4    they have been given anything to make it difficult for them to

5    recall.  Let's say they have been given alcohol or something,

6    that might make it more difficult for them to make a clear

7    disclosure.  That is one reason.

8         A second reason is that trauma, once a child has been

9    traumatized, if they experience trauma again, it is not unusual

10   for the brain to go away from the prefrontal cortex where we

11   can really process things and remember things well.  The

12   neurological impulses are going to go to the mid brain, where

13   we are trying to survive, you know, your fight or flight and

14   fear centers.

15        So, therefore, this is one of the reasons they cannot give

16   you really good details at first.  Sometimes, it can take

17   several years before they are able to really recall many of the

18   things that have happened to them, and those come back

19   sometimes as flashbacks, as they have PTSD, because they

20   usually will have PTSD.

21        And, the third thing that we are aware of is that speaking

22   of this is very difficult.  Now, we recognize that survivors

23   are able to communicate more effectively by writing about what

24   has happened to them.  So, that's why dialectical behavioral

25   therapy has become so much more accepted and encouraged for

1   survivors of child sexual abuse.

2   Q.   And, those -- I guess that quality of recall, does that

3   have some relation to delayed disclosure and the research that

4   we talked about earlier?

5   A.   If I understand your question carefully, if I can

6   understand that completely, it is how you put it.  What I

7   believe is that when children are trying to make a disclosure,

8   one thing we know from the -- that large body of research on

9   the 2020 paper is that the most common person children do make

10  disclosure to are peers, not to adults.  And, if they end up

11  making a peer-based disclosure, that peer may -- or some other

12  types of peers, they have similar -- may have had similar

13  experiences.

14       And, so, then you have an opportunity to share without

15  feeling that you are being judged and wondering is this what it

16  is like?

17       So, that's one component of that delayed disclosure

18  literature.  But, the other part that I think is very important

19  is that in -- is that many times, disclosure is delayed based

20  upon the relationship of the offender.  So, for example, in

21  many of our religious leader offender cases, the individual who

22  is the religious leader will spiritually wound -- the term in

23  the literature is spiritual wounding, where the victim feels as

24  if God is against them, or you know, that whomever, it doesn't

25  have to be God, whoever in their family may be involved with

 1   this as far as their religion is concerned -- but, the bottom

 2   line is that they feel they must have brought this upon

 3   themselves.

 4        So, they have so much more guilt, blame, and self-shame --

 5   self-blame and shame, sorry, that it is very hard for them to

 6   be able to come forward and try to shake it off.  And, so, it

 7   becomes, you know, an ongoing message in their mind for a long

 8   period of time.

 9   Q.  And, relatedly, is there research in delayed disclosure

10   that deals with incomplete disclosure?

11        Or, let's say in the face of kind of irrefutable proof, a

12   child who denies, therefor, doesn't disclose, where you have

13   objective proof that something happened?

14   A.  Yes.  Yes, you do see that, in fact.  And, many times,

15   children and adults will present with triggers; you know, they

16   may smell something that they smelled at the time of their

17   victimization, and this may be the thing that triggers their

18   mind to recall things that have happened.

19        The same thing happens with soldiers who have PTSD because

20   remember, when you have been a victim of child sexual abuse,

21   you typically have at least three diagnoses; post trauma stress

22   disorder, depression, and anxiety.  Those are the three most

23   common diagnoses.  And, many times, now, if you see a patient

24   who has been sexually abused repeatedly, over time, they will

25   have dissociative disorder.

1   Q.   With respect to delayed disclosure, is there also a

2   phenomenon of incomplete disclosure, and, is that backed up in

3   the research?

4   A.   Absolutely.  It is very common for patients to only recall

5   or be able to speak of certain components of their

6   victimization.

7        And, the challenge is that before we understood brain

8   maturation, we didn't know about brain maturation until about

9   2020 -- sorry, 2000, not 2020, when serial MRI studies are done

10  on children, starting at the age of five.  These are brain MRI

11  studies.  And, what we discovered was that the brain starts to

12  mature at the back of the brain, occipital region of the brain

13  and, gradually, it becomes more mature, from the back, forward.

14       And, it isn't until about 24 years of age that the

15  prefrontal cortex -- which is where our executive thinking is

16  -- becomes mature, and finally matures completely at 26 years

17  of age.

18       So, this is one of the reasons that we, in pediatrics, and

19  in adolescent medicine and adolescent psychiatry are pushing

20  for more realistic expectations for our 18-year olds and

21  20-year olds, because now we know that the part of your brain

22  that is where we have common sense is completely not mature

23  enough yet.

24       But, you know, your body is sexually mature and muscularly

25  mature, skeletally mature, so, we thought, we must be mature.

1   But now we know about brain maturation studies, that a lot of

2   different decisions are being made in systems so as not to

3   expect more than the brain is really able to handle.

4          MR. PALOMO:  I have no further questions.

5          Thank you.

6          THE COURT:  Mr. Houlihan?

7                        CROSS-EXAMINATION

8          MR. HOULIHAN:  Thank you, your Honor.

9   BY MR. HOULIHAN:

10  Q.  Good afternoon, Doctor.

11  A.  Good afternoon.

12  Q.  So, your testimony is based on experience and interviews,

13  as well as studies that are based on experience and interviews

14  rather than repeatable experiments.  Is that a fair statement?

15  A.  That would be true.  We don't have -- we don't experiment

16  on letting people sexually abuse a child and see how that turns

17  out.

18  Q.  Sure.  So, you're limited by the nature of the field of

19  study that you are involved in?

20  A.  That's correct.

21  Q.  And, would you agree that conclusions based on, you know,

22  personal experience, interviews -- there is a certain amount of

23  subjectivity involved?

24  A.  Yes, there certainly is; especially related to the fact of

25  denial of a victimization.  We now know that children will deny

1  having been victimized, as I have just brought up.

2  Q.  And, is that something that others in your field of study

3  -- is that a view that they share with you?

4  A.  Absolutely.  That is why I was bringing up the 2020

5  discussion, I will call it.  And, we have a whole compilation

6  of numerous studies that have helped us to recognize that

7  children typically don't tell -- children who have been

8  sexually abused typically do not tell about that in childhood.

9  Most of the time, if they tell, it is in their adulthood years.

10  Q.  Are there factors that can change that?

11  A.  Well, one of the things that the research has shown is that

12  when children did make a disclosure, those in their middle

13  adolescent years, the most common person they would disclose to

14  were to peers, not to adults that could perhaps make a

15  difference, in that sense.

16      So, they do make a disclosure as the brain becomes more

17  mature, but still not completely mature, and they are more

18  likely to tell peers as compared to authorities.

19  Q.  Okay.  So, that is the most common.

20      What percentage of the cases do they disclose to

21  authorities?

22  A.  About 40 percent told peers as compared -- 40 percent told

23  nobody, and 40 percent told peers that something had happened

24  to them sexually.

25  Q.  Okay.  And then 20 percent disclosed to?

1   A.   They didn't disclose.   There wasn't information about that.

2   The -- the immediate disclosure patients would make a

3   disclosure.   But, a lot was depending upon the reaction of who

4   they disclosed to.   So, for example, if a child discloses in an

5   excited utterance manner about something that has happened to

6   them and the parent beats them for lying about something that

7   happened to them, then the child does not make a disclosure

8   about that anymore in childhood, very often.

9   Q.   So, that is something that can happen?

10  A.   Yes.

11  Q.   But, no numbers in terms of percentages when that happens?

12  A.   Less than ten percent.   As I mentioned; 40 percent to

13  peers, 40 percent nondisclosure, and that other 20 percent

14  could be made a disclosure, recanted, but then later on in

15  life, you know, said, "This really did happen to me" as they

16  entered into their adult years.

17  Q.   Okay.   And, in any of those, the 80 percent, any recanting

18  in that percentage?

19  A.   Not that I could see in the literature.

20  Q.   Now, the individuals who were involved in these studies are

21  looking for signs of sexual abuse, right?

22  A.   Not always.   In fact, some of the -- some of the stalwart

23  "children are always lying" type researchers were also involved

24  in this research.   And, I was very surprised because there are

25  some individuals who are very much in the ballpark of "children

1    cannot be trusted; they don't understand what has happened to

2    them; we don't think the children are telling the truth."

3         So, I was very surprised to see that they were included in

4    that body of literature that I spoke of that was made available

5    to us in 2020, and which is -- it was a shot heard around the

6    world.  But, the point was these were not just American

7    researchers.  These were people from all countries around the

8    world who were looking and seeing the same findings.

9    Q.   There are -- there are researchers -- I am sorry I

10   didn't -- there are researchers involved in the studies that

11   are coming from a place where they think children are lying?

12   A.   Oh, definitely.  There are researchers who will say that.

13   And, you know, that is often one of the counters that we see

14   sometimes in proceedings, in legal proceedings.

15        There are those who say, "Well, children cannot be trusted.

16   They are exaggerating.  Look, they can't recall the details,"

17   et cetera.  We know that there are individuals who are in

18   that -- in that pool of the fact that there aren't positive

19   findings, physical findings -- because many times, the type of

20   sexual abuse will not necessarily leave physical findings.

21        So, therefore, there are -- certainly are those researchers

22   who believe that unless someone comes upon an act in the

23   process, it is unlikely that the children are telling the

24   truth.

25   Q.   Who are some of these researchers, for instance?

1    A.   Their names escape me at this moment.  But, I can make that

2    available to you.  And, I apologize that I can't remember

3    exactly the specific person, although I concede that it is

4    number three on the -- it is number three in the bibliography

5    of the paper I am speaking about.  So, I will make that

6    available to you.  I apologize.

7    Q.   I appreciate that.

8         But, as a percentage, how many individuals would you say

9    fall into that camp?

10   A.   The category of not believing children?

11   Q.   Yes.

12   A.   In that research, the majority of the -- of the researchers

13   were not saying the children couldn't be believed.  What they

14   were saying is that their disclosures were delayed.  The

15   whole -- the whole body of research is about delayed disclosure

16   and the fact that the average age of disclosure was 52 years of

17   age.

18        So, therefore, the majority of children don't say anything

19   at all about having been sexually abused in childhood.

20        And, the reason that this is important is because the two

21   big pools of research were from survivors of the Boy Scout

22   cases and survivors of Catholic priests.  Those were two of the

23   very big study populations that were covered; but, those

24   weren't at all the only ones that we had.  These are in the

25   United States.  Most of the other majority of the papers that

1   came from other countries had nothing to do with Boy Scouts or

2   Catholic church, priests, and things of that nature.

3   Q.   I am not sure I have gotten to what I'm trying to find out.

4   And, that is the individuals that are conducting this research,

5   they are looking for signs of sexual abuse, right?

6   A.   Disclosure is what the child says to you.  Looking for

7   signs and symptoms of sexual abuse is physical exam findings,

8   and those are two entirely different phenomenon.  What we know

9   is that if a child has been sexually abused physically --

10   vaginal penetration, for example, anal penetration -- very

11   often, unless we see that patient within between 12 and

12   24 hours, sometimes, after the assault, the patient is not

13   going to have any physical findings.  And, some types of sexual

14   abuse such as individuals who are molesting children by having

15   them in their lap, frotteuristic behavior, where children have

16   been orally penetrated, and haven't had any evidence of

17   bleeding or anything of that nature from the mouth, torn lips,

18   et cetera, many times, those kinds of patients will have no

19   findings at all.

20   Q.   I apologize.  When I used the word "sign," I didn't mean it

21   in a term of art.  I meant evidence.  And, I guess I was

22   speaking more specifically about them speaking about it.

23   A.   Oh, verbal.  If you speak of whether or not children

24   verbally -- it depends upon the age of the child as to whether

25   or not they are able to verbally describe what has happened to

1    them.

2    Q.   When you talk about the age of disclosure, are there

3    factors -- does it, you said so, but is it further broken down;

4    for instance, individuals that are questioned by law

5    enforcement at the time, or shortly thereafter, does that have

6    an impact on the age of disclosure?

7    A.   According to the research, it does not.  The majority of

8    these children do not -- they just don't disclose that early.

9    If you have a child who is brought in to law enforcement, from

10   the standpoint perhaps of having been -- there having been an

11   eyewitness, that is an example.  An eyewitness that comes upon

12   an adult with a child, and they see the adult sexually

13   assaulting the child, the child has not made any disclosure,

14   has not said anything at all about it, and may not even

15   understand what is happening to them.

16       And then they bring that child into a interrogation

17   setting, the child may not say that anything bad has happened

18   to them, as long as they haven't been hurt.

19       So, therefore, generally speaking, we don't even see

20   children for -- not young children -- for statements to be made

21   to the police.  We have, you know, forensic interviewing child

22   advocacy centers in other countries to make those kind of

23   evaluations.

24   Q.   So, this age 50, there is no further breakdown into other

25   categories with different ages, based on different factors?

1    A.   Oh, certainly, there can be different factors of children

2    who have positive physical findings.  They never made a

3    disclosure -- they have positive physical findings, for

4    example, a child who develops a sore throat and gets a throat

5    culture and gonorrhea is growing in their throat, that is a

6    good example where the patient has not said anything at all

7    about what has happened to them, but they have a sexually

8    transmitted disease in their throat, which would infer fellatio

9    of some sort.  And, so, that kind of situation is a different

10   circumstance.

11   Q.   And then they will disclose?

12   A.   Not necessarily, because many times, offenders will have

13   said to the child, "No one will understand our relationship.

14   You will be in trouble.  Your mommy and daddy are going to

15   really be angry with you."

16        They can be very easily manipulated.  And, so,

17   consequently, the child may not make that disclosure at all.

18   Q.   Do the -- in the research, if a child does not make a

19   disclosure, but the researcher thinks that something has

20   happened, how is that handled?

21   A.   Let me tell you how quickly and frequently that occurs.  We

22   see this immeasurably when abusive images exist.  What we know

23   about what we -- what our law calls child pornography, but

24   which our psychiatry psychology and medical field refers to as

25   child sexual abuse material -- when we see those images that

1    have been made of children who are clearly being sexually

2    abused, but they don't make a disclosure, they say nothing at

3    all about that -- we recognize, in fact, that the overwhelming

4    majority of CSAM -- Child Sexual Abuse Materials -- survivors

5    -- and this literature comes from the Canadian Center on Child

6    Protection --

7            THE COURT REPORTER:  I'm sorry, Doctor, if you could

8    please slow down --

9            THE WITNESS:  I apologize.

10           The Canadian Center on Child Protection did a very

11   compelling international study asking many questions, over 300

12   questions, of CSAM survivors.  And, what that literature showed

13   us was that even when children understood very clearly that

14   they had been sexually abused, sometimes by many people, they

15   did not make a disclosure.

16           And, what we also have found out is that if we confront

17   a child with pictures of their own sexual abuse, children

18   between the ages of five, to maybe 13 or so, these children

19   will deny that that picture is them.

20           They just will deny that, because it is -- because of

21   the guilt, self-blame, and shame that accompanies the fact that

22   you can be -- have been sexually abused, and images of your

23   sexual abuse exist, and are on the Internet.

24   Q.  Are you aware of any studies that contradict these

25   findings?

1   A.   The -- the Canadian Center Study, which was an

2   international study, has not had any naysayers to the nature of

3   that.   They were a little concerned because there was an

4   overrepresentation in the Netherlands with respect -- because

5   this is an international research -- so, there seemed to be

6   higher incidence of disclosure in the Netherlands.

7         But, these -- these disclosures were first-person narrative

8   disclosures.   I was part of the working group.   It was an

9   international working group for that research.   And, the

10  individuals who were talking about what had happened to them

11  were doing so online, on their own, and at their own time.   So,

12  therefore, there was a tremendous amount of detail that was

13  made available in that literature.

14  Q.   Now, you've mentioned, you know, studies in the

15  Netherlands, Canada, Australia, the United States?

16  A.   Yes.

17  Q.   They all seem to be western countries?

18  A.   China certainly has research in this particular area, and

19  Sweden has been very proactive.   Really, truthfully, the

20  organization that is most, I think, most beneficial to us is

21  ECPAT, which is an international organization that is in

22  Thailand.   Its headquarters are Thailand.   And, ECPAT

23  International -- the United States has a chapter, as well, in

24  New York City -- ECPAT International has helped us look at

25  child sexual abuse, specifically, and child sexual exploitation

1   worldwide.  And, their data has helped us tremendously.

2       An example was in 2002 or so, they started finding that

3   children were not being sold on street corners very much

4   anymore in Japan, and they were thinking that the prostitution

5   of children was diminishing in Japan.  But, what they found

6   out, what ECPAT Japan found out was, that was when 3D

7   technology had come in on cell phones.  And so, no longer were

8   children on street corners.  There were people who were just

9   saying, "What age do you want?  We will deliver this child to

10  you."

11      So, there are definitely many international agencies that

12  continue to do research, very, very robust research, to this

13  day, on this whole issue of child sexual abuse and child sexual

14  exploitation.

15  Q.  Are there studies that come specifically from Haiti?

16  A.  Haiti, unfortunately, has not been, to my knowledge, able

17  to have scientific research.  But, we have seen reported

18  reports, not research, per se, of different types of travesties

19  because of after the earthquake that occurred in Haiti, their

20  infrastructure was not -- minimally supportive of being able to

21  provide scientific research.

22  Q.  Right.  That was 2010.  Nothing prior to that, to the

23  earthquake?

24  A.  Not that I can recall.  But, I would be glad to review

25  ECPAT, because I am not sure if there is an ECPAT agency in

1   Haiti.

2   Q.   Have you, personally, worked on any cases involving, you

3   know, Haiti or Haitian children?

4   A.   I have seen Haitian children.  Most of them have been

5   children who have been brought to the United States to be

6   adopted.  And, we see some of these children in our clinic to

7   just make sure they are okay, or what kind of problems they

8   will need to have addressed if they are coming in to be adopted

9   in our country.

10   Q.   As a pediatrician, you have seen them?

11   A.   Yes.

12   Q.   Not in connection with sexual abuse research?

13   A.   That's true.

14   Q.   And, you mentioned that there has been anecdotal

15   information, post earthquake; but, anecdotal information isn't

16   really scientific information, is it?

17   A.   Well, thank you for asking that question.  When, in

18   Indonesia, they had the tsunami, there was a pediatrician who

19   wrote a chapter in a book that we wrote entitled "Perspectives

20   on Missing Persons Cases," who wrote about the fact that

21   immediately after the tsunami, when many parents were killed

22   and children were just there, traffickers were already talking

23   about trying to get these children and taking them away from

24   Indonesia.  Within less that 72 to 96 hours, he convinced the

25   legislature to pass a law that no Indonesian children could be

1    taken from that location at all, because they didn't know where

2    their parents were, anything of that nature.  And, he got a

3    major award for having been so wise in making that kind of

4    geopolitical decision to protect children of Indonesia after a

5    natural disaster.

6        I don't think there has been an individual in Haiti who has

7    been able to do something similar, in that sense, and that --

8    and Haiti is such an impoverished country that it is -- has

9    been very difficult to do research there.

10   Q.  So, child sexual abuse, it is a field that has been studied

11   for a while?

12   A.  Yes, that's true.

13   Q.  Can you put a particular date on it?

14       When it -- when more attention -- was it post the McMartin

15   school case?

16   A.  So, child sexual abuse has been studied since the '70s.

17   And, in fact, child abuse was -- that term, that diagnosis came

18   about in the 1960s with C. Henry Kemp, who gave us the book,

19   "The Battered Child Syndrome."

20       And, from that point, forward, in the United States,

21   anyway, we have been looking at child maltreatment in various

22   categories; the battered child, the neglected child, the

23   sexually abused child, the sexually exploited child -- all of

24   these different -- and children exposed to violence.  These

25   have all been ongoing areas of research in child maltreatment

1    since -- certainly since 1960s.

2    Q.   Okay.  And delayed disclosure -- how long would you say

3    that that has been a major field of study?

4    A.   Delayed disclosure has not been written about so, so

5    effectively until about 2017, 2018.  What led us to begin to

6    recognize this were these very large groups of children who

7    were sexually abused in institutional settings, such as the

8    Sandusky case, such as we saw with the gymnast physician who

9    was working with our Olympic gymnasts, some of whom were still

10   minors that, when we started to see that these were -- these

11   were children who were being sexually abused on a regular

12   basis, and no one was saying anything about it.

13   Q.   And the Sandusky case, do you recall when that was?

14   A.   Yes, the Sandusky case was about 15 years ago now, because

15   he was incarcerated.  And, I think he is still alive.  But, I

16   do recall the Sandusky case.  In fact, I was involved in the

17   Sandusky case.  So, I do recall.

18   Q.   So, it is fair to say that public awareness of child sexual

19   abuse has increased significantly in the last couple of

20   decades?

21   A.   Yes.  That would be a true statement.

22   Q.   And, it would be fair to say that there have been some very

23   significant cases that have received widespread news coverage;

24   news coverage, Internet, Snapchat, for instance, the Epstein

25   case?

1   A.   Yes.

2   Q.   The Weinstein case?

3   A.   Yes.

4   Q.   Widely -- and the Sandusky case, that was widely covered,

5   as well?

6   A.   That's correct.

7   Q.   And, all three of those cases involved delayed disclosure?

8   A.   Yes, they did.

9   Q.   So, it is fair to say that there has been an increase in

10   awareness of delayed disclosure?

11   A.   Yes.   That would be true --

12   Q.   In the last decade?

13   A.   -- yes, that would be true.

14   Q.   Has the average age of disclosure closed -- sorry --

15   changed over time?

16   A.   Not that we are aware of, because the literature that was

17   published in 2020 revealed that, fairly universally, it wasn't

18   just an American phenomenon.   It was a international phenomenon

19   well into an individual's third or fourth decade of life,

20   before they would begin to make disclosures.   This is both from

21   males and female survivors.

22   Q.   You mentioned that this -- this concept, delayed

23   disclosure, is not well known.   What is the basis for that

24   opinion?

25   A.   The fact that -- the fact that there have been so many

1    papers written now, and so much research in this area, that it

2    has changed youth-serving organizational policies.  They no

3    longer expect a child to come and tell you that someone in that

4    organization has done something to them.

5        What, instead, is recommended is the agencies, the

6    organization must put into place a 2-D policy where you have

7    two adults instead of one adult who could have access to a

8    child; not a big difference in age difference, between

9    individuals who are sleeping in cabins and camping, et cetera;

10       The fact that you should make sure that there are cameras

11   -- nowadays, we have video surveillance in youth-serving

12   organizations, again, for the purpose of keeping children safe.

13   Almost all childcare centers will have -- if they are licensed,

14   will have video surveillance cameras there just for that very

15   reason.

16       So, we are learning, and the CDC has helped give guidelines

17   on how to make child sexual abuse less common, how to make it

18   more difficult to -- to abuse children in youth-serving

19   organizations.

20   Q.   Sure.  But, these changes in policies sort of indicate that

21   there is a general awareness that the children don't disclose,

22   right?

23   A.   They are becoming more knowledgeable that children don't

24   disclose.  Still, people are surprised when -- especially

25   parents are surprised when a child does make a disclosure,

1   perhaps in forensic interview, and the child has not told their

2   parent.  The parent is very distressed by that.

3        But, the child doesn't want to make their parent be angry

4   with them because the child feels that it is their fault.

5        Self-blame is a very, very compelling component of the

6   child thought process, all the way up until about 21, 22 years

7   of age.

8   Q.   Sure.  But, you know, people can understand delayed

9   disclosure, accept it, understand it, that it exists, and yet

10  still have a hard time accepting it with their children?

11  A.   Yes.  That's true.  That's part of the grief process.

12  Q.   What I'm trying to ask is -- you've indicated that it is

13  something that the jurors need to be educated about because

14  people don't know about it.  And, what I'm trying to find out

15  is if this is just something that you've concluded, based on

16  your experience, or whether there are studies that say, you

17  know, 40 percent of Americans adults don't believe in it, or

18  something of that nature?

19  A.   In answer to that, to that question, what I -- what I would

20  like to make sure is clear is that we, as a field, thought that

21  we could take a child to a child advocacy center and conduct a

22  forensic interview with that child, and the child would tell us

23  everything.  Now, we know that that is not going to be true.

24  We will still do that for the cases in the hopes that we will

25  be able to get some details regarding child sexual abuse; but,

1    we have had to change our expectations of the child because

2    children do not tell, very commonly, in childhood at all.

3         And, so, really, this tells us, as a country, that we can't

4    put the onus of protection on the child.  We can't put the onus

5    of protection on the family.  We have to change our systems of

6    care for children so that there is not an opportunity for a

7    child to be sexually abused in a setting.

8         THE COURT:  I guess what Mr. Houlihan is asking is how

9    do you know that the average American doesn't understand that?

10   How do you know that the average American is not right where

11   you are in that last answer?

12        Is that a fair characterization, Mr. Houlihan?

13        MR. HOULIHAN:  Right on the nose, your Honor.

14        THE COURT:  How do you know that?

15        THE WITNESS:  We are learning that.  We are learning

16   that.  We didn't know it for a long time because this research

17   is not that recent.  Sorry, it has not been around for a long

18   time.  I didn't want to say it is not that recent.  It is

19   recent, and we are now beginning to adjust our expectations for

20   children.  And, in general, since we now know that children are

21   not going to tell even their parents, then we have to use other

22   ways of keeping children safe, and that means environmental

23   processes.

24   Q.  That still -- I am sorry, but that is still not addressing

25   the question that I have.  You are being asked to educate this

1   jury in something that they are unfamiliar with.  And, I'm

2   trying to find out if there is a study or if there is some sort

3   of scientific evidence to suggest that this -- that this

4   delayed disclosure -- which has been widely publicized in all

5   these cases -- is not generally known by the average person,

6   like the Canadian study, the Boy Scouts or the Catholic

7   church -- is there a study that says people don't understand

8   this in --

9   A.   Certainly.  The whole purpose of the 2020 document that has

10  close to more than 30 references was written for us as

11  professionals to understand this.

12       Our job is to educate a jury regarding the fact that when

13  children have been sexually abused, they do not necessarily

14  tell about that while they are still children.  The

15  overwhelming majority do not tell in childhood.

16       So, how does one educate a jury regarding that?

17       And, I have had to do this on numerous occasions, because

18  you are quite correct, it is the perception by jurors and

19  triers of fact that if something bad has happened to a child,

20  the child will immediately go and tell someone.

21       What we are trying to help them understand is that no, the

22  child is not going to tell someone right away.  And, the fact

23  that this child is now 24 years old and is now telling us what

24  has happened to her when she was sexually abused in her church,

25  in the basement -- this is a recent case I testified in -- the

1  purpose of that kind of testimony, my testimony is to educate

2  the jury that their expectation should not be that that child

3  would have told right away, "This is what happened to me."

4       But, in fact, the fact that it was 20 years later, that

5  this child, that this now adult is making this disclosure is

6  the rule more so than the exception.  That is what we are

7  having to do now.

8       Those of us who work in child sexual abuse, that is what we

9  have to do with juries and judges and other systems so that

10  they have realistic expectations, just as we have had to help

11  jurors understand about the brain maturation process and the

12  fact that you can be 20 years old but you still aren't going to

13  necessarily make good decisions because your brain will not be

14  mature until you're 26.

15  Q.  I understand that you have done this with other juries, but

16  have you never asked the jury if they understand or if they

17  actually need to be educated in this, right -- when you come in

18  and testify, you don't ask them, you know, "Hey, do you

19  understand this or not," right?

20  A.  In many of the cases that I testify, I have testified in,

21  they are -- they will -- sometimes, there will be a -- I don't

22  know what the term is, a polling of the jurors to find out --

23  especially in a courts-martial proceeding, this is done almost

24  universally -- they will have the jurors, if they, themselves,

25  have any questions, specifically, to an expert witness.

1       That is not typically done in usual courts.  But, in

2    courts-martial proceedings, that is done routinely to make sure

3    that the Court, the members of the courts-martial jury can ask

4    questions directly from the jury.

5       So, in answer to your question, which I know that those of

6    us who work in this field are working very hard to make this,

7    this information well understood, not speaking as if this is

8    rocket science, but, really based upon guilt, self-blame, and

9    shame, that causes children to be unwilling to make disclosures

10   at very young ages.

11   Q.  Okay.  Not to belabor this, just one more question on this

12   issue.

13       Is there a study that you can point to that shows

14   general ignorance regarding delayed disclosure?

15   A.  I can send you to numerous studies that talk about that

16   there is delayed disclosures.

17       I will have to look specifically for a study that affirms

18   that people do not believe that there is delayed disclosure.

19   Is that your question?

20   Q.  If people don't understand the concept?

21   A.  It is our job to explain that to them, if I understand what

22   you are asking, because we didn't know that as professionals.

23   Q.  I am asking if there is a study that confirms that people

24   do not understand this concept.

25   A.  I don't know if there is a study in that particular area.

1   Q.   Okay.   Same sort of questions with regard to these risk

2   factors.   It seems to me -- I mean, it seems like, you know,

3   common sense to me that, you know, a child who is in an

4   institution maybe be more vulnerable -- are there studies

5   regarding this area that you need to or that you, Government,

6   intend to have you educate the jury about?

7   A.   I do not know if the Government is going to ask me,

8   specifically, to testify regarding the issue of institutions

9   that are associated with child sexual abuse within an

10   institution.

11       Is that your question?

12   Q.   That was just one example.   One of the areas that you are

13   going to or intend to testify about is risk factors that make

14   children more vulnerable, right, more susceptible to being

15   abused?

16   A.   Yes.   Those definitely exist.   And, there are definitely

17   risk factors present.

18       And, the question -- the answer to your question is, if I

19   am asked to educate the jury in that area, I will certainly

20   answer that question --

21   Q.   That is --

22   A.   -- for the jury.

23   Q.   Let me rephrase my question.

24       This issue of susceptibility to abuse is something that

25   you are expecting to testify about, right?

1  A.  If I'm asked that question, yes.

2  Q.  Okay.

3  A.  If I am asked that question.  If I am not asked that

4  question, I will not.

5  Q.  Sure.  But, that was one of the areas that the prosecutor

6  talked about with you, right?

7  A.  He was talking about delayed disclosure.  There were three

8  specific areas; but, I wasn't thinking about the vulnerability

9  of children except their age and the fact that they are --

10  Q.  To talk about children that had experienced trauma, were

11  more -- were more susceptible to abuse, right?

12  A.  No. I said children who have been abused have experienced

13  trauma.  If you have been traumatized, that doesn't mean you

14  are more likely to be abused.

15      MR. HOULIHAN:  If I may have just one second?

16      THE COURT:  As much as you want, Mr. Houlihan.

17  BY MR. HOULIHAN:

18  Q.  So, with regard to anal penetration, if I understood your

19  earlier testimony, it is -- perhaps this is a bit of an

20  oversimplification -- but it is an area of the body that will

21  return to the condition that it was in before?

22  A.  Yes.  Yes.

23  Q.  And, so, there might not be signs that would be picked up

24  by a physician examining somebody, absent the special dyes you

25  talked about, and so forth?

1    A.   Yes, correct.

2              MR. HOULIHAN:  I believe that is all I have.

3         Thank you.

4              THE COURT:  Thank you, Mr. Houlihan.

5         Any redirect?

6              MR. PALOMO:  No further questions, your Honor.

7              THE COURT:  Okay.

8         Dr. Cooper, thank you for being here.  You may step

9    down.

10             THE WITNESS:  Thank you, sir.

11             [Witness Excused]

12             THE COURT:  I'm going to ask, because I expect that at

13   trial, I expect that the defendant is going to invoke the rule

14   of sequestration; correct?

15             MR. HOULIHAN:  Yes, your Honor.

16             THE COURT:  So, I think it would be best if Dr. Cooper

17   leave the courtroom, because we are going to have argument;

18   and, I want to preserve the integrity of the sequestration rule

19   for the defense.

20        Thank you, Doctor.

21        Just one moment so she can get escorted out.

22        I just note for the record there is no other Government

23   witness of any kind in this courtroom.

24        So, I just wanted to do that for Mr. Houlihan's sake.

25        Okay.  A couple of things.

1          Mr. Houlihan, I will hear from you, if you still want

2     to press your motion to exclude this witness in whole or in

3     part.

4          MR. HOULIHAN:  I do, Judge.  Now, I'm not going to

5     quibble regarding her qualifications.  You know, I think,

6     obviously, she has a great deal of experience in child sexual

7     abuse cases.  But, what I am concerned about, and what I would

8     object to her testimony being introduced for is, you know,

9     under 702, it is -- the purpose of the expert is to provide

10    information that is going to be helpful to the jury.  And,

11    Dr. Cooper seemed to be a little slippery on the issue of how

12    commonly understood delayed disclosure is.

13         There is no evidence to suggest that -- no studies that

14    she could cite to -- she offered to look for some.  I -- I

15    mean, I asked a number of times what I thought was a fairly

16    simple question about How is it you know these juries don't

17    understand this?

18         I did not get an answer.  She conceded that this is

19    something that has been widely covered in the news, these

20    cases, where a delayed disclosures has been a feature.

21         Certainly, you know, we have been reading about these

22    cases involving a Catholic church since I was a child; and, you

23    know, even now, probably one of the number one stories right

24    behind the Hunter Biden pardon is, you know, P-Diddy or Sean

25    Combs.  And, the case involved delayed disclosures.

1          So, from that perspective, I would argue that this is

2    something that is commonly understood.

3          The Government had indicated that there were three

4    areas that they were seeking to educe testimony.  The first was

5    delayed disclosure.  The third had to do with factors that made

6    children particularly susceptible to -- to abuse.

7          And, you know, I would argue that, number one, the same

8    sort of argument that all of this is common sense, that

9    children in certain situations -- and we are not talking about

10   a wide variety of situations, a wide variety of different kinds

11   of victims.  We are talking about a very specific group of

12   alleged victims in one particular place.  And, to have the

13   expert testify as to all the various risk factors that might

14   apply, you know, a child with psychological issues was one of

15   the -- was one of the things that she talked about.

16         And, I think that that testimony about general

17   vulnerability factors into -- introduces a risk that the jury

18   is going to focus on victim characteristics rather than

19   evidence, and it creates unfair prejudice and confusion

20   regarding the real issues in this case.

21         I also believe that these are -- that the factors that

22   make children susceptible; poverty, lack of supervision or

23   history of trauma, are within the realm of common understanding

24   and common sense; that, you know, under 401, it is not

25   relevant; under 403, even if the Court were to find that it had

1   some relevance, I believe that the possibility of undue

2   prejudice about -- talking generally about, you know, the kinds

3   of kids that could be at risk, which could include children

4   that have nothing to do with the facts of this case, is

5   something that is likely to create bias against my client, or

6   sympathy for the victims that -- that is -- that isn't

7   warranted, and it is unduly prejudicial.

8          Finally, with regard to the testimony regarding the

9   anal penetration, you know, it is not an element of the

10  offense.  I don't believe it is relevant for the charges in

11  this case.

12         The Government's notice indicates that, you know, they

13  anticipate her testifying about things like extreme

14  inflammation or distension of the colon, chronic constipation,

15  involuntarily passing of stool into the clothing, things of

16  that nature, which are graphic, irrelevant, prejudicial, and,

17  consequently, I think that testimony should be excluded.

18         So, you know, in sum, it is not an issue of challenging

19  the expert's qualifications.  It is an issue of the relevance

20  of --

21         THE COURT:  It's helpfulness, the third prong --

22         MR. HOULIHAN:  Sorry, helpfulness, the helpfulness of

23  the expert's testimony to this jury.

24         And, as I mentioned, I believe some of these -- I mean,

25  a lot of what the Government proposes to have her testify about

1    are factors that are just not even present in this case.

2            THE COURT:  Okay.

3            Anything the Government wants to offer brief rebuttal

4    on?

5            I have read all the -- I have read all of the papers.

6    I certainly listened carefully to the testimony.

7            MR. PALOMO:  On the subject about whether the jury

8    understands delayed discovery, your Honor, first, it is not an

9    element of that prong to produce scientific studies to show

10   that is a jury may or may not understand something.  That is

11   something that we can apply our understanding of -- kind of the

12   general sense of things.  And, we expect one of the defense's

13   strategies in this case is to undermine a victim's credibility

14   by saying, "You didn't report right away, did you?"

15           It didn't take too much more than that to plant in a

16   juror's mind, some idea that if it had really happened, they

17   would have disclosed right away.  That is emphatically not what

18   the data shows.  If we look at how recent some of these studies

19   are that Dr. Cooper testified about, that really -- we only

20   developed a body of data in about 2017, and that we have

21   seminal papers coming out in 2020, discussing delayed

22   disclosure and showing that the average age of disclosure is

23   shockingly high, 50 years old, that is not something that I

24   expected when I saw that number.

25           In my professional experience, I am usually dealing

1    with people that wait about 15 years to disclose.  But, it is

2    something that we have to account for when you are arguing to

3    the jury.

4           So, under the framework of 702, the third prong, is it

5    helpful to the jury?

6           Put differently, does it help them understand the

7    evidence?

8           And, yes, it develops -- I think it clearly meets that

9    threshold.

10          With respect to anal penetration, I mean, I don't need

11   to say it too much more than the actus reus of most of our C

12   counts, the 2423C counts are going to involve the defendant's

13   penetration of the victim's anus with his penis.  It is plainly

14   relevant.  It is not something that I think an average juror

15   would understand.  The range of the effects that that type of

16   penetration would have on a person, it will be helpful for the

17   jury to understand the Government's evidence if she is allowed

18   to give that.

19          And then, finally, with respect to the grooming

20   testimony, she was talking about institutional sexual abuse

21   that happens within an institution, under the framework of

22   grooming, which is, I guess, more broadly defined as strategy

23   to give the offender access to a victim; and, if I am to

24   paraphrase, to practice what Dr. Cooper said discourages the

25   disclosure.

1          So, in institutions, that more naturally happens, but

2    that may not be something that is readily apparent to a juror.

3          So, to think that a juror -- under what I think are

4    some relatively complicated facts of this case, there is a lot

5    happening here -- to just give the testimony to the jurors and

6    say, "Hey, you all have common sense.  You figure it out," that

7    is a bridge too far.

8          And, I don't think that is what the rules require.

9    Certainly, we have satisfied the requirements of 702, and we

10   would ask the Court to admit the testimony of Dr. Cooper.

11          THE COURT:  Mr. Palomo, I agree.  I agree with the

12   Government.  Dr. Cooper is going to be allowed to testify.

13          Let me make a bit of a record on it.

14          First of all, the qualifications are not challenged.

15   And, they couldn't possibly be if they were; the CV, the

16   history, the research, the experience, this is -- this is a

17   classic expert that multiple federal courts have permitted to

18   testify as an expert, some on precisely these topics.

19          With respect to reliable -- the reliability prong, that

20   is really not an issue.  And, it is to Mr. Houlihan's credit

21   that he only does it for things that he can, in good faith --

22   even reliability here can't be seriously challenged, given the

23   nature of the discipline, what she has testified that she has

24   reviewed both in writing and on the stand here today.  It

25   really does come down to the helpfulness prong.

1          And, let me do each of the subtopics on helpfulness.

2          First, on delayed disclosure.  I agree with the

3     Government.  In fact, there were moments where her testimony

4     was close enough, on its own; but, more importantly, it is to

5     the witness' credit that she did not testify to the existence

6     of a study of what the average American thinks in terms of

7     disclosure age.  That is not required to make her testimony on

8     delayed disclosure helpful to the trier of fact.

9          I think Mr. Palomo said it very well.

10         I started my career as a prosecutor in a child sex

11    abuse unit in Cambridge, Massachusetts.  And, her statistics of

12    52 years surprised me.  With all that I have become aware of,

13    all of the testimony in this area on repressed memory, on age

14    of victim, age of disclosure, moreover, putting my own reaction

15    to the 52 years of age figure out of it, taking that reaction

16    completely out of it, it is simply helpful to the trier of fact

17    to have testimony in an area that is not within the kin of the

18    average American; and, anticipating an obvious defense, it is

19    an obvious defense, the delay of report, the delay of

20    narration, the time lags that are in this case.

21         So, for all those reasons, it is -- it clearly, by a --

22    well, more than a preponderance of the evidence, which is all

23    that is required, it satisfies the helpfulness prong, and she

24    will be permitted to testify on delayed disclosure.

25         On the effects of anal penetration, this is even -- I

1   think, clears the mark by an even wider margin; and, it is for

2   much the same purpose:  The absence of medical evidence, the

3   absence of physical evidence -- separate and apart from the

4   delay in time -- the absence of medical evidence within,

5   according to her testimony, two hours of an act, would be -- it

6   would be helpful for a trier of fact to understand that within

7   two hours -- this is one part of her testimony -- you may not

8   see evidence of tearing.

9        That is a clear line of defense.

10       Therefore, it is an obvious area where an expert who is

11  subject to cross should be able to testify as to the effects of

12  anal penetration and how they may differ from common intuition.

13       That takes me to the third subarea.  And, this is where

14  I want to be very careful, because the way that it was stated

15  in the papers was a little broader than what came out here;

16  but, the summary of opinion that was proffered on Page 3 was

17  the socio- and psychological nuances of the child sexual abuse,

18  grooming, and other conditions that make children more

19  vulnerable to and less likely to disclose.  That is a very

20  broad area, as written.

21       What came out at this hearing, a clear, core aspect of

22  that third topic was grooming.  Grooming -- and the way that it

23  was phrased by the witness, and, by the prosecutor, as well, as

24  grooming is a technique that is used to discourage disclosure.

25  That is, itself, a substantial topic in the field.

1          She is an expert.  She will be able to testify to that.

2          But, I want to be careful here.  Even as broad as that

3     is, that is much less than all of the social and psychological

4     nuances of sexual abuse.  So, to the extent that the Government

5     wants to educe testimony in -- let's call it other subareas

6     than grooming -- let me tell you an example that came out by

7     Mr. Houlihan.

8          This witness did not provide any specific testimony as

9     to how orphanages can be areas where child sexual abuse is more

10    likely to occur.  Now, that was a hyperbolic, hypothetical

11    expert statement that I put out to make sure that my ruling is

12    clear.  I didn't hear the Government ask that.  I didn't hear

13    them go into that.  I didn't hear the witness even try to

14    suggest an answer to my hyperbolic, hypothetical example.

15         But, I bring it up because there is a core that she

16    testified to that she will be allowed to testify, that is well

17    within her expertise, and it is helpful to the trier of fact,

18    and I would describe it as grooming.

19         And, it is a broad enough area.  If there is something

20    else beyond that, it has to be described as a subarea, so that

21    the Government cannot hide -- and they couldn't do this.  That

22    is not what I am accusing them of, in any way.  But, just so it

23    is clear -- and the whole purpose of this hearing was for

24    Mr. Houlihan to know where the goal posts are -- is that you

25    can't put everything under the socio- and psychological nuances

1    of child sexual abuse, as it is written in Page 3.

2          I am not saying the Government was going to do that.  I

3    am not saying even that there aren't parts of her testimony

4    today that could fairly be described as not just grooming.  I

5    think that's true.  That Mr. Houlihan got into it with her

6    about how there is a difference between, well, if someone who

7    is traumatized is more likely to be abused, or is someone who

8    is abused more likely to suffer trauma -- that is obviously not

9    just grooming.  That is obviously something that the Government

10   and Mr. Houlihan would be allowed to get into.

11          But, that is not, in any way, this Court's saying that

12   we can put everything under the heading of socio- and

13   psychological nuances.  And, that is -- I think it is important

14   that I say that now, because I think the Government has been

15   very careful and very specific in this case to seek what it

16   wants.

17          And, if there is something that is more specific, they

18   will rise, and they will rise before trial, and they will say

19   so, so that I can rule on it in advance so Mr. Houlihan can

20   contest it, if he is thinks it is beyond the rule; and, more

21   importantly than perhaps even any of that, is that if it is

22   allowed to come in, Mr. Houlihan and his client can prepare for

23   it, can prepare to defend it in the way they see fit.

24          So, for all these reasons, I am going to allow the

25   witness -- she is clearly allowed to testify to -- in this

1   Court's view, as an expert on all of the topics I just went

2   through.

3        But, I do want to be careful.  It actually plays into

4   one other thing which came out today in this witness'

5   testimony, which is that her testimony was also universal in

6   the sense that she is prepared to testify as a blind witness

7   who has never met a single victim here, who has never reviewed

8   a single piece of paper involving these victims, because she is

9   being proffered as an expert witness who is prepared to testify

10  about these topics and subtopics; regardless of nationality,

11  regardless of race, regardless of poverty, and, the

12  catastrophes that have befallen the country and people of

13  Haiti.

14       And, I say that because in some ways, her testimony

15  either obviates or makes duplicative some of the proffered

16  testimony of Professor Accilien.  So, some.  Not all.  We have

17  not gotten to Professor Accilien yet.

18       But, I do think that I would be remiss -- and, again,

19  this is to provide guidance, right or wrong, to the parties so

20  that they can adjust for trial.  But, I think that she was very

21  important, in aspects of her testimony, in saying there was

22  questions about Haiti by Mr. Houlihan, and, she did not blink

23  an eye.  She did not suggest for a moment that there is a

24  particular valiance or specialness that should be placed upon

25  Haitians or Haitian Americans, or Haitian orphans.  Not at all.

1  And, I think that's important for the reasons that we discussed

2  at the last hearing and because of the importance of Daubert

3  and 702.

4          For all these reasons, I am going to admit Dr. Cooper

5  to testify as an expert, and, I am going to ask Ms. Shotwell,

6  our next date that I have is January 21, 2025, for a final

7  pretrial conference.  But, we are going to need to have a

8  second to last in early January to, at a minimum, get to the

9  bottom of the Professor Accilien and wrestle to the ground any

10 other outstanding issues.

11         I have a couple that I can do today, but there are

12 others that are still open.  And, there may be more that come

13 over the next month.

14         So, Ms. Shotwell, early January in Miami, what can we

15 do that is not that close -- let's say it is at least a week to

16 10 days before January 21st, which is the final pretrial

17 conference in this case.

18         THE COURTROOM DEPUTY:  We have Thursday, January 2nd at

19 2:00 o'clock P.M.

20         THE COURT:  Okay.

21         January 2nd at 2:00 P.M.

22         How is that for counsel?

23         MR. HOULIHAN:  I am available.

24         THE COURT:  Mr. Houlihan is available.

25         Ms. Urban?

1          MS. URBAN:  Is there anything that is possible the

2    following week?

3          I understand Mr. Palomo is out of the country on the

4    2nd.

5          THE COURT:  I don't know if we have anything, and that

6    is getting pretty close to the 21st.

7          THE COURTROOM DEPUTY:  We can do Tuesday, January 7th,

8    at 9:00 A.M.

9          THE COURT:  January 7th, Mr. Houlihan?

10         MR. HOULIHAN:  I am available.

11         THE COURT:  January 7th at 9:00 A.M.?

12         MS. URBAN:  That works for the Government.  Thank you.

13         THE COURT:  So, let me tell you what is going to happen

14   then.

15         That is the date we will set aside, Ms. Shotwell.

16         Can we set aside two hours?

17         THE COURTROOM DEPUTY:  Yes.  That is the only thing on

18   the calendar.

19         THE COURT:  Great.  We will set aside two hours.  That

20   is Accilien and any other open items.

21         Let me do a couple of things.

22         Just as I wanted to do it, my computer goes off.

23         So, just give me one moment so I can pull it up and I

24   can do this in an organized fashion.

25         Okay.  So, some of the open things that remain are

 1   witnesses that the Government seeks and that the defense

 2   opposes, pursuant to Rule 413, 414, and 404(b) of the Federal

 3   Rules of Evidence.

 4         In my order dated November 14th, I have already allowed

 5   and deemed admissible for testimony the people identified as

 6   victim A, victim B, victim C, victim H, victim I, victim J,

 7   victim K, and the individuals identified as witness one,

 8   witness two, and witness three.

 9         Today, having -- I held off on others, waiting for the

10   position of -- the full position of the defense, and, today, I

11   can clearly say, based on the papers, that victim L is

12   admissible.

13         The person identified as witness five is excluded, and

14   will not be allowed to testify.

15         Those two, I can clearly do, based on the position of

16   the parties.

17         One moment.

18         So -- and this is why I think it is important that we

19   have that hearing on January 7th.  What remains right now to be

20   ruled upon are the human beings identified as victim D, victim

21   E, victim G, victim M as in Mary, and victim N as in Nancy.

22         I will tell you that, based on what I was told, the

23   Government, at a prior hearing, said that victim D, they did

24   not intend to call.  So, I'm going to exclude victim D, hearing

25   nothing from the Government.

1          MS. URBAN:  We don't have any objection to that.

2          THE COURT:  Okay.  So, victim D is excluded.

3          Now, victim E, they insert in a supplemental proffer

4    dated November 8th, ECF 47, and they basically admit -- the

5    Government -- that they don't have important detail with

6    respect to victim E.  They even drop a footnote with respect to

7    victim E.

8          So, I want to be very, very clear, which is they have

9    proffered, and they have given notice.  But, this proffer, as

10   of November 8th, which is the latest that the Court has, would

11   not be sufficient for victim E to testify.

12         They have, to the Government's credit, provided

13   supplemental notice to the defense as they go.

14         There is a sense that they have had recent

15   conversations with victim E.

16         I want to be very clear.  On January 7th, any witness

17   of any kind, of this list -- the victim list or the witness

18   list -- that is not deemed admitted by January 7th, at the end

19   of that conference -- and we will have argument at that time --

20   they are out.  I am not going to allow the Government, after

21   January 7th, to add, because trial is less than a month away.

22   And, we are going to be at the point where the entire purpose

23   of the entire trial schedule is to, at a certain fair point,

24   pull up the drawbridge with respect to the adding of witnesses

25   so that the defense can prepare for what is coming.

1          So, I wanted to give everyone notice of that, that

2   right now, I have stated very clearly who is in.  I have stated

3   on a few, definitely D, and witness five, who is out.

4          And then that leaves, to my count, four other

5   individuals that are kind of still in play for argument.

6          And, I will tell you an example of that is witness

7   four.  Witness four in the filing, there is a piece -- and this

8   is on Page 2 of ECF 47, the final paragraph -- of witness four,

9   there aren't years in the last two paragraphs.  So, when

10  allegations of sexual abuse arose against defendant, witness

11  four observed a drastic and scary change in the defendant's

12  demeanor.  There is no year there.

13         And, another example, victim L is one of the former

14  child residents who told witness four that the defendant

15  sexually abused him.  There is no year there.

16         So, that would be the kind of thing where, if that

17  specificity or lack of specificity remains, then I wouldn't

18  allow it.

19         But, I say that because maybe the proffer will sharpen

20  up.

21         There are other aspects of this example that I also

22  want all parties to be on notice of, because it will lead to

23  other briefing to this point, with respect to all of these H

24  13, 414, 404(b) witnesses, what has been argued about is

25  whether they are admissible at all.  What hasn't really

1   sharpened yet is other evidentiary objections; for example --
2   and this is just an example, I only have the proffers that are
3   given to me -- even if a given witness is allowed to testify
4   under the Rules of Evidence that I have allowed, it is not
5   clear how some evidence proffered in these briefings by the
6   Government are not hearsay; for example -- and I am not
7   speaking to any specific witness.  I am going to actually use a
8   hypothetical to make the point.
9           If witness nine was allowed to testify, and that part
10  of the proffer is that victim Z, a former child resident, told
11  witness nine that the defendant sexually abused him, that is a
12  potential hearsay objection that the Government has not briefed
13  in any way.  Not saying that they couldn't overcome it.  But,
14  what I am saying is, is that there is a very big difference on
15  some of these proffers with respect to the victims by letter,
16  with respect to the witnesses by number, that they are
17  testifying to what they see, are testifying to what was around
18  them.
19          That is very different, obviously.
20          Some of the proffers actually have who told the
21  witness in my hypothetical, nine; that, I will need briefing
22  on, because I will not, at this trial, with these kinds of
23  charges hanging over this defendant and these kinds of
24  sensitive allegations and the witnesses who will come forward,
25  we will need to make sure that we are not literally by the seat

1    of our pants, statement by statement, dealing with hearsay

2    objections.

3         I am not saying the Government would have done it

4    without me saying it.  I am just telling them where I am.

5         And, I also am saying it for Mr. Houlihan, which is

6    that I have allowed, under Rules 413, 414 and 404(b), these

7    witnesses to testify under those rules.  But, that does not in

8    any way end the potential objections that Mr. Houlihan may have

9    as to something like hearsay.  So, I hadn't said that yet in

10   the case.

11        Finally, I want to be very clear, as well, on

12   January 7th, the second to last pretrial conference, we will

13   clean all of this up.  Anything outstanding with respect to

14   witnesses will be briefed, argued, and ruled upon.

15        So, you know, again, a failure by the Government to

16   press or ask is going to essentially be a waiver, given what I

17   have said and where things are.  They have an opportunity, if

18   things shore up between now and the 7th.

19        Now, that means, finally, that after the 7th, at the

20   final pretrial conference, at the latest, of the January 21st,

21   I am going to be asking the Government to provide to the

22   defense and the Court -- as I do in my trial order, I ask them

23   to file lists of proposed witnesses and exhibits to be

24   presented in their case-in-chief no later than January 20th,

25   the day before the pretrial conference.  Anything they give to

1    defense, I want them to give to me in hard copy or on thumb

2    drives, or however it is digestible.  Same thing on 3500.  3500

3    in the trial order is January 20th, as well.

4         I say that because that means that as part of

5    January 20th and, therefore, January 21st, it is going to be

6    extremely important to the Court that all of these letters and

7    numbers -- not to mention the charged witnesses, the witnesses

8    attached to the charged counts, which are a separate group of

9    witnesses -- you are going to need to give Mr. Houlihan and the

10   Court a clear key, because I need to really see it, that yes,

11   this is one that is clearly in, this is the nature of their

12   testimony.

13        And, I just want to say that now because people get

14   really busy, and Mr. Houlihan is not going to be expected to

15   piece together the letters and the numbers and how they match

16   up to the names.  He is a great attorney and probably knows

17   before the Court does, because I am always the last to know,

18   but, when he gets the 3500 on the 20th, I want to make sure I

19   am being very clear that not only does he get the exhibit in

20   the 3500, but there has to be some sort of key so that there is

21   absolutely no doubt that everyone at these tables are on the

22   same page as to who is walking in the courtroom; and, therefor,

23   what the nature of the cross is, and I can line it up, as well.

24        Again, I say this because -- not because these

25   attorneys wouldn't do it.  I say it because this has been

1   represented as a 12-day trial for the case-in-chief.  These

2   witnesses are, as far as I am concerned, you know, they are

3   only going to testify once.  And, therefor, it all needs to be

4   shored up.

5           Anything else, counsel, that anyone wishes to do today?

6           MS. URBAN:  I do have a few more scheduling matters.

7           Mr. Houlihan, did you have something you wanted to say

8   first?

9           MR. HOULIHAN:  No.

10          MS. URBAN:  Just to put a couple of things on the

11  Court's horizon before we reconvene in January, the Government

12  does remain committed to having this trial on February 3rd.

13  And, we have understood what the Court's rulings have been so

14  far as far as who is admissible, who isn't.  We are expecting

15  to likely have a filing before we come back to see you again

16  that would reclassify several of the "currently uncharged but

17  deemed admissible" victims as charged victims.

18          And, so, the scope of the trial, itself, would not be

19  changing from what we have already understood the parameters to

20  be.  The discovery is the same.  There is no new discovery from

21  that.  It would just be in order to account for who may

22  actually be here or may not be here, given conditions getting

23  into the courthouse from --

24          THE COURT:  Let me make sure I am understanding you,

25  Ms. Urban.  You are saying, as an example, witness two, or

1    victim B, may testify to more than just the extrinsic,

2    uncharged conduct, they may testify to the charged conduct?

3         MS. URBAN:  No.  Sorry I wasn't clear.  So,

4    hypothetically, victim A, who has already been disclosed as

5    having suffered sexual abuse but is not the subject of counts

6    two, three, four or five, would be an additional count.

7         THE COURT:  You are going to supercede?

8         MS. URBAN:  That is what we are planning to do.

9         THE COURT:  Oh, no. Oh, no. No.

10        MS. URBAN:  If I may explain the reason, because I

11   think it is in order to protect what all the parties and Court

12   has been expecting, which is to have the case on

13   February 3rd --

14        And, obviously, as reflected to the Court, there are

15   difficulties in getting victims who are located in Haiti out of

16   the country to come here.

17        And, so, we are still expecting we will be able to have

18   the victims and witnesses we were accounting for; but, to

19   militate against the possibility of someone not being able to

20   get out of Haiti, there are victims who are located in other

21   countries who have already been disclosed, who were going to be

22   testifying as uncharged victim witnesses, and we would simply

23   propose they be additional counts so that if, for example,

24   someone from Haiti isn't able to get out the country and

25   testify, the person who is in that other country, but can come

1   to the U.S. --

2          THE COURT:  You are going to have a busy holiday

3   season.  The Government can brief whatever they want to brief.

4   There are many ways to do this.  The Government, tomorrow, with

5   respect to -- as an example, victim A, they could charge a

6   completely separate indictment, right now, victim A against

7   this defendant.  I would never stop the Government from doing

8   that, if the Government saw fit to do it and can do it

9   according to law.

10         You are asking this Court to allow a superseder, and I

11  am not sure when that superseder would come.

12         And, there is no way that I would ever permit a

13  superseder in January in this trial.  I think that if the

14  Government told me that tomorrow, they were going to the grand

15  jury and made the proffer that Ms. Urban just made about how

16  the evidence doesn't change, the witnesses don't change, they

17  are already in, that's one thing.  But, it would really -- I

18  mean, especially with the holidays coming, with Mr. Houlihan,

19  you know, the Government can bring a superseder any time it

20  sees fit, even during trial, even after trial, according to the

21  law.  But, it doesn't mean that that is what will be tried on

22  February 3rd.

23         There is a point here where Mr. Houlihan gets to know

24  what he is shooting at, and he has been shooting at five counts

25  for close to a year.  So, two months out, which is what we are

1    right now, on a proffer like Ms. Urban's, with proper briefing,

2    yes, I could see -- I am sure Mr. Houlihan will have something

3    to say even about that.  But, that is a far cry even from

4    anything in January, and even before that.

5           I am not going to make Mr. Houlihan adjust to counts,

6    really, as we get into Christmas.  I am not going to make him

7    do that.  The time is short.

8           I appreciate, Ms. Urban, that you rise, and I

9    appreciate the Government takes their witnesses as they find

10   them, and you are being candid.  But, I want to be candid with

11   the Government, which is a failure to try a new substantive

12   count on February 3rd does not mean it doesn't ever get tried.

13   It doesn't mean that that witness isn't even allowed to

14   testify.  They may actually be allowed to testify to the same

15   things.  It just means that it is not a charged count on

16   February 3rd.

17          So, I hope I'm being clear.  The Government will

18   present a live set of facts, or a live superseder, as it sees

19   fit.  But, you know, I want to be very clear and fair to all of

20   the parties here, and it has been clear beyond peradventure for

21   months to Mr. Houlihan that all of the proffers have been on

22   this single indictment before the Court; so, all, I guess, a

23   way of saying that if the Government intends to do what

24   Ms. Urban suggests, it better hustle.

25          MS. URBAN:  Understood.  And that is certainly what we

1    are working on.  And, I would note that we had flagged this for

2    the defense before I --

3              THE COURT:  Of course.

4              MS. URBAN:  -- your Honor, and we provided the key

5    already that gives the names of who are the victims A, B, C, 1,

6    2, and 3.  So, that information has been provided.

7              And, as I said, there has not been new discovery.  It

8    is just that we have been assessing the Court's ruling and the

9    ever-changing conditions abroad, as we figure out the best way

10   to guarantee that we do have the witnesses that we need

11   available for trial, as everyone has been planning for months

12   and months.

13             THE COURT:  Yes.  That's why I appreciate you saying

14   all that.  That's why I want to be very clear.  And this is for

15   both sides.  This trial is happening on February 3rd.  And,

16   right now, it is happening on these counts.

17             And, if things in the world change, if new counts come,

18   you know, the Government will adjust.  But, because of the

19   seriousness of these charges, because of the nature of the

20   witnesses, and how hard it is for witnesses in these cases to

21   testify, the Government is on clear notice now they should

22   gather everything they can under the sun, even if it is just on

23   these five counts, because I promise you, the trial, the

24   trial -- and this is for the defendant, and this is for all of

25   the witnesses in the case -- the trial will not move.  It will

1    not move.  And, that way, everyone gets certainty that, you

2    know, bring it on these five counts and we will go from there.

3           If the Government has a superseder the following day, I

4    promise you, I will take the heat off my colleagues and I will

5    call that a related case.  And, Mr. Houlihan will deal with a

6    new indictment if one comes.

7           But, I appreciate you rising, Ms. Urban, to give me the

8    chance to make the record.

9           MS. URBAN:  And, if I could make one request in terms

10   of the Court's statement today that witness five is going to be

11   excluded, I was wondering if there will be an opportunity for

12   us to brief that.

13          Mr. Houlihan had filed his opposition, and my

14   understanding was we still would have a bit more time before

15   our reply would be due so we could give some additional

16   information to keep open the possibility that witness five

17   would be available.

18          THE COURT:  Well, look.  What I would say on witness

19   five is that the proffer of the Government, to this point --

20   and I am reading from November 8th, "Witness 5 is an American

21   who visited the orphanage as a volunteer in 1991 or 1992 -- and

22   1992.  That witness observes a boy exit a room followed by the

23   defendant.  While the boy exited the room, he was looking down

24   at his pants and buttoning them up."

25          That is all the proffer is.  Compared to every other

1    proffer, that has to be said, as it stands right now, that is

2    highly equivocal.  There is not even a piece of that proffer

3    that rises to the same level for purposes of 403 that the

4    others do.  And, I have excluded him because that is the extent

5    of the proffer.

6          If you tell me that -- you come on January 7th with a

7    much different proffer, I will hear you.  You have supplemented

8    to Mr. Houlihan throughout this case, and you will continue to

9    do so, as you gather additional evidence.

10          But, I wanted to be fair to you.  I haven't seen any

11   additional proffer than that.  And, compared to the others that

12   are admitted, it is not close.  I mean, Mr. Houlihan would

13   basically tell the Court and any factfinder, as written, in the

14   light most favorable to the Government, that is just simply not

15   anything compared to the charges in this case, compared to the

16   other witnesses in the case.

17          So, I appreciate, Ms. Urban, if you get 17 pages out of

18   witness five between now and January 7th, I am sure

19   Mr. Houlihan will have questions about that.  But, I can only

20   rule on what is before me.  And, so, I wanted to give as much

21   notice as possible, as it stands right now, witness five is

22   out.

23          MS. URBAN:  I appreciate and I understand what your

24   Honor is saying.  Thank you.

25          THE COURT:  I haven't talked about E, 4, G, M, and N.

1          I will tell you, based on our meetings last time, and

2    for the sake of clarity, victim N, the proffer is far less --

3    that is N as Nancy -- and I am disinclined.  Same warnings, it

4    all closes on January 7th.

5          One moment.

6          E, I am going to wait, for the reasons that I stated,

7    because of the footnote and because you will have the ripest

8    proffer on or before the 7th of January.

9          It is close.  I could let it in right now, but, in

10   fairness to Mr. Houlihan, I think there is enough there that,

11   to the Government's credit, they are unsure about, that their

12   lack of certainty on certain detail leads me to wait until the

13   7th.  That's E and N.

14         Four, I already talked about, and M -- that's Mary -- I

15   just don't have a view.  I really -- I don't have a clear view

16   of M as in Mary yet.  So, I will wait until the 7th as well.

17         Anything else we need to do?

18         MS. URBAN:  The final thing to note is -- we will file

19   this so it is clear on the record, as well -- a supplemental

20   response to the Court's standing discovery order.

21         As I flagged before, we will continue to supplement our

22   discovery productions.  We made a request for reciprocal

23   discovery, and we have not received anything in return yet.

24         We, of course, reiterate that request so we will have a

25   fair opportunity to respond to anything the defense might be

1    planning on.  We will just put that in filing on the record so

2    it is documented as to what we produced.

3         THE COURT:  Thank you, Ms. Urban.

4         One last area, and then I think we are done, which is I

5    just want to make sure we have been talking about -- not the --

6    let's call it the core proof on each of the counts.

7         To my understanding -- and I am asking the Government

8    to educate the Court, to the extent that it knows -- each count

9    relies upon a separate single witness and airport records.

10   That's what I understand each count will have in it, something

11   like a travel record and a core victim, not one of these

12   victims with the letters, a different victim.  Is there

13   anything else on each of those counts that I can expect in

14   terms of witnesses, or other evidence?

15        I just want to make sure that I'm not getting lost on

16   victim A through N, and witness 1 through 5, and we are not

17   talking about things that are obvious to the two of you,

18   Ms. Urban and Mr. Houlihan, with respect to the charged counts.

19        MS. URBAN:  Right.  So, we are not planning to have

20   other witnesses, other than probably a couple of law

21   enforcement witnesses to help get in some of those records,

22   perhaps talk, generally, about the scope of the investigation.

23        So, the universe of witnesses is essentially the four

24   currently charged victims, counts two, three, four and five,

25   and then the 404, 413, 414 victims, the expert witness or

1   witnesses, and then a couple of law enforcement witnesses.

2          THE COURT:  For the records?

3          MS. URBAN:  Right.  For records.

4          As far as additional evidence that might come in, you

5   are correct that for each of those four 2423C counts, each of

6   those is predicated on the sexual abuse of the particular

7   victim seated with that count.

8          By virtue of the 413, 414 rulings, and this will be

9   fleshed out in jury instructions, the jury may be able to

10  consider the testimony of the uncharged victims as assessing

11  what happened with respect to the 2423C victims.

12         And then there may be a few other documents that are --

13         THE COURT:  That is very helpful, Ms. Urban.  I am not

14  saying -- you don't have to have a photographic memory right

15  now -- that you don't get to call the witness.  I am not saying

16  that.  It is very helpful just to make sure I am preparing

17  myself for the trial, and we have been focused so much on 413,

18  414, that I just wanted to make sure that I wasn't missing a

19  big area.

20         Mr. Houlihan, sir, anything else you wish to do?

21         MR. HOULIHAN:  Not at this time, your Honor.

22         THE COURT:  Okay.  I will see everybody on January 7th.

23         I wish you all a happy holiday.

24         Thank you.

25         (Proceedings concluded at 5:46 p.m.)

```
 1                      C E R T I F I C A T E
 2

 3          I hereby certify that the foregoing is an

 4   accurate transcription of the proceedings in the

 5   above-entitled matter.

 6

 7
     December 30, 2024        /s/Sharon Velazco
 8   DATE                     SHARON VELAZCO, RPR, FPR
                              Official Court Reporter
 9                            United States District Court
                              400 North Miami Avenue
10                            9th Floor
                              Miami, Florida 33128
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**'**

**'60s** [1] - 23:11
**'70s** [1] - 44:16

---

**/**

**/s/Sharon** [1] - 85:7

---

**1**

**1** [3] - 1:8, 79:5, 83:16
**10** [1] - 67:16
**100,000** [1] - 25:24
**11,000** [3] - 11:24, 13:5
**12** [2] - 23:14, 37:10
**12-day** [1] - 75:1
**12-year** [1] - 16:15
**13** [4] - 13:25, 23:14, 40:18, 71:24
**1301** [1] - 1:18, 1:22
**14-year** [1] - 16:15
**14th** [1] - 69:4
**15** [2] - 45:14, 60:1
**150** [1] - 2:4
**17** [1] - 81:17
**18** [2] - 12:5, 12:6
**18-year** [1] - 31:20
**1960s** [3] - 23:9, 44:18, 45:1
**1980** [2] - 7:18, 8:4
**1983** [1] - 9:21
**1986** [1] - 7:16
**1991** [1] - 80:21
**1992** [2] - 80:21, 80:22
**1:24-cr-20008-DSL-1** [1] - 1:2

---

**2**

**2** [2] - 71:8, 79:6
**2-D** [1] - 47:6
**20** [4] - 33:25, 34:13, 51:4, 51:12
**20-year** [1] - 31:21
**200** [1] - 20:15
**2000** [1] - 31:9
**20005** [2] - 1:19, 1:22
**20008** [1] - 3:7
**2002** [1] - 42:2
**2005** [1] - 10:18
**2010** [1] - 42:22
**2015** [1] - 10:20
**2017** [2] - 45:5, 59:20
**2018** [2] - 13:4, 45:5
**2020** [9] - 25:20, 29:9, 31:9, 33:4, 35:5,
46:17, 50:9, 59:21
**2024** [2] - 1:5, 85:7
**2025** [1] - 67:6
**20th** [4] - 73:24, 74:3, 74:5, 74:18
**21** [2] - 48:6, 67:6
**21st** [4] - 67:16, 68:6, 73:20, 74:5
**22** [2] - 8:1, 48:6
**24** [4] - 3:6, 31:14, 37:12, 50:23
**2423C** [3] - 60:12, 84:5, 84:11
**26** [3] - 7:7, 31:16, 51:14
**2:00** [3] - 1:6, 67:19, 67:21
**2nd** [2] - 67:18, 67:21, 68:4

---

**3**

**3** [3] - 63:16, 65:1, 79:6
**30** [2] - 50:10, 85:7
**300** [1] - 40:11
**305** [1] - 2:10
**32** [1] - 2:17
**33128** [2] - 2:10, 85:10
**33130-1556** [1] - 2:4
**33132** [1] - 1:15
**3500** [4] - 74:2, 74:18, 74:20
**3:30** [1] - 4:16
**3D** [1] - 42:6
**3rd** [6] - 75:12, 76:13, 77:22, 78:12, 78:16, 79:15

---

**4**

**4** [1] - 81:25
**40** [8] - 11:25, 25:21, 33:22, 33:23, 34:12, 34:13, 48:17
**400** [2] - 2:9, 85:9
**401** [1] - 57:24
**403** [2] - 57:25, 81:3
**404** [1] - 83:25
**404(b** [3] - 69:2, 71:24, 73:6
**413** [5] - 69:2, 73:6, 83:25, 84:8, 84:17
**414** [6] - 69:2, 71:24, 73:6, 83:25, 84:8, 84:18
**47** [2] - 70:4, 71:8
**4th** [1] - 1:14

---

**5**

**5** [3] - 1:5, 80:20, 83:16
**50** [3] - 25:21, 38:24, 59:23
**52** [5] - 11:18, 12:3, 36:16, 62:12, 62:15
**523-5356** [1] - 2:10
**5:46** [2] - 1:6, 84:25
**5th** [1] - 5:1

---

**6**

**6** [1] - 2:17
**60** [1] - 4:16
**612** [1] - 1:15

---

**7**

**702** [5] - 3:21, 56:9, 60:4, 61:9, 67:3
**72** [1] - 43:24
**7th** [17] - 68:7, 68:9, 68:11, 69:19, 70:16, 70:18, 70:21, 73:12, 73:18, 73:19, 81:6, 81:18, 82:4, 82:8, 82:13, 82:16, 84:22

---

**8**

**80** [1] - 34:17
**8th** [3] - 70:4, 70:10, 80:20

---

**9**

**90** [1] - 4:17
**96** [1] - 43:24
**99** [1] - 1:14
**9:00** [2] - 68:8, 68:11
**9th** [2] - 2:9, 85:10

---

**A**

**A.M** [2] - 68:8, 68:11
**ability** [1] - 27:24
**able** [21] - 14:20, 15:6, 20:2, 21:16, 28:2, 28:17, 28:23, 30:6, 31:5, 32:3, 37:25, 42:16, 42:20, 44:7, 48:25, 63:11, 64:1, 76:17, 76:19, 76:24, 84:9
**abnormal** [1] - 7:10
**above-entitled** [1] - 85:5
**abreast** [1] - 22:4
**abroad** [1] - 79:9
**absence** [3] - 63:2, 63:3, 63:4
**absent** [1] - 54:24
**absolutely** [6] - 11:14, 14:8, 22:25, 31:4, 33:4, 74:21
**abuse** [54] - 8:5, 9:4, 9:16, 9:18, 14:15, 15:2, 15:10, 15:11, 15:16, 15:18, 15:21, 17:3, 17:4, 20:7, 20:8, 20:12, 24:6, 24:21, 29:1, 30:20, 32:16, 34:21, 35:20, 37:5, 37:7, 37:14, 39:25, 40:17, 40:23, 41:25, 42:13, 43:12, 44:10, 44:16, 44:17, 45:19, 47:17, 47:18, 48:25, 51:8, 53:9, 53:24, 54:11, 56:7, 57:6, 60:20, 62:11, 63:17, 64:4, 64:9, 65:1, 71:10, 76:5, 84:6
**Abuse** [1] - 40:4
**abused** [26] - 11:9, 11:17, 12:1, 14:10, 16:2, 30:24, 33:8, 36:19, 37:9, 40:2, 40:14, 40:22, 44:23, 45:7, 45:11, 49:7, 50:13, 50:24, 53:15, 54:12, 54:14, 65:7, 65:8, 71:15, 72:11
**abusive** [2] - 14:5, 39:17
**accept** [1] - 48:9
**accepted** [1] - 28:25
**accepting** [1] - 48:10
**access** [2] - 47:7, 60:23
**Acclien** [8] - 4:15, 4:22, 4:25, 5:22, 66:16, 66:17, 67:9, 68:20
**accompanies** [1] - 40:21
**according** [4] - 38:7, 63:5, 77:9, 77:20
**account** [2] - 60:2, 75:21
**accounting** [1] - 76:18
**accurate** [1] - 85:4
**accusing** [1] - 64:22
**act** [3] - 14:5, 35:22, 63:5
**actus** [1] - 60:11
**acute** [1] - 9:11
**add** [1] - 70:21
**adding** [1] - 70:24
**addition** [2] - 9:17, 11:21
**additional** [6] - 76:6, 76:23, 80:15, 81:9, 81:11, 84:4
**addressed** [1] - 43:8
**addressing** [1] - 49:24
**adjust** [4] - 49:19, 66:20, 78:5, 79:18
**admissible** [5] - 69:5, 69:12, 71:25, 75:14, 75:17
**admit** [4] - 4:6, 61:10, 67:4, 70:4
**admitted** [2] - 70:18, 81:12
**adolescent** [3] - 31:19, 33:13
**adopted** [2] - 43:6, 43:8
**adult** [12] - 14:1, 18:9, 18:12, 18:24, 19:1, 19:5, 22:22, 34:16, 38:12, 47:7, 51:5
**adulthood** [1] - 33:9
**adults** [7] - 13:15, 14:2, 29:10, 30:15, 33:14, 47:7, 48:17
**advance** [1] - 65:19
**adversities** [1] - 15:2
**advocacy** [2] - 38:22, 48:21
**affection** [1] - 16:19
**affirms** [1] - 52:17
**afraid** [1] - 22:17
**afternoon** [12] - 3:4, 3:10, 3:13, 3:14, 3:15, 3:16, 3:19, 3:20, 6:16, 6:24, 32:10, 32:11
**age** [27] - 7:7, 11:11, 11:17, 11:18, 12:2, 23:8, 23:13, 23:21, 31:10, 31:14, 31:17, 36:16, 36:17, 37:24, 38:2, 38:6, 38:24, 42:9, 46:14, 47:8, 48:7, 54:9, 59:22, 62:7, 62:13, 62:14, 62:15
**agencies** [2] - 42:11, 47:5
**agency** [1] - 42:25
**ages** [3] - 38:25, 40:18, 52:10
**ago** [2] - 4:3, 45:14
**agree** [5] - 10:10,

32:21, 61:11, 62:2
**airport** [1] - 83:9
**ALBERTO** [1] - 1:21
**alcohol** [1] - 28:5
**align** [2] - 16:9,
24:20
**alive** [1] - 45:15
**allegations** [2] -
71:10, 72:24
**alleged** [1] - 57:12
**allow** [4] - 65:24,
70:20, 71:18, 77:10
**allowed** [14] - 60:17,
61:12, 64:16, 65:10,
65:22, 65:25, 69:4,
69:14, 72:3, 72:4,
72:9, 73:6, 78:13,
78:14
**almost** [4] - 16:11,
16:12, 47:13, 51:23
**AMED** [1] - 8:16
**AMERICA** [1] - 1:4
**America** [1] - 11:20
**American** [7] - 35:6,
46:18, 49:9, 49:10,
62:6, 62:18, 80:20
**Americans** [2] -
48:17, 66:25
**amount** [4] - 4:7,
11:16, 32:22, 41:12
**anal** [11] - 16:22,
17:2, 17:4, 17:16,
19:13, 37:10, 54:18,
58:9, 60:10, 62:25,
63:12
**anally** [1] - 17:9
**anecdotal** [2] -
43:14, 43:15
**angry** [2] - 39:15,
48:3
**announce** [1] - 3:8
**answer** [7] - 48:19,
49:11, 52:5, 53:18,
53:20, 56:18, 64:14
**anticipate** [1] - 58:13
**anticipating** [1] -
62:18
**anus** [7] - 17:7, 18:9,
18:20, 18:25, 19:2,
19:21, 60:13
**anxiety** [1] - 30:22
**anxious** [1] - 18:18
**anyway** [1] - 44:21
**apart** [1] - 63:3
**apologize** [5] -
26:18, 36:2, 36:6,
37:20, 40:9
**apparent** [1] - 61:2
**appearances** [1] -
3:8

**APPEARANCES** [2] -
1:12, 2:1
**apply** [2] - 57:14,
59:11
**appreciate** [7] - 36:7,
78:8, 78:9, 79:13,
80:7, 81:17, 81:23
**approach** [1] - 21:5
**area** [14] - 8:10,
41:18, 47:1, 52:25,
53:5, 53:19, 54:20,
62:13, 62:17, 63:10,
63:20, 64:19, 83:4,
84:19
**areas** [6] - 44:25,
53:12, 54:5, 54:8,
57:4, 64:9
**argue** [2] - 57:1, 57:7
**argued** [2] - 71:24,
73:14
**arguing** [1] - 60:2
**argument** [5] - 4:8,
55:17, 57:8, 70:19,
71:5
**Army** [7] - 7:24, 7:25,
8:4, 8:7, 8:17, 9:21,
9:23
**arose** [1] - 71:10
**art** [1] - 37:21
**aside** [3] - 68:15,
68:16, 68:19
**aspect** [1] - 63:21
**aspects** [2] - 66:21,
71:21
**assault** [7] - 8:23,
9:11, 9:12, 19:20,
20:25, 21:21, 37:12
**assaulted** [2] -
17:24, 25:7
**assaulting** [1] -
38:13
**assessing** [2] - 79:8,
84:10
**assigned** [1] - 8:6
**assignment** [1] - 8:6
**associated** [3] -
9:12, 22:11, 53:9
**assuredly** [2] -
13:23, 14:19
**atlas** [1] - 17:19
**atlases** [1] - 17:21
**attached** [1] - 74:8
**attention** [4] - 8:19,
8:20, 25:3, 44:14
**attorney** [1] - 74:16
**Attorney's** [1] - 1:14
**attorneys** [1] - 74:25
**atypical** [1] - 7:9
**Australia** [2] - 27:3,
41:15

**authorities** [2] -
33:18, 33:21
**available** [13] - 4:23,
5:2, 9:22, 20:17, 35:4,
36:2, 36:6, 41:13,
67:23, 67:24, 68:10,
79:11, 80:17
**Ave** [2] - 1:18, 1:22
**Avenue** [2] - 2:9,
85:9
**average** [11] - 11:17,
12:2, 36:16, 46:14,
49:9, 49:10, 50:5,
59:22, 60:14, 62:6,
62:18
**award** [1] - 44:3
**aware** [5] - 5:13,
28:21, 40:24, 46:16,
62:12
**awareness** [3] -
45:18, 46:10, 47:21
**axillary** [1] - 23:4

---

### B

**backed** [1] - 31:2
**background** [1] -
15:1
**bad** [3] - 24:16,
38:17, 50:19
**ballpark** [1] - 34:25
**barring** [1] - 5:10
**based** [13] - 11:15,
29:11, 29:19, 32:12,
32:13, 32:21, 38:25,
48:15, 52:8, 69:11,
69:15, 69:22, 82:1
**basement** [1] - 50:25
**basis** [4] - 11:1,
21:21, 45:12, 46:23
**bath** [1] - 22:18
**bathroom** [1] - 18:14
**Battered** [1] - 44:19
**battered** [1] - 44:22
**beats** [1] - 34:6
**became** [2] - 9:21,
26:10
**become** [9] - 9:7,
15:21, 18:18, 19:1,
20:19, 25:1, 25:2,
28:25, 62:12
**becomes** [4] - 30:7,
31:13, 31:16, 33:16
**becoming** [1] - 47:23
**befallen** [1] - 66:12
**BEFORE** [1] - 1:10
**befriend** [2] - 21:14,
23:21
**began** [2] - 7:18, 8:8
**begin** [2] - 45:5,

46:20
**beginning** [5] - 3:9,
6:25, 7:21, 23:3,
49:19
**behalf** [2] - 3:11,
3:17
**behavior** [2] - 27:12,
37:15
**behavioral** [1] -
28:24
**behind** [1] - 56:24
**beings** [1] - 69:20
**belabor** [1] - 52:11
**beneficial** [1] - 41:20
**best** [3] - 6:17,
55:16, 79:9
**better** [3] - 9:25,
17:13, 78:24
**between** [9] - 4:16,
15:9, 22:21, 37:11,
40:18, 47:8, 65:6,
73:18, 81:18
**beyond** [4] - 64:20,
65:20, 78:20
**bias** [1] - 58:5
**bibliography** [1] -
36:4
**Biden** [1] - 56:24
**big** [9] - 11:19, 17:8,
26:25, 27:1, 36:21,
36:23, 47:8, 72:14,
84:19
**bit** [8] - 12:14, 19:2,
23:5, 27:12, 54:19,
61:13, 80:14
**blame** [5] - 30:4,
30:5, 40:21, 48:5,
52:8
**bleed** [1] - 18:17
**bleeding** [2] - 18:15,
37:17
**blind** [1] - 66:6
**blink** [1] - 66:22
**bodies** [2] - 11:19,
25:22
**bodily** [1] - 18:19
**body** [9] - 13:3,
14:22, 26:1, 29:8,
31:24, 35:4, 36:15,
54:20, 59:20
**book** [4] - 10:20,
10:22, 43:19, 44:18
**bottom** [2] - 30:1,
67:9
**bowel** [2] - 17:8,
18:18
**boy** [2] - 80:22,
80:23
**Boy** [4] - 11:20,
36:21, 37:1, 50:6

**boys** [1] - 15:17
**brain** [15] - 7:8,
28:10, 28:12, 31:7,
31:8, 31:10, 31:11,
31:12, 31:21, 32:1,
32:3, 33:16, 51:11,
51:13
**breakdown** [1] -
38:24
**bridge** [1] - 61:7
**brief** [5] - 8:25, 59:3,
77:3, 80:12
**briefed** [2] - 72:12,
73:14
**briefing** [3] - 71:23,
72:21, 78:1
**briefings** [1] - 72:5
**bring** [5] - 9:7, 38:16,
64:15, 77:19, 80:2
**bringing** [1] - 33:4
**broad** [5] - 12:22,
20:9, 63:20, 64:2,
64:19
**broader** [1] - 63:15
**broadly** [1] - 60:22
**broken** [1] - 38:3
**brought** [6] - 9:15,
17:10, 30:2, 33:1,
38:9, 43:5
**brutal** [1] - 20:23
**brutally** [1] - 20:24
**bumps** [1] - 12:14
**business** [1] - 26:23
**busy** [2] - 74:14,
77:2
**buttoning** [1] - 80:24
**BY** [7] - 2:6, 6:23,
10:15, 12:10, 27:21,
32:9, 54:17

---

### C

**C-O-O-P-E-R** [1] -
6:13
**cabins** [1] - 47:9
**calendar** [1] - 68:18
**California** [1] - 8:8
**Cambridge** [1] -
62:11
**cameras** [2] - 47:10,
47:14
**camp** [1] - 36:9
**camping** [1] - 47:9
**Canada** [2] - 27:4,
41:15
**Canadian** [4] - 40:5,
40:10, 41:1, 50:6
**candid** [2] - 78:10
**cannot** [4] - 28:15,
35:1, 35:15, 64:21

**capabilities** [1] - 20:1
**care** [5] - 7:10, 15:1, 15:4, 16:20, 49:6
**career** [2] - 7:21, 62:10
**careful** [4] - 63:14, 64:2, 65:15, 66:3
**carefully** [3] - 19:16, 29:5, 59:6
**caregivers** [2] - 14:23, 15:15
**CASE** [1] - 1:2
**Case** [1] - 3:6
**case** [34] - 4:9, 5:9, 5:23, 13:1, 27:16, 44:15, 45:8, 45:13, 45:14, 45:16, 45:17, 45:25, 46:2, 46:4, 50:25, 56:25, 57:20, 58:4, 58:11, 59:1, 59:13, 61:4, 62:20, 65:15, 67:17, 73:10, 73:24, 75:1, 76:12, 79:25, 80:5, 81:8, 81:15, 81:16
**case-in-chief** [2] - 73:24, 75:1
**Cases** [2] - 10:21, 43:20
**cases** [16] - 9:4, 11:21, 20:16, 29:21, 33:20, 36:22, 43:2, 45:23, 46:7, 48:24, 50:5, 51:20, 56:7, 56:20, 56:22, 79:20
**catastrophes** [1] - 66:12
**categories** [2] - 38:25, 44:22
**category** [1] - 36:10
**Catholic** [5] - 11:21, 36:22, 37:2, 50:6, 56:22
**causes** [1] - 52:9
**CDC** [1] - 47:16
**cell** [1] - 42:7
**Center** [8] - 7:25, 8:7, 8:16, 8:17, 22:1, 40:5, 40:10, 41:1
**center** [1] - 48:21
**centers** [3] - 28:14, 38:22, 47:13
**certain** [8] - 9:6, 14:9, 27:13, 31:5, 32:22, 57:9, 70:23, 82:12
**certainly** [15] - 5:7, 7:2, 7:23, 27:4, 32:24, 35:21, 39:1, 41:18,

45:1, 50:9, 53:19, 56:21, 59:6, 61:9, 78:25
**certainty** [2] - 80:1, 82:12
**certify** [1] - 85:3
**cetera** [4] - 8:13, 35:17, 37:18, 47:9
**chair** [1] - 6:17
**challenge** [2] - 23:7, 31:7
**challenged** [2] - 61:14, 61:22
**challenging** [1] - 58:18
**chance** [1] - 80:8
**change** [7] - 33:10, 49:1, 49:5, 71:11, 77:16, 79:17
**changed** [2] - 46:15, 47:2
**changes** [1] - 47:20
**changing** [2] - 75:19, 79:9
**chaotic** [1] - 14:25
**chapter** [2] - 41:23, 43:19
**characteristics** [1] - 57:18
**characterization** [1] - 49:12
**charge** [1] - 77:5
**charged** [7] - 74:7, 74:8, 75:17, 76:2, 78:15, 83:18, 83:24
**charges** [4] - 58:10, 72:23, 79:19, 81:15
**checking** [1] - 18:16
**chief** [2] - 73:24, 75:1
**Child** [5] - 25:20, 40:4, 40:5, 40:10, 44:19
**child** [133] - 7:6, 8:5, 8:9, 8:12, 8:21, 9:2, 9:3, 9:8, 9:15, 9:16, 9:18, 10:1, 10:19, 11:9, 11:11, 11:17, 13:21, 13:24, 14:12, 14:15, 14:25, 15:6, 15:10, 16:20, 17:2, 17:9, 18:11, 18:13, 18:16, 19:4, 19:5, 20:12, 20:13, 20:20, 20:24, 21:1, 21:14, 21:16, 21:21, 22:5, 22:6, 22:12, 22:17, 22:21, 22:22, 24:1, 24:6, 24:14, 24:21, 26:5, 26:7, 27:9,

27:11, 27:14, 27:23, 28:8, 29:1, 30:12, 30:20, 32:16, 34:4, 34:7, 37:6, 37:9, 37:24, 38:9, 38:12, 38:18, 38:16, 38:17, 38:21, 39:4, 39:13, 39:17, 39:18, 39:23, 39:25, 40:17, 41:25, 42:9, 42:13, 44:10, 44:16, 44:17, 44:21, 44:22, 44:23, 44:25, 45:18, 47:3, 47:8, 47:17, 47:25, 48:1, 48:3, 48:4, 48:6, 48:21, 48:22, 48:25, 49:1, 49:4, 49:7, 50:19, 50:20, 50:22, 50:23, 51:2, 51:5, 51:8, 53:3, 53:9, 56:6, 56:22, 57:14, 62:10, 63:17, 64:9, 65:1, 71:14, 72:10
**child's** [1] - 20:14
**childcare** [1] - 47:13
**childhood** [7] - 12:1, 12:2, 33:8, 34:8, 36:19, 49:2, 50:15
**children** [104] - 7:12, 8:23, 10:21, 11:24, 11:25, 12:18, 13:6, 13:9, 13:10, 13:14, 13:22, 14:9, 14:11, 14:20, 16:1, 16:18, 17:20, 17:23, 18:2, 20:8, 21:10, 22:2, 22:5, 22:13, 22:20, 22:24, 23:11, 23:19, 23:25, 24:7, 24:9, 24:18, 24:22, 24:25, 25:4, 25:23, 26:19, 27:13, 28:1, 29:7, 29:9, 30:15, 31:10, 32:25, 33:7, 33:12, 34:23, 34:25, 35:2, 35:11, 35:15, 35:23, 36:10, 36:13, 36:18, 37:14, 37:15, 37:23, 38:8, 38:20, 39:1, 40:1, 40:13, 40:17, 40:18, 42:3, 42:5, 42:8, 43:3, 43:4, 43:5, 43:6, 43:22, 43:23, 43:25, 44:4, 44:24, 45:6, 45:11, 47:12, 47:18, 47:21, 47:23, 49:20, 49:22, 50:13, 50:14, 52:9, 53:14, 54:9, 54:10, 54:12, 57:6, 57:9, 57:22,

58:3, 63:18
**Children's** [1] - 22:1
**China** [1] - 41:18
**Christmas** [1] - 78:6
**chronic** [1] - 58:14
**church** [5] - 11:21, 37:2, 50:7, 50:24, 56:22
**circumstance** [1] - 39:10
**circumstances** [2] - 20:7, 22:7
**cite** [1] - 56:14
**City** [1] - 41:24
**civilian** [1] - 10:5
**clarity** [1] - 82:2
**classic** [1] - 61:17
**clean** [1] - 73:13
**clear** [21] - 5:8, 28:6, 48:20, 63:9, 63:21, 64:12, 64:23, 70:8, 70:16, 72:5, 73:11, 74:10, 74:19, 76:3, 78:17, 78:19, 78:20, 79:14, 79:21, 82:15, 82:19
**clearly** [10] - 27:24, 40:1, 40:13, 60:8, 62:21, 65:25, 69:11, 69:15, 71:2, 74:11
**clears** [1] - 63:1
**client** [2] - 58:5, 65:22
**clinic** [2] - 9:8, 43:6
**clinical** [3] - 18:8, 24:20, 24:24
**close** [8] - 6:18, 50:10, 62:4, 67:15, 68:6, 77:25, 81:12, 82:9
**closed** [1] - 46:14
**closes** [1] - 82:4
**clothing** [1] - 58:15
**co** [1] - 3:12
**co-counsel** [1] - 3:12
**Code** [1] - 8:19
**colleagues** [1] - 80:4
**collecting** [1] - 26:7
**collection** [1] - 26:15
**college** [1] - 7:23
**colon** [1] - 58:14
**coloscopic** [1] - 17:25
**Combs** [1] - 56:25
**comfortable** [1] - 6:17
**coming** [7] - 4:9, 5:22, 35:11, 43:8, 59:21, 70:25, 77:18
**commander** [1] -

10:3
**commanders** [1] - 9:24
**committed** [1] - 75:12
**common** [16] - 22:13, 23:23, 27:14, 29:9, 30:23, 31:4, 31:22, 33:13, 33:19, 47:17, 53:3, 57:8, 57:23, 57:24, 61:6, 63:12
**commonly** [5] - 16:6, 27:7, 49:2, 56:12, 57:2
**communicate** [1] - 28:23
**communication** [3] - 13:20, 14:7, 14:14
**communities** [1] - 10:5
**compared** [9] - 15:10, 15:13, 24:23, 33:18, 33:22, 80:25, 81:11, 81:15
**compelling** [2] - 40:11, 48:5
**compilation** [1] - 33:5
**completely** [8] - 10:10, 23:5, 29:6, 31:16, 31:22, 33:17, 62:16, 77:6
**compliance** [2] - 21:17, 21:18
**compliant** [4] - 20:6, 21:2, 21:6, 25:2
**complicated** [1] - 61:4
**component** [3] - 26:12, 29:17, 48:5
**components** [1] - 31:5
**computer** [1] - 68:22
**concede** [1] - 36:3
**conceded** [1] - 56:18
**concept** [4] - 12:22, 46:22, 52:20, 52:24
**concern** [1] - 10:2
**concerned** [7] - 4:12, 9:7, 15:16, 30:1, 41:3, 56:7, 75:2
**concerning** [1] - 25:8
**concluded** [2] - 48:15, 84:25
**conclusions** [1] - 32:21
**condition** [1] - 54:21
**conditions** [4] - 20:5,

63:18, 75:22, 79:9
**conduct** [4] - 12:3, 48:21, 76:2
**conducting** [1] - 37:4
**conference** [6] - 67:7, 67:17, 70:19, 73:12, 73:20, 73:25
**conferences** [1] - 10:25
**conferred** [1] - 4:18
**confident** [1] - 13:7
**confirms** [1] - 52:23
**confront** [1] - 40:16
**confused** [2] - 15:22, 16:20
**confusion** [1] - 57:19
**connection** [1] - 43:12
**consequently** [2] - 39:17, 58:17
**consider** [2] - 11:3, 84:10
**consistent** [1] - 25:14
**constipation** [1] - 58:14
**Cont'd** [1] - 2:1
**contact** [4] - 14:1, 16:18, 16:21, 22:16
**contacting** [1] - 23:23
**contest** [1] - 65:20
**continental** [2] - 8:2, 8:3
**continue** [4] - 18:2, 42:12, 81:8, 82:21
**continued** [1] - 8:10
**contradict** [1] - 40:24
**control** [1] - 24:13
**controversial** [2] - 12:23, 19:14
**conversations** [1] - 70:15
**convince** [2] - 20:13, 22:21
**convinced** [1] - 43:24
**COOPER** [1] - 6:7
**Cooper** [20] - 2:16, 3:23, 4:14, 4:22, 5:9, 6:4, 6:13, 6:14, 6:16, 6:24, 7:2, 8:14, 55:8, 55:16, 56:11, 59:19, 60:24, 61:10, 61:12, 67:4
**Cooper's** [1] - 5:11
**copy** [1] - 74:1
**core** [4] - 63:21,

64:15, 83:6, 83:11
**corners** [2] - 42:3, 42:8
**correct** [10] - 5:5, 9:2, 12:7, 21:8, 32:20, 46:6, 50:18, 55:1, 55:14, 84:5
**correctly** [1] - 21:4
**cortex** [2] - 28:10, 31:15
**counsel** [5] - 3:8, 3:12, 12:9, 67:22, 75:5
**count** [7] - 71:4, 76:6, 78:12, 78:15, 83:8, 83:10, 84:7
**counterintuitive** [2] - 11:8, 16:13
**counters** [1] - 35:13
**countries** [8] - 17:22, 25:17, 27:2, 35:7, 37:1, 38:22, 41:17, 76:21
**country** [11] - 25:15, 25:17, 43:9, 44:8, 49:3, 66:12, 68:3, 76:16, 76:24, 76:25
**counts** [16] - 60:12, 74:8, 76:5, 76:23, 77:24, 78:5, 79:16, 79:17, 79:23, 80:2, 83:6, 83:13, 83:18, 83:24, 84:5
**couple** [8] - 27:19, 45:19, 55:25, 67:11, 68:21, 75:10, 83:20, 84:1
**course** [7] - 8:11, 8:14, 8:15, 16:17, 23:7, 79:3, 82:24
**courses** [1] - 8:18
**court** [2] - 16:12, 20:16
**COURT** [46] - 1:1, 3:3, 3:15, 3:19, 3:24, 5:3, 5:6, 6:3, 6:16, 10:7, 10:10, 12:2, 12:6, 12:8, 32:6, 40:7, 49:8, 49:14, 54:16, 55:4, 55:7, 55:12, 55:16, 58:21, 59:2, 61:11, 67:20, 67:24, 68:5, 68:9, 68:11, 68:13, 68:19, 70:2, 75:24, 76:7, 76:9, 77:2, 79:3, 79:13, 80:18, 81:25, 83:3, 84:2, 84:13, 84:22
**Court** [22] - 2:8, 2:8, 3:18, 4:11, 5:1, 5:13,

52:3, 57:25, 61:10, 70:10, 73:22, 74:6, 74:10, 74:17, 76:11, 76:14, 77:10, 78:22, 81:13, 83:8, 85:8, 85:9
**Court's** [7] - 65:11, 66:1, 75:11, 75:13, 79:8, 80:10, 82:20
**courthouse** [1] - 75:23
**courtroom** [4] - 4:24, 55:17, 55:23, 74:22
**COURTROOM** [7] - 3:2, 3:5, 6:11, 6:14, 67:18, 68:7, 68:17
**courts** [5] - 51:23, 52:1, 52:2, 52:3, 61:17
**courts-martial** [3] - 51:23, 52:2, 52:3
**coverage** [2] - 45:23, 45:24
**covered** [3] - 36:23, 46:4, 56:19
**crack** [1] - 4:20
**create** [1] - 58:5
**creates** [2] - 21:6, 57:19
**credibility** [1] - 59:13
**credit** [4] - 61:20, 62:5, 70:12, 82:11
**Crimes** [1] - 21:25
**crimes** [2] - 10:22, 22:5
**criminal** [1] - 9:14
**Criminal** [1] - 3:6
**CROSS** [1] - 32:7
**cross** [3] - 4:7, 63:11, 74:23
**Cross** [1] - 2:14
**CROSS-EXAMINATION** [1] - 32:7
**cross-examine** [1] - 4:7
**cry** [1] - 78:3
**CSAM** [2] - 40:4, 40:12
**culture** [1] - 39:5
**current** [1] - 11:4
**CV** [2] - 10:11, 61:15

daily [2] - 17:5, 17:20
**data** [5] - 12:19, 26:15, 42:1, 59:18, 59:20
**DATE** [1] - 85:8
**date** [5] - 4:24, 8:20, 44:13, 67:6, 68:15
**dated** [2] - 69:4, 70:4
**DAUBERT** [1] - 1:10
**Daubert** [3] - 3:21, 67:2
**David** [1] - 21:25
**DAVID** [1] - 1:10
**days** [1] - 67:16
**DC** [2] - 1:19, 1:22
**deal** [2] - 56:6, 80:5
**dealing** [3] - 10:10, 59:25, 73:1
**deals** [2] - 27:23, 30:10
**decade** [3] - 23:11, 46:12, 46:19
**decades** [1] - 45:20
**deceased** [1] - 9:15
**December** [2] - 1:5, 85:7
**decided** [1] - 8:4
**decision** [2] - 10:3, 44:4
**decisions** [2] - 32:2, 51:13
**deemed** [3] - 69:5, 70:18, 75:17
**defecation** [1] - 18:13
**defend** [1] - 65:23
**defendant** [9] - 1:8, 55:13, 71:10, 71:14, 72:11, 72:23, 77:7, 79:24, 80:23
**DEFENDANT** [1] - 2:3
**defendant's** [2] - 60:12, 71:11
**Defender's** [1] - 2:3
**defense** [12] - 55:19, 62:18, 62:19, 63:9, 69:1, 69:10, 70:13, 70:25, 73:22, 74:1, 79:2, 82:25
**Defense** [1] - 9:23
**defense's** [1] - 59:12
**define** [1] - 20:10
**defined** [2] - 7:7, 60:22
**definitely** [5] - 35:12, 42:11, 53:16, 71:3
**delay** [6] - 11:18, 14:11, 14:12, 62:19, 63:4

delayed [41] - 11:2, 11:4, 11:6, 11:8, 12:21, 13:12, 14:13, 14:17, 14:19, 19:10, 15:20, 27:22, 27:23, 29:3, 29:17, 29:19, 30:9, 31:1, 36:14, 36:15, 45:2, 45:4, 46:7, 46:10, 46:22, 48:8, 50:4, 52:14, 52:16, 52:18, 54:7, 56:12, 56:20, 56:25, 57:5, 59:8, 59:21, 62:2, 62:8, 62:24
**delays** [1] - 15:9
**deliver** [1] - 42:9
**demeanor** [1] - 71:12
**denial** [1] - 32:25
**denies** [1] - 30:12
**deny** [4] - 19:10, 32:25, 40:19, 40:20
**Department** [3] - 1:18, 1:21, 9:23
**depression** [1] - 30:22
**DEPUTY** [7] - 3:2, 3:5, 6:11, 6:14, 67:18, 68:7, 68:17
**deputy** [1] - 4:24
**describe** [5] - 7:21, 8:25, 14:21, 37:25, 64:18
**described** [2] - 64:20, 65:4
**desensitize** [1] - 22:17
**designated** [2] - 8:5, 9:21
**detail** [3] - 41:12, 70:5, 82:12
**details** [4] - 27:25, 28:16, 35:16, 48:25
**detoured** [1] - 23:15
**developed** [1] - 59:20
**development** [2] - 7:6, 7:10
**developmental** [9] - 7:3, 7:4, 7:5, 7:14, 7:17, 14:6, 14:11, 14:12
**develops** [2] - 39:4, 60:8
**diagnoses** [2] - 30:21, 30:23
**diagnosis** [1] - 44:17
**dialectical** [1] - 28:24
**Diddy** [1] - 56:24
**differ** [1] - 63:12

## D

**D'ARCEY** [1] - 2:3
**D'Arsey** [1] - 3:16
d'arsey_houlihan@ fd.org [1] - 2:5
**daddy** [1] - 39:14

**difference** [7] - 15:8, 27:1, 33:15, 47:8, 65:6, 72:14

**differences** [1] - 15:23

**different** [17] - 10:1, 20:2, 22:3, 24:18, 25:21, 32:2, 37:8, 38:25, 39:1, 39:9, 42:18, 44:24, 57:10, 72:19, 81:7, 83:12

**differently** [1] - 60:6

**difficult** [6] - 15:6, 28:4, 28:6, 28:22, 44:9, 47:18

**difficulties** [2] - 7:13, 76:15

**difficulty** [1] - 28:1

**digestible** [1] - 74:2

**digitally** [1] - 23:23

**diminishing** [1] - 42:5

**Direct** [1] - 2:14

**DIRECT** [1] - 6:22

**directly** [1] - 52:4

**disagree** [1] - 19:8

**disaster** [1] - 44:5

**discipline** [1] - 61:23

**disclose** [10] - 30:12, 33:13, 33:20, 34:1, 38:8, 39:11, 47:21, 47:24, 60:1, 63:19

**disclosed** [5] - 33:25, 34:4, 59:17, 76:4, 76:21

**discloses** [1] - 34:4

**disclosure** [79] - 9:2, 9:5, 11:3, 11:4, 11:6, 11:8, 11:17, 12:3, 12:22, 13:9, 13:12, 13:13, 13:16, 13:17, 14:18, 14:19, 15:7, 15:9, 15:19, 15:23, 19:10, 25:20, 27:10, 27:22, 27:23, 28:7, 29:3, 29:7, 29:10, 29:11, 29:17, 29:19, 30:9, 30:10, 31:1, 31:2, 33:12, 33:16, 34:2, 34:3, 34:7, 34:14, 36:15, 36:16, 37:6, 38:2, 38:6, 38:13, 39:3, 39:17, 39:19, 40:2, 40:15, 41:6, 45:2, 45:4, 46:7, 46:10, 46:14, 46:23, 47:25, 48:9, 50:4, 51:5, 52:14, 52:18, 54:7, 56:12, 57:5, 59:22, 60:25, 62:2,

62:7, 62:8, 62:14, 62:24, 63:24

**disclosures** [9] - 15:13, 36:14, 41:7, 41:8, 46:20, 52:9, 52:16, 56:20, 56:25

**discomfort** [1] - 19:5

**discourage** [1] - 63:24

**discourages** [1] - 60:24

**discovered** [1] - 31:11

**discovery** [7] - 59:8, 75:20, 79:7, 82:20, 82:22, 82:23

**discussed** [2] - 26:16, 67:1

**discussing** [1] - 59:21

**discussion** [1] - 33:5

**disease** [1] - 39:8

**disinclined** [1] - 82:3

**disorder** [2] - 30:22, 30:25

**disrobe** [1] - 22:18

**dissociative** [1] - 30:25

**distension** [1] - 58:14

**distinct** [1] - 25:6

**distressed** [2] - 19:1, 48:2

**DISTRICT** [3] - 1:1, 1:1, 1:11

**District** [2] - 2:8, 85:9

**division** [1] - 9:14

**DIVISION** [1] - 1:2

**doctor** [2] - 7:19, 17:19

**Doctor** [3] - 32:10, 40:7, 55:20

**document** [1] - 50:9

**documented** [1] - 83:2

**documents** [2] - 10:24, 84:12

**domestic** [1] - 15:3

**done** [10] - 13:1, 19:19, 31:9, 47:4, 51:15, 51:23, 52:1, 52:2, 73:3, 83:4

**doubt** [1] - 74:21

**down** [6] - 22:7, 38:3, 40:8, 55:9, 61:25, 80:23

**Dr** [26] - 2:16, 3:23, 4:14, 4:15, 4:22, 4:25, 5:9, 5:11, 5:22, 6:4,

6:16, 6:24, 8:14, 12:16, 17:19, 18:1, 23:10, 55:8, 55:16, 56:11, 59:19, 60:24, 61:10, 61:12, 67:4

**drastic** [1] - 71:11

**drawbridge** [1] - 70:24

**drives** [1] - 74:2

**drop** [1] - 70:6

**due** [1] - 80:15

**duly** [1] - 6:8

**duplicative** [1] - 66:15

**during** [1] - 77:20

**dyes** [2] - 20:2, 54:24

**dynamic** [1] - 24:13

**dynamics** [4] - 8:11, 15:5, 15:25, 22:3

# E

**e-mailed** [1] - 4:23

**early** [3] - 38:8, 67:8, 67:14

**earthquake** [3] - 42:19, 42:23, 43:15

**easily** [1] - 39:16

**ECF** [2] - 70:4, 71:8

**ECPAT** [6] - 41:21, 41:22, 41:24, 42:6, 42:25

**editor** [1] - 10:18

**Eduardo** [1] - 3:12

**EDUARDO** [1] - 1:21

**eduardo.palomo2 @usdoj.gov** [1] - 1:23

**educate** [8] - 16:12, 49:25, 50:12, 50:16, 51:1, 53:6, 53:19, 83:8

**educated** [2] - 48:13, 51:17

**Education** [1] - 8:17

**educe** [3] - 4:5, 57:4, 64:5

**effectively** [2] - 28:23, 45:5

**effects** [4] - 18:8, 60:15, 62:25, 63:11

**eight** [1] - 23:13

**either** [1] - 66:15

**element** [2] - 58:9, 59:9

**ELIZABETH** [1] - 1:13

**emergency** [5] - 9:10, 9:15, 17:10, 18:1, 19:22

**emphatically** [1] -

59:17

**encouraged** [1] - 28:25

**end** [4] - 13:5, 29:10, 70:18, 73:8

**enforcement** [6] - 9:14, 10:5, 38:5, 38:9, 83:21, 84:1

**enter** [1] - 23:3

**entered** [1] - 34:16

**entering** [1] - 23:12

**entire** [3] - 12:17, 70:22, 70:23

**entirely** [1] - 37:8

**entitled** [3] - 10:20, 43:19, 85:5

**environmental** [1] - 49:22

**Epstein** [1] - 45:24

**equals** [1] - 11:25

**equivocal** [1] - 81:2

**escape** [1] - 36:1

**escorted** [1] - 55:21

**especially** [9] - 14:10, 16:1, 19:4, 24:7, 24:12, 32:24, 47:24, 51:23, 77:18

**ESQ** [4] - 1:13, 1:17, 1:21, 2:3

**essentially** [2] - 73:16, 83:23

**et** [4] - 8:13, 35:17, 37:18, 47:9

**evaluated** [1] - 25:23

**evaluations** [1] - 38:23

**evaluators** [1] - 27:2

**event** [1] - 27:25

**eventually** [1] - 9:23

**ever-changing** [1] - 79:9

**evidence** [20] - 9:16, 10:2, 17:11, 37:16, 37:21, 50:3, 56:13, 57:19, 60:7, 60:17, 62:22, 63:2, 63:3, 63:4, 63:8, 72:5, 77:16, 81:9, 83:14, 84:4

**Evidence** [2] - 69:3, 72:4

**evidentiary** [1] - 72:1

**exactly** [1] - 36:3

**exaggerating** [1] - 35:16

**exam** [1] - 37:7

**examination** [2] - 17:25, 19:24

**EXAMINATION** [2] - 6:22, 32:7

**examinations** [1] - 19:19

**examine** [2] - 4:7, 14:6

**examined** [2] - 6:9, 17:20

**examining** [1] - 54:24

**example** [24] - 9:16, 13:14, 23:23, 24:8, 26:5, 29:20, 34:4, 37:10, 38:11, 39:4, 39:6, 42:2, 53:12, 64:6, 64:14, 71:6, 71:13, 71:21, 72:1, 72:2, 72:6, 75:25, 76:23, 77:5

**excellent** [1] - 20:1

**except** [1] - 54:9

**exception** [1] - 51:6

**excited** [1] - 34:5

**exclude** [2] - 56:2, 69:24

**excluded** [5] - 58:17, 69:13, 70:2, 80:11, 81:4

**excoriations** [1] - 17:11

**Excused** [1] - 55:11

**executive** [1] - 31:15

**exhibit** [1] - 74:19

**exhibits** [1] - 73:23

**exist** [3] - 39:22, 40:23, 53:16

**existence** [1] - 62:5

**exists** [1] - 48:9

**exit** [1] - 80:22

**exited** [1] - 80:23

**expand** [1] - 17:7

**expect** [8] - 5:22, 11:9, 32:3, 47:3, 55:12, 55:13, 59:12, 83:13

**expectation** [1] - 51:2

**expectations** [4] - 31:20, 49:1, 49:19, 51:10

**expected** [2] - 59:24, 74:14

**expecting** [4] - 53:25, 75:14, 76:12, 76:17

**experience** [14] - 10:14, 10:16, 16:10, 18:8, 18:20, 24:20, 28:9, 32:12, 32:13, 32:22, 48:16, 56:6, 59:25, 61:16

**experienced** [3] -

27:11, 54:10, 54:12
**experiences** [1] -
29:13
**experiment** [1] -
32:15
**experiments** [1] -
32:14
**expert** [13] - 4:8,
51:25, 56:9, 57:13,
61:17, 61:18, 63:10,
64:1, 64:11, 66:1,
66:9, 67:5, 83:25
**expert's** [2] - 58:19,
58:23
**expertise** [1] - 64:17
**experts** [1] - 10:11
**explain** [2] - 52:21,
76:10
**exploitation** [4] -
10:19, 22:5, 41:25,
42:14
**exploited** [1] - 44:23
**exposed** [1] - 44:24
**exposure** [2] - 15:1,
15:3
**express** [1] - 9:5
**expressing** [1] -
16:19
**extent** [4] - 5:18,
64:4, 81:4, 83:8
**extraordinarily** [1] -
25:14
**extreme** [1] - 58:13
**extremely** [2] -
14:25, 74:6
**extrinsic** [1] - 76:1
**eye** [2] - 20:4, 66:23
**eyewitness** [2] -
38:11

## F

**face** [1] - 30:11
**facilitate** [1] - 7:12
**fact** [28] - 9:17,
15:12, 26:9, 30:14,
32:24, 34:22, 35:18,
36:16, 40:3, 40:21,
43:20, 44:17, 45:16,
46:25, 47:10, 50:12,
50:19, 50:22, 51:4,
51:12, 54:9, 62:3,
62:8, 62:16, 63:6,
64:17
**factfinder** [1] - 81:13
**factor** [1] - 13:20
**factors** [15] - 13:11,
13:19, 18:7, 33:10,
38:3, 38:25, 39:1,
53:2, 53:13, 53:17,

57:5, 57:13, 57:17,
57:21, 59:1
**facts** [5] - 16:13,
25:16, 58:4, 61:4,
78:18
**failure** [2] - 73:15,
78:11
**fair** [9] - 32:14,
45:18, 45:22, 46:9,
49:12, 70:23, 78:19,
81:10, 82:25
**fairly** [5] - 5:17,
13:24, 46:17, 56:15,
65:4
**fairness** [1] - 82:10
**faith** [1] - 61:21
**fall** [1] - 36:9
**fallen** [2] - 23:8
**familiar** [2] - 11:3,
16:23
**family** [12] - 7:12,
9:6, 10:3, 13:22,
20:14, 20:18, 20:20,
20:21, 29:25, 49:5
**far** [10] - 13:17,
17:16, 30:1, 61:7,
75:2, 75:14, 78:3,
82:2, 84:4
**fashion** [1] - 68:24
**fault** [2] - 15:21, 48:4
**favorable** [1] - 81:14
**fear** [1] - 28:14
**fearfulness** [1] - 9:5
**feature** [1] - 56:20
**February** [6] - 75:12,
77:22, 78:12,
78:16, 79:15
**federal** [1] - 61:17
**Federal** [2] - 2:3,
69:2
**fellatio** [1] - 39:8
**fellowship** [1] - 7:16
**female** [2] - 15:11,
46:21
**females** [1] - 15:12
**few** [3] - 71:3, 75:6,
84:12
**field** [11] - 16:6,
19:17, 27:8, 32:18,
33:2, 39:24, 44:10,
45:3, 48:20, 52:6,
63:25
**fight** [1] - 28:13
**figure** [3] - 61:6,
62:15, 79:9
**file** [2] - 73:23, 82:18
**filed** [1] - 80:13
**filing** [1] - 71:7,
75:15, 83:1
**final** [6] - 4:8, 67:6,

67:16, 71:8, 73:20,
82:18
**finally** [5] - 31:16,
58:8, 60:19, 73:11,
73:19
**findings** [18] - 16:9,
17:6, 17:14, 17:15,
18:5, 18:12, 18:13,
25:15, 35:8, 35:19,
35:20, 37:7, 37:13,
37:19, 39:2, 39:3,
40:25
**fine** [1] - 5:6
**finished** [1] - 7:16
**Finklehor** [1] - 21:25
**first** [13] - 3:22, 21:8,
22:11, 23:9, 25:4,
28:2, 28:16, 41:7,
57:4, 59:8, 61:14,
62:2, 75:8
**first-person** [1] -
41:7
**fit** [4] - 65:23, 77:8,
77:20, 78:19
**five** [14] - 31:10,
40:18, 69:13, 71:3,
76:6, 77:24, 79:23,
80:2, 80:10, 80:16,
80:19, 81:18, 81:21,
83:24
**FL** [1] - 1:15
**flagged** [1] - 79:1,
82:21
**Flagler** [1] - 2:4
**flashbacks** [1] -
28:19
**fleshed** [1] - 84:9
**flight** [1] - 28:13
**Floor** [2] - 2:9, 85:10
**FLORIDA** [1] - 1:1
**Florida** [4] - 1:4, 2:4,
2:10, 85:10
**focus** [1] - 57:18
**focused** [1] - 84:17
**followed** [1] - 80:22
**following** [3] - 3:1,
68:2, 80:3
**follows** [1] - 6:9
**footnote** [2] - 70:6,
82:7
**FOR** [3] - 1:13, 2:3,
2:15
**foregoing** [1] - 85:3
**foremost** [1] - 10:11
**forensic** [7] - 7:3,
7:4, 7:5, 7:14, 38:21,
48:1, 48:22
**forensics** [1] - 7:17
**forget** [1] - 4:3
**form** [2] - 22:6, 25:3

**former** [2] - 71:13,
72:10
**forth** [1] - 54:25
**forward** [4] - 30:6,
31:13, 44:20, 72:24
**foster** [2] - 15:1, 15:4
**four** [12] - 22:14,
71:4, 71:7, 71:8,
71:11, 71:14, 76:6,
82:14, 83:23, 83:24,
84:5
**four-year** [1] - 22:14
**fourth** [1] - 46:19
**FPR** [2] - 2:7, 85:8
**framework** [2] - 60:4,
60:21
**Francisco** [1] - 8:7
**frequently** [1] -
39:21
**friend** [1] - 21:15
**frotteuristic** [1] -
37:15
**full** [2] - 6:11, 69:10
**functions** [1] - 18:19

## G

**gather** [2] - 79:22,
81:9
**GEILENFELD** [1] -
1:7
**Geilenfeld** [3] - 3:6,
3:17, 3:19
**general** [6] - 16:8,
47:21, 49:20, 52:14,
57:16, 59:12
**generally** [4] - 38:19,
50:5, 58:2, 83:22
**generically** [1] - 8:21
**geopolitical** [1] -
44:4
**girls** [2] - 15:16,
23:13
**given** [12] - 5:19,
10:11, 20:16, 23:18,
28:4, 28:5, 61:22,
70:9, 72:3, 73:16,
75:22
**glad** [1] - 42:24
**goal** [2] - 22:16,
64:24
**God** [2] - 29:24,
29:25
**gonorrhea** [1] - 39:5
**goose** [1] - 12:14
**Government** [47] -
3:9, 4:5, 4:14, 5:22,
6:4, 53:5, 53:7, 55:22,
57:3, 58:25, 59:3,
61:12, 62:3, 64:4,

64:12, 64:21, 65:2,
65:9, 65:14, 68:12,
69:1, 69:23, 69:25,
70:5, 70:20, 72:6,
72:12, 73:3, 73:15,
73:21, 75:11, 77:3,
77:4, 77:7, 77:8,
77:14, 77:19, 78:9,
78:11, 78:17, 78:23,
79:18, 79:21, 80:3,
80:19, 81:14, 83:7
**GOVERNMENT** [1] -
3:10
**Government's** [4] -
58:12, 60:17, 70:12,
82:11
**gradual** [1] - 21:19
**gradually** [2] - 22:20,
31:13
**graduated** [1] - 7:23
**grand** [1] - 77:14
**graphic** [1] - 58:16
**great** [3] - 56:6,
68:19, 74:16
**grief** [1] - 48:11
**groom** [1] - 20:24
**groomed** [1] - 24:9
**groomer** [1] - 23:20
**grooming** [31] -
20:10, 20:11, 20:13,
20:15, 20:17, 20:18,
21:4, 21:17, 21:18,
22:11, 22:23, 23:19,
24:1, 24:3, 24:18,
25:3, 25:9, 26:16,
26:19, 27:6, 27:14,
60:19, 60:22, 63:18,
63:22, 63:24, 64:6,
64:18, 65:4, 65:9
**ground** [1] - 67:9
**group** [5] - 23:21,
41:8, 41:9, 57:11,
74:8
**groups** [1] - 45:6
**growing** [1] - 39:5
**guarantee** [1] - 79:10
**guess** [11] - 3:24,
5:21, 18:20, 19:12,
22:7, 26:13, 29:2,
37:21, 49:8, 60:22,
78:22
**guidance** [2] - 13:2,
66:19
**guidelines** [1] -
47:16
**guides** [2] - 20:15,
20:17
**guilt** [3] - 30:4,
40:21, 52:8
**Guy** [1] - 20:19

**gymnast** [1] - 45:8
**gymnasts** [1] - 45:9

## H

**hair** [2] - 23:4, 23:5
**Haiti** [12] - 42:15, 42:16, 42:19, 43:1, 43:3, 44:6, 44:8, 66:13, 66:22, 76:15, 76:20, 76:24
**Haitian** [4] - 43:3, 43:4, 66:25
**Haitians** [1] - 66:25
**Hamilton** [1] - 13:2
**Hampshire** [1] - 22:1
**hand** [2] - 4:12, 9:9
**handle** [1] - 32:3
**handled** [1] - 39:20
**hanging** [1] - 72:23
**happy** [1] - 84:23
**hard** [7] - 14:22, 21:12, 30:5, 48:10, 52:6, 74:1, 79:20
**haves** [1] - 17:4
**Hawaii** [1] - 8:1
**heading** [1] - 65:12
**headquarters** [1] - 41:22
**healing** [1] - 18:3
**hear** [6] - 6:19, 56:1, 64:12, 64:13, 81:7
**heard** [2] - 23:15, 35:5
**hearing** [14] - 3:21, 4:2, 4:23, 4:25, 5:10, 5:19, 5:23, 63:21, 64:23, 67:2, 69:19, 69:23, 69:24
**HEARING** [1] - 1:10
**hearsay** [4] - 72:6, 72:12, 73:1, 73:9
**heat** [1] - 80:4
**held** [1] - 69:9
**help** [4] - 50:21, 51:10, 60:6, 83:21
**helped** [5] - 22:1, 33:6, 41:24, 42:1, 47:16
**helpful** [10] - 25:21, 56:10, 60:5, 60:16, 62:8, 62:16, 63:6, 64:17, 84:13, 84:16
**helpfulness** [8] - 5:16, 10:12, 58:21, 58:22, 61:25, 62:1, 62:23
**Henry** [2] - 23:10, 44:18
**hereby** [1] - 85:3

**hide** [1] - 64:21
**high** [3] - 19:6, 21:9, 59:23
**high-risk** [1] - 21:9
**higher** [3] - 14:9, 14:14, 41:6
**highly** [1] - 81:2
**history** [4] - 5:14, 17:4, 57:23, 61:16
**holiday** [2] - 77:2, 84:23
**holidays** [1] - 77:18
**home** [1] - 15:4
**Honolulu** [1] - 8:1
**Honor** [18] - 3:10, 3:16, 3:23, 4:21, 5:5, 6:5, 6:21, 10:9, 10:13, 11:24, 32:8, 49:13, 55:6, 55:15, 59:8, 79:4, 81:24, 84:21
**HONORABLE** [1] - 1:10
**hope** [1] - 78:17
**hopes** [1] - 48:24
**horizon** [1] - 75:11
**hospital** [2] - 12:17, 19:24
**hospitals** [2] - 24:12
**HOULIHAN** [16] - 2:3, 3:16, 10:9, 32:8, 32:9, 49:13, 54:15, 54:17, 55:2, 55:15, 56:4, 58:22, 67:23, 68:10, 75:9, 84:21
**Houlihan** [42] - 2:17, 3:17, 3:20, 4:1, 4:7, 4:20, 5:11, 5:18, 10:8, 32:6, 49:8, 49:12, 54:16, 55:4, 56:1, 64:7, 64:24, 65:5, 65:10, 65:19, 65:22, 66:22, 67:24, 68:9, 73:5, 73:8, 74:9, 74:14, 75:7, 77:18, 77:23, 78:2, 78:5, 78:21, 80:5, 80:13, 81:8, 81:12, 81:19, 82:10, 83:18, 84:20
**Houlihan's** [2] - 55:24, 61:20
**hours** [7] - 17:9, 37:12, 43:24, 63:5, 63:7, 68:16, 68:19
**human** [1] - 69:20
**hundreds** [1] - 8:24
**Hunter** [1] - 56:24
**hurt** [1] - 38:18
**hustle** [1] - 78:24
**hyperbolic** [2] - 64:10, 64:14

**hypothetical** [4] - 64:10, 64:14, 72:8, 72:21
**hypothetically** [1] - 76:4

## I

**idea** [2] - 12:21, 59:16
**identified** [4] - 69:5, 69:7, 69:13, 69:20
**ignorance** [1] - 52:14
**images** [3] - 39:22, 39:25, 40:22
**immeasurably** [1] - 39:22
**immediate** [1] - 34:2
**immediately** [2] - 43:21, 50:20
**impact** [3] - 14:16, 18:8, 38:6
**imperative** [1] - 17:12
**importance** [1] - 67:2
**important** [11] - 3:24, 4:4, 24:10, 29:18, 36:20, 65:13, 66:21, 67:1, 69:18, 70:5, 74:6
**importantly** [2] - 62:4, 65:21
**impoverished** [1] - 44:8
**impulses** [1] - 28:12
**incarcerated** [3] - 26:6, 26:23, 45:15
**incidence** [1] - 41:6
**include** [1] - 58:3
**included** [1] - 35:3
**incomplete** [2] - 30:10, 31:2
**increase** [1] - 46:9
**increased** [1] - 45:19
**indicate** [1] - 47:20
**indicated** [2] - 48:12, 57:3
**indicates** [1] - 58:12
**indictment** [3] - 77:6, 78:22, 80:6
**individual** [11] - 7:5, 9:6, 13:21, 20:11, 20:19, 21:1, 24:2, 25:2, 25:5, 29:21, 44:6
**individual's** [1] - 46:19
**individuals** [17] - 19:9, 19:17, 20:23,

21:19, 25:18, 26:6, 34:20, 34:25, 35:17, 36:8, 37:4, 37:14, 38:4, 41:10, 47:9, 69:7, 71:5
**Indonesia** [3] - 43:18, 43:24, 44:4
**Indonesian** [1] - 43:25
**infer** [2] - 15:23, 39:8
**infers** [1] - 17:16
**inflammation** [1] - 58:14
**information** [11] - 24:5, 26:17, 26:21, 34:1, 43:15, 43:16, 52:7, 56:10, 79:6, 80:16
**informs** [1] - 21:5
**infrastructure** [1] - 42:20
**injuries** [3] - 9:11, 9:17, 19:20
**insert** [1] - 70:3
**installations** [2] - 8:2, 8:13
**instance** [3] - 35:25, 38:4, 45:24
**instead** [2] - 23:14, 47:5, 47:7
**institution** [3] - 53:4, 53:10, 60:21
**institutional** [6] - 24:3, 24:6, 24:11, 24:17, 45:7, 60:20
**institutionalized** [1] - 15:5
**institutions** [2] - 53:8, 61:1
**instructions** [1] - 84:9
**integrity** [1] - 55:18
**intend** [3] - 53:6, 53:13, 69:24
**intends** [1] - 78:23
**intent** [2] - 20:12, 21:5
**interfere** [1] - 15:25
**International** [2] - 41:23, 41:24
**international** [10] - 10:25, 11:22, 25:16, 40:11, 41:2, 41:5, 41:9, 41:21, 42:11, 46:18
**Internet** [3] - 22:5, 40:23, 45:24
**internship** [1] - 7:25
**interrogation** [1] - 38:16

**interview** [2] - 48:1, 48:22
**interviewing** [1] - 38:21
**interviews** [4] - 26:3, 32:12, 32:13, 32:22
**introduce** [1] - 6:25
**introduced** [1] - 56:8
**introduces** [1] - 57:17
**intuition** [1] - 63:12
**investigation** [3] - 13:18, 83:22
**investigations** [1] - 11:19
**investigative** [2] - 9:14, 10:6
**invoke** [1] - 55:13
**involuntarily** [1] - 58:15
**involve** [2] - 12:19, 60:12
**involved** [9] - 29:25, 32:19, 32:23, 34:20, 34:23, 35:10, 45:16, 46:7, 56:25
**involving** [3] - 43:2, 56:22, 66:8
**Ireland** [1] - 27:4
**irrefutable** [1] - 30:11
**irrelevant** [1] - 58:16
**issue** [9] - 19:10, 42:13, 52:12, 53:8, 53:24, 56:11, 58:18, 58:19, 61:20
**issues** [5] - 7:12, 19:11, 57:14, 57:20, 67:10
**items** [1] - 68:20
**itself** [2] - 63:25, 75:18

## J

**January** [27] - 67:6, 67:8, 67:14, 67:16, 67:18, 67:21, 68:7, 68:9, 68:11, 69:19, 70:16, 70:18, 70:21, 73:12, 73:20, 73:24, 74:3, 74:5, 75:11, 77:13, 78:4, 81:6, 81:18, 82:4, 82:8, 84:22
**Japan** [3] - 42:4, 42:5, 42:6
**JESSICA** [1] - 1:17
**Jessica** [1] - 3:10
**jessica.urban@**

**usdoj.gov** [1] - 1:19
**job** [2] - 50:12, 52:21
**join** [1] - 7:24
**judge** [4] - 6:25,
11:6, 20:10, 23:2
**JUDGE** [1] - 1:11
**Judge** [1] - 56:4
**judged** [1] - 29:15
**judges** [1] - 51:9
**juries** [3] - 51:9,
51:15, 56:16
**juror** [3] - 60:14,
61:2, 61:3
**juror's** [1] - 59:16
**jurors** [6] - 48:13,
50:18, 51:11, 51:22,
51:24, 61:5
**jury** [23] - 5:17,
16:13, 50:1, 50:12,
50:16, 51:2, 51:16,
52:3, 52:4, 53:6,
53:19, 53:22, 56:10,
57:17, 58:23, 59:7,
59:10, 60:3, 60:5,
60:17, 77:15, 84:9
**Justice** [3] - 1:18,
1:21, 8:19

## K

**Karl** [2] - 3:6, 12:16
**KARL** [1] - 1:7
**keep** [1] - 80:16
**keeping** [3] - 22:4,
47:12, 49:22
**Kemp** [1] - 44:18
**key** [3] - 74:10,
74:20, 79:4
**kids** [1] - 58:3
**kill** [1] - 13:22
**killed** [1] - 43:21
**kin** [1] - 62:17
**kind** [17] - 12:21,
15:5, 16:21, 20:9,
23:15, 24:18, 30:11,
38:22, 39:9, 43:7,
44:3, 51:1, 55:23,
59:11, 70:17, 71:5,
71:16
**kinds** [5] - 37:18,
57:10, 58:2, 72:22,
72:23
**knowledge** [1] -
42:16
**knowledgeable** [1] -
47:23
**known** [3] - 12:15,
46:23, 50:5
**knows** [3] - 17:24,
74:16, 83:8

## L

**Lacee** [1] - 3:14
**LACEE** [1] - 1:13
**lacee.monk@usdoj
.gov** [1] - 1:16
**lack** [3] - 57:22,
71:17, 82:12
**lags** [1] - 62:20
**language** [1] - 14:22
**lap** [2] - 22:15, 37:15
**large** [3] - 13:6, 29:8,
45:6
**larger** [1] - 19:4
**last** [17] - 4:12, 6:12,
10:13, 20:5, 27:15,
27:19, 45:19, 46:12,
49:11, 67:2, 67:8,
71:9, 73:12, 74:17,
82:1, 83:4
**latest** [1] - 8:20,
70:10, 73:20
**law** [10] - 9:13, 10:4,
38:4, 38:9, 39:23,
43:25, 77:9, 77:21,
83:20, 84:1
**lay** [1] - 18:22
**lead** [2] - 10:18,
71:22
**leader** [2] - 29:21,
29:22
**leading** [1] - 13:18
**leads** [1] - 82:12
**learned** [2] - 11:19,
23:1
**learning** [3] - 47:16,
49:15
**least** [2] - 30:21,
67:15
**leave** [2] - 35:20,
55:17
**leaves** [1] - 71:4
**led** [1] - 45:5
**legal** [1] - 35:14
**legislature** [1] -
43:25
**LEIBOWITZ** [1] -
1:10
**Lerman** [1] - 8:7
**less** [9] - 4:3, 13:25,
34:12, 43:24, 47:17,
63:19, 64:3, 70:21,
82:2
**letter** [1] - 72:15
**letters** [3] - 74:6,
74:15, 83:12
**letting** [1] - 32:16
**level** [2] - 14:6, 81:3
**licensed** [1] - 47:13
**life** [2] - 34:15, 46:19

**lift** [1] - 12:16
**light** [1] - 81:14
**likely** [9] - 15:13,
33:18, 54:14, 58:5,
63:19, 64:10, 65:7,
65:8, 75:15
**limitations** [1] - 13:8
**limited** [1] - 32:18
**line** [3] - 30:2, 63:9,
74:23
**lips** [1] - 37:17
**list** [3] - 70:17, 70:18
**listen** [1] - 27:3
**listened** [1] - 59:6
**lists** [1] - 73:23
**literally** [1] - 72:25
**literature** [16] -
11:22, 12:25, 13:3,
15:12, 21:18, 21:22,
22:4, 26:5, 29:18,
29:23, 34:19, 35:4,
40:5, 40:12, 41:13,
46:16
**live** [2] - 78:18
**lives** [3] - 15:2,
21:10, 21:11
**local** [1] - 10:4
**located** [2] - 76:15,
76:20
**location** [1] - 44:1
**look** [9] - 21:13,
22:2, 25:14, 35:16,
41:24, 52:17, 56:14,
59:18, 80:18
**looking** [7] - 13:17,
34:21, 35:8, 37:5,
37:6, 44:21, 80:23
**looks** [1] - 21:9
**lost** [1] - 83:15
**love** [1] - 24:10
**lying** [3] - 34:6,
34:23, 35:11

## M

**M.D** [1] - 6:7
**ma'am** [1] - 6:16
**mailed** [1] - 4:23
**main** [1] - 18:6
**major** [2] - 44:3, 45:3
**majority** [8] - 18:4,
19:17, 36:12, 36:18,
36:25, 38:7, 40:4,
40:15
**male** [2] - 15:10, 17:3
**males** [6] - 15:14,
15:19, 15:20, 16:1,
46:21
**maltreatment** [8] -
8:9, 8:12, 8:21, 10:1,

12:18, 22:6, 44:21,
44:25
**manifest** [1] - 18:9
**manifested** [1] -
14:13
**manipulated** [1] -
39:16
**manner** [1] - 34:5
**Marcy** [1] - 13:2
**margin** [1] - 63:1
**mark** [1] - 63:1
**martial** [3] - 51:23,
52:2, 52:3
**Mary** [3] - 69:21,
82:14, 82:16
**Massachusetts** [1] -
62:11
**match** [1] - 74:15
**material** [1] - 39:25
**materials** [2] - 22:9,
27:16
**Materials** [1] - 40:4
**matter** [2] - 3:5, 85:5
**matters** [1] - 75:6
**maturation** [5] - 7:8,
31:8, 32:1, 51:11
**mature** [12] - 23:6,
31:12, 31:13, 31:16,
31:22, 31:24, 31:25,
33:17, 51:14
**matures** [1] - 31:16
**McCann** [2] - 17:19,
18:1
**McMartin** [1] - 44:14
**mean** [13] - 19:12,
19:13, 37:20, 53:2,
54:13, 56:15, 58:24,
60:10, 77:18, 77:21,
78:12, 78:13, 81:12
**means** [8] - 5:8,
11:7, 20:10, 23:2,
49:22, 73:19, 74:4,
78:15
**meant** [1] - 37:21
**Medical** [3] - 7:25,
8:7, 8:17
**medical** [8] - 7:11,
7:19, 7:23, 8:15,
19:14, 39:24, 63:2,
63:4
**medicine** [1] - 31:19
**meetings** [1] - 82:1
**meets** [1] - 60:8
**member** [1] - 9:6
**members** [1] - 52:3
**memory** [2] - 62:13,
84:14
**mention** [1] - 74:7
**mentioned** [5] -
34:12, 41:14, 43:14,

46:22, 58:24
**message** [1] - 30:7
**met** [1] - 66:7
**method** [1] - 24:1
**methodology** [1] -
23:24
**MIAMI** [1] - 1:2
**Miami** [8] - 1:4, 1:15,
2:4, 2:9, 2:10, 67:14,
85:9, 85:10
**Michael** [1] - 3:6
**MICHAEL** [1] - 1:7
**microphone** [1] -
6:18
**mid** [1] - 28:12
**middle** [1] - 33:12
**might** [11] - 9:2, 9:4,
9:7, 14:4, 15:23, 18:9,
28:6, 54:23, 57:13,
82:25, 84:4
**military** [5] - 7:22,
8:10, 8:14, 8:15, 8:22
**Military** [1] - 8:19
**military's** [1] - 8:15
**militate** [1] - 76:19
**mind** [3] - 30:7,
30:18, 59:16
**minimally** [1] - 42:20
**minimum** [1] - 67:8
**minors** [2] - 20:6,
45:10
**minutes** [1] - 4:17
**missing** [1] - 84:18
**Missing** [1] - 10:20,
43:20
**molesting** [1] - 37:14
**moment** [7] - 27:18,
36:1, 55:21, 66:23,
68:23, 69:17, 82:5
**moments** [1] - 62:3
**mommy** [1] - 39:14
**MONK** [2] - 1:13,
3:14
**Monk** [1] - 3:14
**month** [3] - 4:3,
67:13, 70:21
**months** [4] - 77:25,
78:21, 79:11, 79:12
**moreover** [1] - 62:14
**most** [18] - 4:4,
13:22, 13:23, 14:19,
16:14, 20:25, 25:21,
29:9, 30:22, 33:9,
33:13, 33:19, 36:25,
41:20, 43:4, 60:11,
81:14
**motion** [1] - 56:2
**motive** [1] - 16:21
**mouth** [1] - 37:17
**move** [2] - 79:25,

80:1
**movement** [2] - 17:8, 18:18
**MR** [30] - 3:13, 3:16, 3:23, 4:21, 5:5, 6:4, 6:21, 6:23, 10:9, 10:13, 10:15, 12:10, 27:19, 27:21, 32:4, 32:8, 32:9, 49:13, 54:15, 54:17, 55:2, 55:6, 55:15, 56:4, 58:22, 59:7, 67:23, 68:10, 75:9, 84:21
**MRI** [2] - 31:9, 31:10
**MS** [17] - 3:14, 6:2, 68:1, 68:12, 70:1, 75:6, 75:10, 76:3, 76:8, 76:10, 78:25, 79:4, 80:9, 81:23, 82:18, 83:19, 84:3
**multiple** [3] - 9:11, 15:1, 61:17
**muscularly** [1] - 31:24
**music** [1] - 19:18
**must** [3] - 30:2, 31:25, 47:6

**N**

**naked** [1] - 20:4
**name** [4] - 6:11, 6:12, 6:13, 7:2
**names** [3] - 36:1, 74:16, 79:5
**Nancy** [2] - 69:21, 82:3
**narration** [1] - 62:20
**narrative** [1] - 41:7
**nation's** [1] - 10:11
**national** [1] - 10:25
**nationality** [1] - 66:10
**natural** [1] - 44:5
**naturally** [1] - 61:1
**nature** [13] - 14:1, 17:12, 32:18, 37:2, 37:17, 41:2, 44:2, 48:18, 58:16, 61:23, 74:11, 74:23, 79:19
**naysayers** [1] - 41:2
**NE** [1] - 1:14
**nebulous** [1] - 14:22
**necessarily** [8] - 14:23, 15:19, 25:18, 26:4, 35:20, 39:12, 50:13, 51:13
**necessary** [2] - 27:9, 27:10
**necessity** [1] - 17:13

**need** [14] - 11:12, 13:8, 43:8, 48:13, 51:17, 53:5, 60:10, 67:7, 72:21, 72:25, 74:9, 74:10, 79:10, 82:17
**needed** [2] - 8:4, 10:2
**needs** [1] - 75:3
**neglect** [1] - 15:2
**neglected** [1] - 44:22
**neighborhood** [1] - 21:20
**Netherlands** [3] - 41:4, 41:6, 41:15
**neurological** [1] - 28:12
**never** [7] - 11:25, 23:15, 39:2, 51:16, 66:7, 77:7
**new** [5] - 75:20, 78:11, 79:7, 79:17, 80:6
**New** [4] - 1:18, 1:22, 22:1, 41:24
**newer** [1] - 22:6
**news** [3] - 45:23, 45:24, 56:19
**next** [4] - 8:1, 28:2, 67:6, 67:13
**nice** [1] - 20:19
**Nice** [1] - 20:19
**nine** [4] - 23:14, 72:9, 72:11, 72:21
**NO** [1] - 1:2
**nobody** [1] - 33:23
**nondisclosure** [1] - 34:13
**normal** [2] - 7:9, 18:19
**normally** [1] - 13:17
**North** [2] - 2:9, 85:9
**nose** [1] - 49:13
**note** [3] - 55:22, 79:1, 82:18
**nothing** [5] - 37:1, 40:2, 42:22, 58:4, 69:25
**notice** [7] - 58:12, 70:9, 70:13, 71:1, 71:22, 79:21, 81:21
**November** [4] - 69:4, 70:4, 70:10, 80:20
**nowadays** [1] - 47:11
**nuances** [4] - 63:17, 64:4, 64:25, 65:13
**number** [12] - 4:21, 9:18, 26:8, 26:11, 36:4, 56:15, 56:23,

57:7, 59:24, 72:16
**numbers** [4] - 25:22, 34:11, 74:7, 74:15
**numerous** [4] - 27:2, 33:6, 50:17, 52:15
**NW** [2] - 1:18, 1:22

**O**

**o'clock** [1] - 67:19
**O'Tanner** [1] - 23:10
**object** [1] - 56:8
**objection** [3] - 10:8, 70:1, 72:12
**objections** [3] - 72:1, 73:2, 73:8
**objective** [1] - 30:13
**observations** [3] - 16:3, 16:5, 16:9
**observe** [1] - 19:20
**observed** [1] - 71:11
**observes** [1] - 80:22
**obviates** [1] - 66:15
**obvious** [4] - 62:18, 62:19, 63:10, 83:17
**obviously** [5] - 56:6, 65:8, 65:9, 72:19, 76:14
**occasions** [1] - 50:17
**occipital** [1] - 31:12
**occur** [3] - 8:11, 22:3, 64:10
**occurred** [2] - 12:4, 42:19
**occurring** [2] - 8:12, 9:4
**occurs** [2] - 5:24, 39:21
**OF** [2] - 1:1, 1:4
**offender** [8] - 21:6, 21:9, 21:11, 24:14, 26:25, 29:20, 29:21, 60:23
**offenders** [6] - 20:7, 26:3, 26:20, 26:23, 27:12, 39:12
**offense** [1] - 58:10
**offer** [1] - 59:3
**offered** [1] - 56:14
**Office** [2] - 1:14, 2:3
**Official** [1] - 85:8
**official** [1] - 2:8
**often** [7] - 9:2, 11:10, 17:16, 24:9, 34:8, 35:13, 37:11
**old** [6] - 16:15, 50:23, 51:12, 59:23
**olds** [3] - 22:14, 31:20, 31:21

**Olympic** [1] - 45:9
**once** [3] - 9:21, 28:8, 75:3
**one** [59] - 5:3, 5:13, 10:11, 10:13, 12:15, 13:5, 13:18, 14:8, 14:10, 14:11, 15:18, 17:25, 19:11, 21:5, 21:21, 23:12, 25:19, 25:21, 26:12, 26:20, 26:25, 27:18, 28:7, 28:15, 29:8, 29:17, 31:18, 33:11, 35:13, 39:13, 45:12, 47:7, 50:16, 52:11, 53:12, 54:5, 54:15, 55:21, 56:23, 57:7, 57:12, 57:14, 57:15, 59:12, 63:7, 66:4, 68:23, 69:7, 69:17, 71:13, 74:11, 77:17, 80:6, 80:9, 82:5, 83:4, 83:11
**one-time** [1] - 21:21
**ones** [1] - 36:24
**ongoing** [2] - 30:7, 44:25
**online** [2] - 20:17, 41:11
**onset** [2] - 23:7, 23:8
**onus** [2] - 49:4
**open** [4] - 67:12, 68:20, 68:25, 80:16
**opinion** [4] - 4:13, 46:24, 63:16
**opinions** [4] - 4:5, 4:9, 5:16, 5:17
**opportunities** [1] - 20:7
**opportunity** [6] - 19:16, 29:14, 49:6, 73:17, 80:11, 82:25
**opposed** [1] - 25:1
**opposes** [1] - 69:2
**opposite** [1] - 11:14
**opposition** [1] - 80:13
**orally** [1] - 37:16
**order** [8] - 10:2, 27:24, 69:4, 73:22, 74:3, 75:21, 76:11, 82:20
**organization** [4] - 41:20, 41:21, 47:4, 47:6
**organizational** [1] - 47:2
**organizations** [2] - 47:12, 47:19
**organized** [1] - 68:24

**orientation** [1] - 15:24
**orphanage** [1] - 80:21
**orphanages** [1] - 64:9
**orphans** [1] - 66:25
**outcome** [1] - 5:10
**outside** [2] - 8:3, 8:12
**outstanding** [2] - 67:10, 73:13
**overcome** [1] - 72:13
**overrepresentation** [1] - 41:4
**overseas** [3] - 8:13, 9:24, 10:4
**oversimplification** [1] - 54:20
**overwhelming** [2] - 40:3, 50:15
**own** [5] - 40:17, 41:11, 62:4, 62:14

**P**

**P-Diddy** [1] - 56:24
**p.m** [3] - 1:6, 84:25
**P.M** [2] - 67:19, 67:21
**Page** [3] - 63:16, 65:1, 71:8
**page** [1] - 74:22
**Pages** [1] - 1:8
**pages** [2] - 20:15, 81:17
**pain** [1] - 18:13
**PALOMO** [16] - 1:21, 3:13, 3:23, 4:21, 5:5, 6:4, 6:21, 6:23, 10:13, 10:15, 12:10, 27:19, 27:21, 32:4, 55:6, 59:7
**palomo** [1] - 6:3
**Palomo** [8] - 2:17, 3:12, 6:2, 6:20, 10:7, 61:11, 62:9, 68:3
**pants** [2] - 73:1, 80:24
**paper** [4] - 25:20, 29:9, 36:5, 66:8
**papers** [7] - 4:1, 36:25, 47:1, 59:5, 59:21, 63:15, 69:11
**paragraph** [1] - 71:8
**paragraphs** [1] - 71:9
**parameters** [1] - 75:19
**paraphrase** [1] -

60:24

**pardon** [1] - 56:24
**parent** [5] - 9:7, 34:6, 48:2, 48:3
**parents** [8] - 11:10, 14:23, 15:15, 16:14, 43:21, 44:2, 47:25, 49:21
**part** [14] - 8:16, 8:22, 10:5, 10:16, 20:14, 23:19, 29:18, 31:21, 41:8, 48:11, 56:3, 63:7, 72:9, 74:4
**particular** [8] - 10:23, 25:5, 41:18, 44:13, 52:25, 57:12, 66:24, 84:6
**particularly** [4] - 17:3, 22:13, 24:22, 57:6
**parties** [6] - 4:18, 66:19, 69:16, 71:22, 76:11, 78:20
**parts** [1] - 65:3
**pass** [1] - 43:25
**passing** [1] - 58:15
**patient** [9] - 9:11, 17:10, 18:24, 19:1, 30:23, 37:11, 37:12, 39:6
**patients** [9] - 7:9, 7:22, 9:1, 9:10, 18:4, 19:6, 31:4, 34:2, 37:18
**patulous** [1] - 17:7
**pawns** [1] - 24:9
**pay** [2] - 8:19, 8:20
**paying** [1] - 25:2
**pediatrician** [6] - 7:3, 7:4, 7:5, 7:15, 43:10, 43:18
**pediatricians** [1] - 8:5
**pediatrics** [2] - 7:17, 31:18
**pedigree** [1] - 5:14
**peer** [3] - 12:11, 29:11
**peer-based** [1] - 29:11
**peer-reviewed** [1] - 12:11
**peers** [8] - 13:15, 29:10, 29:12, 33:14, 33:18, 33:22, 33:23, 34:13
**penetrated** [4] - 17:9, 18:11, 19:4, 37:16
**penetration** [15] -

16:22, 17:2, 17:16, 18:9, 18:21, 19:13, 37:10, 54:18, 58:9, 60:10, 60:13, 60:16, 62:25, 63:12
**penis** [3] - 18:10, 18:12, 60:13
**Pennsylvania** [1] - 12:25
**people** [18] - 12:13, 12:15, 14:2, 32:16, 35:7, 40:14, 42:8, 47:24, 48:8, 48:14, 50:7, 52:18, 52:20, 52:23, 60:1, 66:12, 69:5, 74:13
**per** [1] - 42:18
**peradventure** [1] - 78:20
**percent** [11] - 11:25, 33:22, 33:23, 33:25, 34:12, 34:13, 34:17, 48:17
**percentage** [3] - 33:20, 34:18, 36:8
**percentages** [1] - 34:11
**perception** [1] - 50:18
**perfectly** [1] - 22:22
**perhaps** [6] - 33:14, 38:10, 48:1, 54:19, 65:21, 83:22
**period** [1] - 30:8
**peripubescent** [3] - 22:24, 23:1, 23:19
**Peripubescent** [1] - 23:3
**permit** [1] - 77:12
**permitted** [2] - 61:17, 62:24
**perpetrator** [1] - 20:22
**person** [12] - 12:15, 17:21, 23:21, 24:13, 29:9, 33:13, 36:3, 41:7, 50:5, 60:16, 69:13, 76:25
**Person** [1] - 20:19
**personal** [1] - 32:22
**personally** [2] - 19:19, 43:2
**persons** [1] - 18:22
**Persons** [2] - 10:20, 43:20
**perspective** [1] - 57:1
**Perspectives** [1] - 43:19
**pertaining** [1] -

27:23
**pet** [1] - 25:1
**phenomenon** [5] - 21:19, 31:2, 37:8, 46:18
**phones** [1] - 42:7
**photographic** [1] - 84:14
**photographing** [1] - 18:2
**photographs** [1] - 17:20
**photography** [3] - 17:5, 20:1
**phrased** [1] - 63:23
**physical** [13] - 14:17, 15:2, 17:6, 18:5, 18:8, 18:12, 35:19, 35:20, 37:7, 37:13, 39:2, 39:3, 63:3
**physically** [1] - 37:9
**physician** [2] - 45:8, 54:24
**physicians** [1] - 19:7
**picked** [1] - 54:23
**picture** [1] - 40:19
**pictures** [1] - 40:17
**piece** [4] - 66:8, 71:7, 74:15, 81:2
**place** [3] - 35:11, 47:6, 57:12
**placed** [1] - 66:24
**plainly** [1] - 60:13
**Plaintiff** [1] - 1:5
**PLAINTIFF** [2] - 1:13, 2:15
**planning** [4] - 76:8, 79:11, 83:1, 83:19
**plant** [1] - 59:15
**play** [3] - 13:12, 13:19, 71:5
**plays** [1] - 66:3
**point** [10] - 21:8, 35:6, 44:20, 52:13, 70:22, 70:23, 71:23, 72:8, 77:23, 80:19
**pointed** [1] - 8:8
**points** [1] - 26:15
**police** [1] - 38:21
**policies** [2] - 47:2, 47:20
**policy** [1] - 47:6
**polling** [1] - 51:22
**polygraph** [2] - 26:3, 26:4
**polygraphs** [1] - 26:10
**pool** [1] - 35:18
**pools** [1] - 36:21
**populations** [1] -

36:23
**pornography** [4] - 26:5, 26:7, 39:23
**position** [4] - 8:22, 69:10, 69:15
**positive** [6] - 17:14, 17:15, 18:5, 35:18, 39:2, 39:3
**possibility** [5] - 17:6, 25:6, 58:1, 76:19, 80:16
**possible** [3] - 17:9, 68:1, 81:21
**possibly** [1] - 61:15
**post** [5] - 26:3, 26:4, 30:21, 43:15, 44:14
**post-polygraph** [2] - 26:3, 26:4
**posts** [1] - 64:24
**potential** [4] - 20:21, 23:25, 72:12, 73:8
**potentially** [1] - 25:3
**poverty** [2] - 57:22, 66:11
**power** [2] - 24:13, 24:14
**practice** [1] - 60:24
**precisely** [1] - 61:18
**predicated** [1] - 84:6
**predominantly** [1] - 11:20
**prefrontal** [2] - 28:10, 31:15
**prejudice** [2] - 57:19, 58:2
**prejudicial** [2] - 58:7, 58:16
**prepare** [3] - 65:22, 65:23, 70:25
**prepared** [2] - 66:6, 66:9
**prepares** [1] - 21:1
**preparing** [1] - 84:16
**preponderance** [1] - 62:22
**presence** [1] - 20:3
**present** [9] - 3:17, 10:2, 21:12, 22:9, 23:11, 30:15, 53:17, 59:1, 78:18
**presented** [1] - 73:24
**preserve** [1] - 55:18
**press** [2] - 56:2, 73:16
**pressure** [1] - 5:7
**pretrial** [5] - 67:7, 67:16, 73:12, 73:20, 73:25
**pretty** [1] - 68:6
**priests** [2] - 36:22,

37:2
**primary** [1] - 5:19
**principles** [1] - 27:6
**proactive** [1] - 41:19
**probability** [1] - 19:5
**problems** [3] - 7:11, 43:7
**proceeding** [1] - 51:23
**proceedings** [5] - 3:1, 35:14, 52:2, 85:4
**Proceedings** [1] - 84:25
**process** [7] - 10:6, 18:3, 28:11, 35:23, 48:6, 48:11, 51:11
**processes** [1] - 49:23
**produce** [1] - 59:9
**produced** [1] - 83:2
**producing** [1] - 26:7
**productions** [1] - 82:22
**profession** [4] - 7:1, 12:23, 16:24, 19:14
**professional** [2] - 16:9, 59:25
**professionals** [4] - 16:6, 27:7, 50:11, 52:22
**Professor** [4] - 13:2, 66:16, 66:17, 67:9
**proffer** [16] - 10:12, 70:3, 70:9, 71:19, 72:10, 77:15, 78:1, 80:19, 80:25, 81:1, 81:2, 81:5, 81:7, 81:11, 82:2, 82:8
**proffered** [11] - 4:5, 4:8, 4:9, 4:13, 5:16, 63:16, 66:9, 66:15, 70:9, 72:5
**proffers** [4] - 72:2, 72:15, 72:20, 78:21
**profoundly** [2] - 11:23, 26:8
**program** [1] - 8:15
**progressed** [1] - 9:1
**promise** [2] - 79:23, 80:4
**prong** [6] - 58:21, 59:9, 60:4, 61:19, 61:25, 62:23
**proof** [3] - 30:11, 30:13, 83:6
**proper** [1] - 78:1
**propose** [1] - 76:23
**proposed** [1] - 73:23
**proposes** [1] - 58:25
**prosecutor** [3] -

54:5, 62:10, 63:23
**Prospectus** [1] - 10:20
**prostitution** [1] - 42:4
**protect** [2] - 44:4, 76:11
**Protection** [2] - 40:6, 40:10
**protection** [2] - 49:4, 49:5
**protective** [1] - 15:16
**protector** [1] - 21:15
**provide** [5] - 42:21, 56:9, 64:8, 66:19, 73:21
**provided** [4] - 5:12, 70:12, 79:4, 79:6
**psychiatric** [2] - 24:8, 24:12
**psychiatry** [2] - 31:19, 39:24
**psychological** [7] - 7:11, 14:17, 57:14, 63:17, 64:3, 64:25, 65:13
**psychology** [1] - 39:24
**PTSD** [3] - 28:19, 28:20, 30:19
**puberty** [5] - 23:4, 23:7, 23:8, 23:12, 23:13
**pubescent** [2] - 22:24, 23:18
**pubic** [1] - 23:5
**public** [1] - 45:18
**Public** [1] - 2:3
**publicized** [1] - 50:4
**published** [2] - 10:16, 46:17
**pull** [2] - 68:23, 70:24
**pulling** [1] - 12:21
**purpose** [9] - 5:19, 27:14, 47:12, 50:9, 51:1, 56:9, 63:2, 64:23, 70:22
**purposes** [2] - 5:15, 81:3
**pursuant** [1] - 69:2
**pushing** [1] - 31:19
**put** [16] - 4:1, 9:18, 12:13, 18:25, 25:22, 29:6, 44:13, 47:6, 49:4, 60:6, 64:11, 64:25, 65:12, 75:10, 83:1
**putting** [1] - 62:14

**Q**

**qualifications** [5] - 5:11, 10:8, 56:5, 58:19, 61:14
**quality** [1] - 29:2
**quantities** [1] - 13:6
**questioned** [1] - 38:4
**questions** [10] - 27:20, 32:4, 40:11, 40:12, 51:25, 52:4, 53:1, 55:6, 66:22, 81:19
**quibble** [1] - 56:5
**quickly** [1] - 39:21
**quite** [2] - 27:12, 50:18

**R**

**race** [1] - 66:11
**range** [3] - 19:20, 25:24, 60:15
**rapist** [1] - 21:20
**rapists** [1] - 20:23
**rates** [1] - 15:9
**rather** [3] - 13:15, 32:14, 57:18
**RAYMOND** [1] - 2:3
**react** [1] - 9:25
**reaction** [4] - 19:3, 34:3, 62:14, 62:15
**read** [2] - 59:5
**readily** [2] - 15:19, 61:2
**reading** [2] - 56:21, 80:20
**real** [1] - 57:20
**realistic** [2] - 31:20, 51:10
**really** [29] - 10:21, 10:22, 12:15, 12:16, 14:3, 17:24, 20:1, 26:20, 28:11, 28:16, 28:17, 32:3, 34:15, 39:15, 41:19, 43:16, 49:3, 52:8, 59:16, 59:19, 61:20, 61:25, 71:25, 74:10, 74:14, 77:17, 78:6, 82:15
**realm** [1] - 57:23
**reason** [7] - 15:20, 18:6, 28:7, 28:8, 36:20, 47:15, 76:10
**reasons** [9] - 15:18, 25:19, 28:15, 31:18, 62:21, 65:24, 67:1, 67:4, 82:6
**rebuttal** [1] - 59:3
**recanted** [1] - 34:14

**recanting** [1] - 34:17
**received** [3] - 9:1, 45:23, 82:23
**receiving** [1] - 8:8
**recent** [6] - 49:17, 49:18, 49:19, 50:25, 59:18, 70:14
**reciprocal** [1] - 82:22
**reclassify** [1] - 75:16
**recognize** [7] - 14:23, 16:18, 27:13, 28:22, 33:6, 40:3, 45:6
**recognizing** [2] - 17:13, 25:5
**recommended** [1] - 47:5
**reconvene** [1] - 75:11
**record** [9] - 3:9, 5:25, 6:12, 55:22, 61:13, 80:8, 82:19, 83:1, 83:11
**records** [4] - 83:9, 83:21, 84:2, 84:3
**Red** [1] - 2:14
**redirect** [1] - 55:5
**references** [1] - 50:10
**refers** [1] - 39:24
**reflected** [1] - 76:14
**reflexive** [1] - 19:3
**regard** [3] - 53:1, 54:18, 58:8
**regarding** [10] - 24:5, 48:25, 50:12, 50:16, 52:14, 53:5, 53:8, 56:5, 57:20, 58:8
**regardless** [3] - 66:10, 66:11
**region** [1] - 31:12
**regular** [2] - 11:1, 45:11
**reiterate** [1] - 82:24
**related** [4] - 13:12, 20:14, 32:24, 80:5
**relatedly** [1] - 30:9
**relates** [2] - 14:17, 20:11
**relation** [1] - 29:3
**relationship** [2] - 29:20, 39:13
**relatively** [1] - 61:4
**relevance** [2] - 58:1, 58:19
**relevant** [3] - 57:25, 58:10, 60:14
**reliability** [5] - 5:17, 10:12, 25:25, 61:19, 61:22

**reliable** [2] - 25:11, 61:19
**relied** [2] - 16:6, 27:7
**relies** [1] - 83:9
**religion** [1] - 30:1
**religious** [2] - 29:21, 29:22
**remain** [2] - 68:25, 75:12
**remaining** [1] - 10:4
**remains** [2] - 69:19, 71:17
**remember** [3] - 28:11, 30:20, 36:2
**remiss** [2] - 5:21, 66:18
**remotely** [1] - 12:22
**repeat** [1] - 26:10
**repeatable** [1] - 32:14
**repeatedly** [1] - 30:24
**repetitively** [1] - 21:3
**rephrase** [1] - 53:23
**reply** [1] - 80:15
**report** [2] - 59:14, 62:19
**reported** [1] - 42:17
**REPORTED** [1] - 2:6
**REPORTER** [1] - 40:7
**Reporter** [2] - 2:8, 85:8
**reports** [1] - 42:18
**represented** [1] - 75:1
**repressed** [1] - 62:13
**reproducible** [1] - 12:19
**reputable** [1] - 27:2
**request** [3] - 80:9, 82:22, 82:24
**require** [1] - 61:8
**required** [2] - 62:7, 62:23
**requirements** [1] - 61:9
**Research** [1] - 22:1
**research** [45] - 8:21, 10:17, 11:4, 11:15, 11:16, 11:24, 13:1, 18:7, 22:9, 23:18, 24:3, 24:20, 25:8, 25:16, 25:19, 25:22, 26:2, 27:3, 27:22, 29:3, 29:8, 30:9, 31:3, 33:11, 34:24, 36:12, 36:15, 36:21, 37:4, 38:7, 39:18, 41:5, 41:9, 41:18, 42:12,

42:17, 42:18, 42:21, 43:12, 44:9, 44:25, 47:1, 49:16, 61:16
**researcher** [1] - 39:19
**researchers** [12] - 17:22, 21:24, 27:2, 27:5, 34:23, 35:7, 35:9, 35:10, 35:12, 35:21, 35:25, 36:12
**residency** [1] - 7:25
**resident** [1] - 72:10
**residential** [3] - 24:22, 24:23, 24:25
**residents** [1] - 71:14
**respect** [25] - 4:14, 4:21, 16:21, 22:4, 22:24, 25:18, 26:11, 26:15, 26:24, 28:1, 31:1, 41:4, 60:10, 60:19, 61:19, 70:6, 70:24, 71:23, 72:15, 72:16, 73:13, 77:5, 83:18, 84:11
**respond** [1] - 82:25
**responds** [1] - 18:21
**response** [1] - 82:20
**return** [2] - 54:21, 82:23
**reus** [1] - 60:11
**revealed** [1] - 46:17
**review** [2] - 25:8, 42:24
**reviewed** [5] - 12:11, 27:15, 27:16, 61:24, 66:7
**revised** [1] - 13:8
**reward** [2] - 22:15
**rewards** [2] - 22:11, 23:18
**ripest** [1] - 82:7
**rise** [4] - 3:2, 65:18, 78:8
**rises** [1] - 81:3
**rising** [1] - 80:7
**risk** [10] - 14:9, 14:14, 15:17, 21:9, 53:1, 53:13, 53:17, 57:13, 57:17, 58:3
**robust** [1] - 42:12
**rocket** [1] - 52:8
**room** [7] - 9:10, 9:16, 17:10, 18:1, 19:23, 80:22, 80:23
**Room** [1] - 1:15
**routine** [1] - 19:24
**routinely** [1] - 52:2
**RPR** [2] - 2:7, 85:8
**Rule** [1] - 69:2
**rule** [6] - 51:6, 55:13,

55:18, 65:19, 65:20,
81:20
  **ruled** [2] - 69:20,
73:14
  **rules** [2] - 61:8, 73:7
  **Rules** [3] - 69:3,
72:4, 73:6
  **ruling** [2] - 64:11,
79:8
  **rulings** [2] - 75:13,
84:8

## S

  **sadnesses** [1] -
21:10
  **safe** [2] - 47:12,
49:22
  **sake** [2] - 55:24, 82:2
  **San** [1] - 8:7
  **Sandusky** [7] - 13:1,
45:8, 45:13, 45:14,
45:16, 45:17, 46:4
  **satisfied** [1] - 61:9
  **satisfies** [1] - 62:23
  **saw** [3] - 45:8, 59:24,
77:8
  **scary** [1] - 71:11
  **schedule** [2] - 19:24,
70:23
  **scheduled** [1] - 5:1
  **scheduling** [1] - 75:6
  **school** [2] - 7:24,
44:15
  **School** [2] - 8:16,
8:17
  **science** [1] - 52:8
  **scientific** [5] - 42:17,
42:21, 43:16, 50:3,
59:9
  **scope** [2] - 75:18,
83:22
  **Scout** [1] - 36:21
  **Scouts** [3] - 11:20,
37:1, 50:6
  **SDFL** [1] - 1:14
  **se** [1] - 42:18
  **Sean** [1] - 56:24
  **season** [1] - 77:3
  **seat** [1] - 72:25
  **seated** [3] - 3:3,
6:15, 84:7
  **second** [6] - 5:20,
10:20, 28:8, 54:15,
67:8, 73:12
  **see** [32] - 7:9, 9:3,
9:9, 17:11, 18:2,
19:22, 19:25, 20:2,
20:3, 25:16, 25:17,
26:4, 30:14, 30:23,

32:16, 34:19, 35:3,
35:13, 37:11, 38:12,
38:19, 39:22, 39:25,
43:6, 45:10, 63:8,
65:23, 72:17, 74:10,
75:15, 78:2, 84:22
  **seeing** [1] - 35:8
  **seek** [1] - 65:15
  **seeking** [3] - 4:6,
4:14, 57:4
  **seeks** [1] - 69:1
  **seem** [2] - 16:13,
41:17
  **sees** [2] - 77:20,
78:18
  **self** [5] - 30:4, 30:5,
40:21, 48:5, 52:8
  **self-blame** [4] - 30:5,
40:21, 48:5, 52:8
  **self-shame** [1] - 30:4
  **seminal** [1] - 59:21
  **send** [2] - 52:15
  **sense** [5] - 31:22,
33:15, 44:7, 53:3,
57:8, 57:24, 59:12,
61:6, 66:6, 70:14
  **sensitive** [1] - 72:24
  **sensory** [1] - 18:13
  **sent** [2] - 9:21, 9:24
  **separate** [4] - 63:3,
74:8, 77:6, 83:9
  **sequestration** [2] -
55:14, 55:18
  **serial** [2] - 17:4, 31:9
  **seriously** [1] - 61:22
  **seriousness** [1] -
79:19
  **serving** [2] - 47:2,
47:11, 47:18
  **set** [4] - 68:15, 68:16,
68:19, 78:18
  **setting** [10] - 9:8,
9:10, 18:1, 19:23,
24:4, 24:7, 24:11,
24:17, 38:17, 49:7
  **settings** [6] - 15:1,
24:8, 24:23, 24:24,
24:25, 45:7
  **several** [3] - 21:24,
28:17, 75:16
  **sex** [2] - 27:12, 62:10
  **sexual** [52] - 8:23,
9:4, 9:11, 9:12, 9:16,
9:18, 10:19, 14:1,
14:15, 15:10, 15:11,
15:16, 15:17, 15:24,
16:18, 17:2, 19:19,
20:6, 22:5, 24:6,
24:21, 29:1, 30:20,
34:21, 35:20, 37:5,

37:7, 37:13, 39:25,
40:17, 40:23, 41:25,
42:13, 43:12, 44:10,
44:16, 45:18, 47:17,
48:25, 51:8, 53:9,
56:6, 60:20, 63:17,
64:4, 64:9, 65:1,
71:10, 76:5, 84:6
  **Sexual** [1] - 40:4
  **sexuality** [1] - 15:22
  **sexually** [32] - 11:9,
11:17, 12:1, 14:10,
16:1, 17:24, 20:8,
20:12, 21:21, 23:5,
25:7, 30:24, 31:24,
32:16, 33:8, 33:24,
36:19, 37:9, 38:12,
39:7, 40:1, 40:14,
40:22, 44:23, 45:7,
45:11, 49:7, 50:13,
50:24, 71:15, 72:11
  **shake** [1] - 30:6
  **shame** [4] - 30:4,
30:5, 40:21, 52:9
  **share** [2] - 29:14,
33:3
  **SHARON** [3] - 2:7,
6:7, 85:8
  **sharon** [1] - 6:4
  **Sharon** [4] - 2:16,
3:23, 6:13, 7:2
  **sharpen** [1] - 71:19
  **sharpened** [1] - 72:1
  **sheet** [1] - 19:18
  **shift** [2] - 16:22, 20:5
  **shockingly** [1] -
59:23
  **shooting** [2] - 77:24
  **shore** [1] - 73:18
  **shored** [1] - 75:4
  **short** [1] - 78:7
  **shortly** [1] - 38:5
  **shot** [1] - 35:5
  **Shotwell** [3] - 67:5,
67:14, 68:15
  **show** [1] - 59:9
  **showed** [1] - 40:12
  **showing** [1] - 59:22
  **shown** [1] - 33:11
  **shows** [2] - 52:13,
59:18
  **sic** [1] - 20:21
  **sided** [1] - 21:5
  **sides** [1] - 79:15
  **sign** [1] - 37:20
  **significant** [5] - 8:8,
11:18, 13:1, 19:5,
45:23
  **significantly** [1] -
45:19

  **signs** [4] - 34:21,
37:5, 37:7, 54:23
  **similar** [4] - 5:23,
29:12, 44:7
  **simple** [1] - 56:16
  **simply** [2] - 62:16,
76:22, 81:14
  **single** [4] - 66:7,
66:8, 78:22, 83:9
  **sitting** [1] - 22:15
  **situation** [2] - 24:9,
39:9
  **situations** [2] - 57:9,
57:10
  **skeletally** [1] - 31:25
  **skills** [2] - 14:7,
14:14
  **sleeping** [1] - 47:9
  **slippery** [1] - 56:11
  **slow** [1] - 40:8
  **small** [1] - 17:6
  **smell** [1] - 30:16
  **smelled** [1] - 30:16
  **Snapchat** [1] - 45:24
  **social** [1] - 64:3
  **socio** [3] - 63:17,
64:25, 65:12
  **sold** [1] - 42:3
  **soldier** [1] - 10:3
  **soldiers** [1] - 30:19
  **someone** [11] - 12:3,
16:19, 21:16, 35:22,
47:3, 50:20, 50:22,
65:6, 65:7, 76:19,
76:24
  **sometimes** [9] -
9:13, 21:18, 24:15,
28:16, 28:19, 35:14,
37:12, 40:14, 51:21
  **somewhat** [1] - 4:2
  **sore** [1] - 39:4
  **sorry** [11] - 23:15,
26:18, 30:5, 31:9,
35:9, 40:7, 46:14,
49:17, 49:24, 58:22,
76:3
  **sort** [8] - 11:8, 19:2,
39:9, 47:20, 50:2,
53:1, 57:8, 74:20
  **sources** [1] - 26:16
  **SOUTHERN** [1] - 1:1
  **space** [1] - 24:2
  **speaking** [10] - 6:18,
18:25, 25:1, 28:21,
36:5, 37:22, 38:19,
52:7, 72:7
  **special** [1] - 54:24
  **specialness** [1] -
66:24
  **specific** [9] - 8:5,

22:7, 36:3, 54:8,
57:11, 64:8, 65:15,
65:17, 72:7
  **specifically** [8] - 8:9,
19:12, 37:22, 41:25,
42:15, 51:25, 52:17,
53:8
  **specificity** [2] -
71:17
  **spell** [1] - 6:12
  **spending** [1] - 23:25
  **spent** [1] - 8:1
  **spiritual** [1] - 29:23
  **spiritually** [1] - 29:22
  **split** [1] - 4:19
  **stages** [1] - 23:10
  **stalwart** [1] - 34:22
  **stand** [1] - 61:24
  **standing** [1] - 82:20
  **standpoint** [1] -
38:10
  **stands** [2] - 81:1,
81:21
  **start** [3] - 11:2, 20:9,
24:25
  **started** [3] - 42:2,
45:10, 62:10
  **starting** [2] - 23:9,
31:10
  **starts** [3] - 20:18,
22:13, 31:11
  **state** [2] - 3:24, 6:11
  **statement** [6] -
32:14, 45:21, 64:11,
73:1, 80:10
  **statements** [1] -
38:20
  **STATES** [3] - 1:1,
1:4, 1:11
  **States** [16] - 2:8, 3:6,
3:11, 7:24, 8:2, 8:3,
8:12, 11:22, 26:22,
27:5, 36:25, 41:15,
41:23, 43:5, 44:20,
85:9
  **stationed** [1] - 8:7
  **statistics** [1] - 62:11
  **statutes** [1] - 13:7
  **stay** [1] - 4:16
  **STENOGRAPHICA
LLY** [2] - 2:6
  **step** [1] - 55:8
  **still** [18] - 10:25,
13:10, 16:14, 33:17,
45:9, 45:15, 47:24,
48:10, 48:24, 49:24,
50:14, 51:12, 56:1,
67:12, 71:5, 76:17,
80:14
  **stool** [1] - 58:15

**stop** [2] - 10:7, 77:7
**stopped** [1] - 18:16
**stories** [1] - 56:23
**strategies** [1] - 59:13
**strategy** [2] - 27:14, 60:22
**street** [2] - 42:3, 42:8
**Street** [1] - 1:14, 2:4
**stress** [1] - 30:21
**structure** [1] - 20:20
**studied** [8] - 13:11, 21:23, 22:8, 22:23, 23:9, 44:10, 44:16
**studies** [26] - 12:11, 12:13, 12:19, 13:6, 14:6, 14:16, 15:8, 16:3, 16:5, 26:1, 31:9, 31:11, 32:1, 32:13, 33:6, 34:20, 35:10, 40:24, 41:14, 42:15, 48:16, 52:15, 53:4, 56:13, 59:9, 59:18
**Study** [1] - 41:1
**study** [16] - 13:5, 19:16, 32:19, 33:2, 36:23, 40:11, 41:2, 45:3, 50:2, 50:6, 50:7, 52:13, 52:17, 52:23, 52:25, 62:6
**subarea** [2] - 63:13, 64:20
**subareas** [1] - 64:5
**subject** [5] - 19:12, 20:5, 59:7, 63:11, 76:5
**subjectivity** [1] - 32:23
**subjects** [3] - 11:2, 13:7, 25:23
**subspecialty** [1] - 7:6
**substantial** [1] - 63:25
**substantive** [1] - 78:11
**subtopics** [2] - 62:1, 66:10
**suffer** [1] - 65:8
**suffered** [1] - 76:5
**sufficient** [3] - 4:7, 4:19, 70:11
**suggest** [4] - 50:3, 56:13, 64:14, 66:23
**suggests** [1] - 78:24
**sum** [1] - 58:18
**summary** [1] - 63:16
**sun** [1] - 79:22
**supercede** [1] - 76:7
**superseder** [6] - 77:10, 77:11, 77:13,

77:19, 78:18, 80:3
**supervision** [1] - 57:22
**supplement** [1] - 82:21
**supplemental** [3] - 70:3, 70:13, 82:19
**supplemented** [1] - 81:7
**support** [1] - 15:12
**supportive** [1] - 42:20
**supports** [1] - 11:23
**suppository** [1] - 18:25
**surprised** [5] - 34:24, 35:3, 47:24, 47:25, 62:12
**surveillance** [2] - 47:11, 47:14
**survive** [1] - 28:13
**survivors** [7] - 28:22, 29:1, 36:21, 36:22, 40:4, 40:12, 46:21
**susceptibility** [1] - 53:24
**susceptible** [5] - 20:6, 53:14, 54:11, 57:6, 57:22
**sussed** [1] - 5:18
**Svadine** [1] - 12:16
**Sweden** [2] - 12:17, 41:19
**sworn** [1] - 6:8
**sympathy** [1] - 58:6
**symptoms** [1] - 37:7
**Syndrome** [1] - 44:19
**systems** [3] - 32:2, 49:5, 51:9

# T

**tables** [1] - 74:21
**tactile** [1] - 22:16
**talks** [1] - 26:6
**Tanner** [1] - 23:10
**teacher's** [1] - 25:1
**tearing** [2] - 17:11, 63:8
**tease** [1] - 27:10
**technique** [2] - 22:23, 63:24
**technology** [1] - 42:7
**ten** [2] - 16:15, 34:12
**ten-year** [1] - 16:15
**tend** [1] - 13:15
**term** [9] - 29:10, 20:10, 20:11, 20:13, 23:16, 29:22, 37:21,

44:17, 51:22
**terminology** [1] - 21:17
**terms** [4] - 34:11, 62:6, 80:9, 83:14
**tested** [1] - 5:17
**testified** [8] - 5:12, 6:9, 20:16, 50:25, 51:20, 59:19, 61:23, 64:16
**testify** [30] - 51:18, 51:20, 53:8, 53:13, 53:25, 57:13, 58:25, 61:12, 61:18, 62:5, 62:24, 63:11, 64:1, 64:16, 65:25, 66:6, 66:9, 67:5, 69:14, 70:11, 72:3, 72:9, 73:7, 75:3, 76:1, 76:2, 76:25, 78:14, 79:21
**testifying** [4] - 58:13, 72:17, 76:22
**testimony** [32] - 4:13, 32:12, 51:1, 54:19, 56:8, 57:4, 57:16, 58:8, 58:17, 58:23, 59:6, 60:20, 61:5, 61:10, 62:3, 62:7, 62:13, 62:17, 63:5, 63:7, 64:5, 64:8, 65:3, 66:5, 66:14, 66:16, 66:21, 69:5, 74:12, 84:10
**textbook** [1] - 10:19
**Thailand** [2] - 41:22
**THE** [64] - 1:10, 1:13, 2:3, 2:15, 3:2, 3:3, 3:5, 3:10, 3:15, 3:19, 3:24, 5:3, 5:6, 6:3, 6:10, 6:11, 6:13, 6:14, 6:16, 10:7, 10:10, 12:2, 12:5, 12:6, 12:7, 12:8, 32:6, 40:7, 40:9, 49:8, 49:14, 49:15, 54:16, 55:4, 55:7, 55:10, 55:12, 55:16, 58:21, 59:2, 61:11, 67:18, 67:20, 67:24, 68:5, 68:7, 68:9, 68:11, 68:13, 68:17, 68:19, 70:2, 75:24, 76:7, 76:9, 77:2, 79:3, 79:13, 80:18, 81:25, 83:3, 84:2, 84:13, 84:22
**themselves** [4] - 5:12, 21:12, 30:3, 51:24
**therapy** [1] - 28:25
**thereafter** [1] - 38:5

**therefor** [7] - 13:16, 14:21, 15:9, 24:17, 30:12, 74:22, 75:3
**therefore** [10] - 16:5, 17:8, 19:3, 28:15, 35:21, 36:18, 38:19, 41:12, 63:10, 74:5
**Thereupon** [1] - 6:6
**thinking** [3] - 31:15, 42:4, 54:8
**thinks** [2] - 39:19, 62:6, 65:20
**third** [7] - 28:21, 46:19, 57:5, 58:21, 60:4, 63:13, 63:22
**thousand** [1] - 9:20
**thousands** [2] - 22:2, 24:21
**threat** [1] - 13:20
**threaten** [1] - 24:15
**three** [12] - 3:15, 22:14, 30:21, 30:22, 36:4, 46:7, 54:7, 57:3, 69:8, 76:6, 83:24
**threshold** [1] - 60:9
**throat** [4] - 39:4, 39:5, 39:8
**throughout** [1] - 81:8
**thumb** [1] - 74:1
**Thursday** [1] - 67:18
**tick** [1] - 22:7
**tighten** [1] - 19:2
**timing** [1] - 27:24
**tipped** [1] - 4:11
**tissue** [1] - 20:3
**today** [14] - 5:4, 5:8, 5:15, 5:19, 23:1, 23:24, 61:24, 65:4, 66:4, 67:11, 69:9, 69:10, 75:5, 80:10
**together** [4] - 13:3, 22:19, 23:22, 74:15
**tomorrow** [2] - 77:4, 77:14
**topic** [4] - 10:23, 16:22, 63:22, 63:25
**topics** [3] - 61:18, 66:1, 66:10
**torn** [1] - 37:17
**totally** [1] - 24:18
**touches** [2] - 11:12, 16:16
**traffickers** [1] - 43:22
**training** [3] - 7:6, 8:9, 9:24
**trainings** [1] - 9:22
**transcription** [1] - 85:4
**transmitted** [1] - 39:8

**trauma** [9] - 14:17, 20:3, 28:8, 28:9, 30:21, 54:10, 54:13, 57:23, 65:8
**traumas** [1] - 21:11
**traumatic** [1] - 17:17
**traumatized** [3] - 28:9, 54:13, 65:7
**travel** [1] - 83:11
**travesties** [1] - 42:18
**treat** [1] - 8:23
**treated** [4] - 7:22, 9:19, 9:20, 24:21
**treatment** [5] - 9:1, 24:23, 26:9, 26:25
**tremendous** [2] - 11:16, 41:12
**tremendously** [3] - 21:24, 22:2, 42:1
**trial** [22] - 4:6, 4:24, 55:13, 65:18, 66:20, 70:21, 70:23, 72:22, 73:22, 74:3, 75:1, 75:12, 75:18, 77:13, 77:20, 79:11, 79:15, 79:23, 79:24, 79:25, 84:17
**trials** [1] - 5:13
**tried** [2] - 77:21, 78:12
**trier** [4] - 62:8, 62:16, 63:6, 64:17
**triers** [1] - 50:19
**triggers** [2] - 30:15, 30:17
**Tripler** [1] - 7:25
**trouble** [1] - 39:14
**true** [9] - 32:15, 43:13, 44:12, 45:21, 46:11, 46:13, 48:11, 48:23, 65:5
**trust** [3] - 20:18, 20:20, 21:16
**trusted** [2] - 35:1, 35:15
**trusts** [1] - 24:1
**truth** [2] - 35:2, 35:24
**truthfully** [1] - 41:19
**try** [5] - 24:18, 24:25, 30:6, 64:13, 78:11
**trying** [9] - 4:24, 28:13, 29:7, 37:3, 43:23, 48:12, 48:14, 50:2, 50:21
**tsunami** [2] - 43:18, 43:21
**Tuesday** [1] - 68:7
**turns** [1] - 32:16
**two** [20] - 10:19, 17:9, 21:5, 22:14,

36:20, 36:22, 37:8,
47:7, 63:5, 63:7,
68:16, 68:19, 69:8,
69:15, 71:9, 75:25,
76:6, 77:25, 83:17,
83:24
**two-sided** [1] - 21:5
**two-volume** [1] -
10:19
**type** [5] - 18:8,
23:21, 34:23, 35:19,
60:15
**types** [11] - 7:12,
7:22, 10:1, 14:9,
14:10, 14:11, 15:3,
20:2, 29:12, 37:13,
42:18
**typical** [1] - 9:3
**typically** [9] - 14:13,
17:17, 18:25, 19:22,
23:20, 30:21, 33:7,
33:8, 52:1

**U**

**U.S** [4] - 1:14, 1:18,
1:21, 77:1
**U.S.A** [1] - 25:20
**UK** [1] - 27:4
**uncharged** [4] -
75:16, 76:2, 76:22,
84:10
**uncommon** [3] - 9:9,
13:8, 17:2
**under** [14] - 13:1,
19:12, 56:9, 57:24,
57:25, 60:4, 60:21,
61:3, 64:25, 65:12,
72:4, 73:6, 73:7,
79:22
**underestimated** [1] -
26:8
**undermine** [1] -
59:13
**underrated** [1] - 26:8
**understood** [11] -
10:13, 18:22, 31:7,
40:13, 52:7, 54:18,
56:12, 57:2, 75:13,
75:19, 78:25
**undue** [1] - 58:1
**unduly** [1] - 58:7
**unfair** [1] - 57:19
**unfamiliar** [1] - 50:1
**unfortunately** [4] -
18:23, 24:7, 24:8,
42:16
**Uniform** [1] - 8:19
**uniquely** [1] - 20:6
**unit** [1] - 62:11

**united** [1] - 2:8
**UNITED** [3] - 1:1,
1:4, 1:11
**United** [15] - 3:5,
3:11, 7:24, 8:2, 8:3,
8:12, 11:21, 26:22,
27:5, 36:25, 41:15,
41:23, 43:5, 44:20,
85:9
**universal** [1] - 66:5
**universally** [2] -
46:17, 51:24
**universe** [1] - 83:23
**universities** [1] -
8:18
**University** [1] - 12:25
**unless** [2] - 35:22,
37:11
**unlikely** [1] - 35:23
**unsure** [1] - 82:11
**unusual** [1] - 28:9
**unwilling** [1] - 52:9
**up** [19] - 4:19, 8:20,
12:16, 29:10, 31:2,
33:1, 33:4, 48:6,
54:23, 64:15, 68:23,
70:24, 71:20, 73:13,
73:18, 74:16, 74:23,
75:4, 80:24
**URBAN** [17] - 1:17,
6:2, 68:1, 68:12, 70:1,
75:6, 75:10, 76:3,
76:8, 76:10, 78:25,
79:4, 80:9, 81:23,
82:18, 83:19, 84:3
**Urban** [11] - 3:11,
67:25, 75:25, 77:15,
78:8, 78:24, 80:7,
81:17, 83:3, 83:18,
84:13
**urban's** [1] - 78:1
**Urban..** [1] - 6:1
**usual** [1] - 52:1
**utterance** [1] - 34:5

**V**

**vaginal** [1] - 37:10
**valiance** [1] - 66:24
**variety** [2] - 57:10
**various** [3] - 8:1,
44:21, 57:13
**VELAZCO** [2] - 2:7,
85:8
**Velazco** [1] - 85:7
**verbal** [1] - 37:23
**verbally** [2] - 37:24,
37:25
**verbose** [1] - 26:10
**verified** [1] - 26:2

**versus** [1] - 3:6
**victim** [43] - 14:7,
17:3, 21:6, 29:23,
30:20, 57:18, 60:23,
62:14, 66:7, 69:6,
69:7, 69:11, 69:20,
69:21, 69:23, 69:24,
70:2, 70:3, 70:6, 70:7,
70:11, 70:15, 70:17,
71:13, 72:10, 76:1,
76:4, 76:22, 77:5,
77:6, 82:2, 83:11,
83:12, 83:16, 84:7
**victim's** [3] - 27:24,
59:13, 60:13
**victimization** [3] -
30:17, 31:6, 32:25
**victimized** [1] - 33:1
**victims** [28] - 8:23,
9:19, 10:22, 12:18,
14:15, 15:10, 15:11,
17:5, 19:20, 24:21,
26:8, 26:11, 57:11,
57:12, 58:6, 66:8,
72:15, 75:17, 76:15,
76:18, 76:20, 79:5,
83:12, 83:24, 83:25,
84:10, 84:11
**video** [2] - 47:11,
47:14
**view** [4] - 33:3, 66:1,
82:15
**violence** [2] - 15:3,
44:24
**virtue** [2] - 16:23,
84:8
**visited** [1] - 80:21
**volume** [1] - 10:19
**volunteer** [1] - 80:21
**volunteered** [1] -
7:24
**vs** [1] - 1:6
**vulnerability** [2] -
54:8, 57:17
**vulnerable** [3] - 53:4,
53:14, 63:19

**W**

**wait** [4] - 60:1, 82:6,
82:12, 82:16
**waiting** [1] - 69:9
**waiver** [1] - 73:16
**walk** [1] - 20:25
**walking** [1] - 74:22
**wants** [3] - 59:3,
64:5, 65:16
**warn** [1] - 11:11
**warnings** [1] - 82:3
**warranted** [1] - 58:7

**Washington** [2] -
1:19, 1:22
**ways** [4] - 26:20,
49:22, 66:14, 77:4
**week** [2] - 67:15,
68:2
**Weinstein** [1] - 46:2
**well-known** [1] -
12:15
**West** [1] - 2:4
**western** [1] - 41:17
**whole** [7] - 33:5,
36:15, 42:13, 50:9,
56:2, 64:23
**wide** [2] - 57:10
**widely** [4] - 46:4,
50:4, 56:19
**wider** [1] - 63:1
**widespread** [1] -
45:23
**wise** [1] - 44:3
**wish** [2] - 84:20,
84:23
**wishes** [2] - 5:18,
75:5
**Witness** [2] - 55:11,
80:20
**witness** [47] - 3:22,
4:6, 5:4, 5:8, 5:20,
6:2, 6:3, 6:8, 6:20,
51:25, 55:23, 56:2,
63:23, 64:8, 64:13,
65:25, 66:6, 66:9,
69:7, 69:8, 69:13,
70:16, 70:17, 71:3,
71:6, 71:7, 71:8,
71:10, 71:14, 72:3,
72:7, 72:9, 72:11,
72:21, 75:25, 78:13,
80:10, 80:16, 80:18,
80:22, 81:18, 81:21,
83:9, 83:16, 83:25,
84:15
**WITNESS** [7] - 6:10,
6:13, 12:5, 12:7, 40:9,
49:15, 55:10
**witness'** [2] - 62:5,
66:4
**witnessed** [1] -
17:24
**witnesses** [29] -
4:17, 4:22, 69:1,
70:24, 71:24, 72:16,
72:24, 73:7, 73:14,
73:23, 74:7, 74:9,
75:2, 76:18, 76:22,
77:16, 78:9, 79:10,
79:20, 79:25, 81:16,
83:14, 83:20, 83:21,
83:23, 84:1

**WITNESSES** [1] -
2:15
**wondering** [2] -
29:15, 80:11
**word** [1] - 37:20
**words** [1] - 14:20
**works** [1] - 68:12
**world** [3] - 35:6,
35:8, 79:17
**worldwide** [2] -
26:22, 42:1
**worry** [1] - 18:14
**wound** [1] - 29:22
**wounding** [1] - 29:23
**wrestle** [1] - 67:9
**writing** [2] - 28:23,
61:24
**written** [7] - 10:24,
45:4, 47:1, 50:10,
63:20, 65:1, 81:13
**wrote** [4] - 10:19,
43:19, 43:20

**Y**

**year** [6] - 16:15,
22:14, 23:12, 71:12,
71:15, 77:25
**years** [22] - 7:7, 8:1,
9:21, 11:18, 22:2,
28:17, 31:14, 31:16,
33:9, 33:13, 34:16,
36:16, 45:14, 48:6,
50:23, 51:4, 51:12,
59:23, 60:1, 62:12,
62:15, 71:9
**York** [3] - 1:18, 1:22,
41:24
**young** [6] - 13:24,
22:13, 22:20, 38:20,
52:10
**yourself** [3] - 6:17,
6:25, 11:3
**youth** [1] - 47:2,
47:11, 47:18
**youth-serving** [3] -
47:2, 47:11, 47:18

**Z**

**zero** [1] - 7:7