Hi Jessica,
Below are some articles that I think may be useful. I have tried to highlight some key points for you. Please don't hesitate to contact me if you have any other questions or concerns.

1) https://www.state.gov/wp-content/uploads/2023/02/415610_HAITI-2022-HUMAN-RIGHTS-REPORT.pdf
**Insights that may be useful from reports**:

**Trial Procedures**
The constitution provides for the right to a fair and public trial, but the judiciary did not uniformly enforce this right. Authorities widely ignored constitutional trial and due-process rights.
The constitution provides for the right to a fair and public trial, but the judiciary did not uniformly enforce this right. Authorities widely ignored constitutional trial and due-process rights.
Defendants have the right to the assistance of an attorney of their choice, but legal aid programs were limited, and those who could not pay for attorneys were not always provided one free of charge. The law does not specifically provide a defendant time to prepare an adequate defense. Defendants have the right to confront hostile witnesses and present their own witnesses and evidence, but judges often denied these rights. The perception of widespread impunity discouraged some witnesses from testifying at trials.
While French and Haitian Creole are both official languages, with Haitian Creole being the most commonly spoken language, all laws and most legal proceedings were in French. Observers noted judges generally ensured defendants fully understood the proceedings.
The functioning of justice of the peace courts, the lowest courts in the judicial system, was inadequate. Justices presided based on their personal availability and often maintained separate, full-time jobs. Law enforcement authorities rarely maintained order during court proceedings, and frequently there was no court reporter. **To avoid lengthy waits, defendants would often bribe judges to have their cases heard.**"
"Human rights activists continued to allege that corruption fueled gang violence, since diverted government funds were believed to contribute to financing of gangs. RNDDH stated corruption in public agencies led to trafficking of arms and drugs."
"Victims of gender-based violence faced major obstacles in seeking legal justice, as well as in accessing protective services such as women's shelters. Civil society organizations reported many victims did not report such cases because of social pressure, fear of retaliation, and a lack of logistical and financial resources. According to some civil society organizations, many local nonprofit organizations that provided shelter, medical services, psychological services, and legal assistance to victims had to reduce services due to a lack of funding. There were reports that in rural areas, criminal cases, including cases of gender-based violence, were settled outside the justice system. In such cases, local leaders often pressured family members to come to financial settlements with the accused to avoid social discord and embarrassment. According to judicial observers, prosecutors often

encouraged such settlements.

**Other Forms of Gender-based Violence**: The feminist organization Neges Mawon reported invasive and violent "virginity checks" persisted. These were typically performed by family members on young women, sometimes using foreign objects. Neges Mawon also reported instances of young women being "prepared for intercourse" using foreign objects.

Sexual Harassment: The law does not specifically prohibit sexual harassment, although the labor code states men and women have the same rights and obligations. Observers indicated sexual harassment occurred frequently. Although authorities stated the government was opposed to sexual harassment, there were no formal governmental programs to combat it on a national scale."

**Institutionalized Children**: T**he IBESR has official responsibility for monitoring and accrediting the country's residential children's homes and care centers. The institute visited 754 such facilities, of which 176 institutions were accredited by the government. According to the international NGO Lumos, an estimated 26,000 children lived in residential children's homes and care centers, and approximately 80 percent of these children had at least one living parent. Children in these institutions were vulnerable to human trafficking**."

**Violence against LGBTQI+ Persons**: There were no reports of violence against LGBTQI+ individuals by police or other government agencies. Armed gangs targeted LGBTQI+ individuals based on their sexuality.

Kay Trans Haiti, the country's first shelter and social services organization for transgender youth, reported two transgender persons were killed during the April 24 – May 6 clashes between the Chen Mechan and 400 Mawozo gangs in the Plaine du Cul de Sac region. Kay Trans also reported an additional three attempted killings of LGBTQI+ persons during the same period. In all five cases, the individuals had previously received threats from gang members.

KOURAJ, an LGBTQI+ activist group, reported two educators affiliated with their organization were injured in a violent and transphobic attack on July 23. Wales Charlotin and John Peterson were attacked in their home in Bolosse. The attacker hit Charlotin in the stomach with two projectiles and inflicted several other injuries; Peterson was stabbed in the neck and eyes.

BINUH's report on targeted sexual violence stated gangs used "corrective" rape against LGBTQI+ persons, often inflicting sexual violence in highly public places to humiliate victims as much as possible. LGBTQI+ men and boys were sometimes forced into same-sex sexual relationships following these violent attacks from gang members.

Discrimination: The law does not prohibit discrimination by state and nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics and does not recognize LGBTQI+ individuals, couples, or their families. Same-sex marriages are not recognized.

There are few laws that infringe upon LGBTQI+ persons' rights, but many individuals and groups were openly hostile towards LGBTQI+ persons. Individual parliamentarians frequently used inflammatory anti-LGBTQI+ language in radio

broadcasts or in other media outlets. Religious leaders also publicly denounced LGBTQI+ persons as "not Haitian."

A 2017 study of public opinions on stigma and discrimination towards vulnerable groups showed that 71 percent of the individuals surveyed responded "hate" was the most appropriate term to express their attitude toward LGBTQI+ persons, and 90 percent of the adult population rejected the idea of equal rights for sexual minorities.

Local attitudes, particularly in Port-au-Prince, remained hostile toward LGBTQI+ persons who made their sexual orientation or gender identity public and visible. Some politicians, social leaders, and organizations actively opposed the social integration of LGBTQI+ persons or any discussion of their rights. LGBTQI+ advocacy groups in Port-au-Prince reported a greater sense of insecurity and less trust of government authorities than did groups in rural areas.

2)https://haitiantimes.com/2021/05/18/experts-failures-of-haiti-institutions-laid-bare-amid-rising-violence/ .

**Here are some insights from this article**:

"In its latest [Fragile States Index](#) report, The Fund for Peace, a nonprofit, ranked Haiti 13th out of 178 countries on its list, which ranked countries on a scale from least, to most stable. Among the worst indicators for Haiti, according to the index, were high degrees of economic inequality, minimal public services and factionalization among the country's ruling elite...

**The botched raid reflects the government's inability to quell gangs or to bring criminals to justice, according to observers.** Gangs are better outfitted with weapons than the police, who work for a beleaguered agency with a gang of violent detractors, Fantom 509, within its own ranks. Domond Saincy, a police spokesperson, said in a [radio](#) interview last month that some police officers buy their own bullets and bulletproof vests. At one point, Fatton said, the government will likely have to negotiate with gangs to put down their arms. However, he pointed out, the government lacks the authority and means to use appropriate force in the process. In the past year, human rights groups have [accused](#) the Haitian government of collaborating with gangs for political reasons. Protesters in the diaspora and in Haiti have voiced their displeasure with the climate of insecurity and the government's perceived role. For its part, the Moïse administration [says](#) it has arrested gang members and created a task force to dismantle gangs. But human rights experts like Pierre Esperance of the National Human Rights Defense Network say the government has helped create a climate of impunity for gangs to operate. "That's why the gangs are very arrogant, and they are involved with a lot of human rights violations like massacres and also kidnappings," Esperance said..."

Since the fall of Duvalier in 1986, Haiti has struggled to overcome issues like state corruption and poverty. Haiti has also endured two foreign military interventions and a 2010 earthquake that further weakened state capacity and social conditions. Despite [more than $7 billion](#) in international aid that flowed into Haiti, just $280 million went directly to the government, *The Haitian Times* reported in 2020.

**And, since the fall of Duvalier, gangs have proliferated in poor neighborhoods underserved by the state. Following a survival logic, armed gangs "ensure the distribution of food rations to poor families and organize sports and sociocultural activities," Djems Olivier wrote in the March 2021 NACLA paper.**

Gang members also maintain patronage relationships with political and economic actors in the country, the NACLA paper also noted.

**3)Site for NACLA paper**: https://nacla.org/news/2021/political-anatomy-haiti-armed-gangs

Here are some highlights from the **NACLA Paper** mentioned (by Djems Olivier, one of the scholars I referenced):
"In my research in various marginalized neighborhoods of Port-au-Prince in recent years, I have observed the disorganization of community groups and a chaotic management of aid intended for poor populations. I use the concept of archipelization to explain this phenomenon. Archipelization refers to the fragmentation of precarious neighborhoods not only by the action of NGOs that compensate for the absence of the state, but also by the emergence of armed gangs who impose themselves as informal authorities. These two main actors, NGOs and armed gangs, are motivated by their own interests: NGOs try to remedy the shortcomings of the state through projects financed by international donors, while the armed gangs, following a survival logic, ensure the distribution of food rations to poor families and organize sports and sociocultural activities. This co-management strategy contributes to territorial fragmentation whereby an archipelago of neighborhoods ends up beyond the control of the central state and local authorities, who become figure heads...

In general, an archipelago is made up of a set of islets—or blocks of houses—located relatively close to each other. In the field of urban management, Sylvy Jaglin defines archipelagos as "configurations dominated by political-functional discontinuities resulting from the compartmentalization of services into autonomous isolates, and spatial discontiguities resulting from the fragmentation of territories made up of insular, inward-focused urban blocks." However, Valérie Messer argues that Jaglin's use of the term at the neighborhood level does not take into account the relationships that may exist between these islets. Messer employs Pierre Veltz's definition of the archipelago as "an ultimate form of the network, a networked territory in which the poles are points of intersection"—that is, a territory made up of focused centers that are linked and have relationships to each other.

From this perspective, I use the notion of territorial archipelization to describe the process of a multitude of actors each carving out a turf within the poor neighborhoods they control without worrying about others' actions in the area. This phenomenon is ubiquitous in Port-au-Prince's marginal communities, where each NGO defines its area of intervention without taking into account the actions of its neighbors."

4)https://www.nejm.org/doi/full/10.1056/NEJMp1001820

**Highlights from this article**:
Children constitute almost half of Haiti's population of 9 million. Before the earthquake, an estimated 350,000 children lived in "orphanages," yet only 50,000 of them had no living parents.[1] Desperately poor families have often felt compelled to place children in residential care facilities, only to return later and find that they have been given away for adoption. Throughout the world, many families have historically relinquished their children when they reached a tipping point due to unmanageable birth rates; parental death, disability, or unemployment; physical insecurity; displacement; or natural disasters.[2] In pre-earthquake Haiti, many families had already reached such a crisis.

Local officials estimate that there are about 350 registered orphanages in the country and about twice as many unregistered and unregulated ones. Even most registered institutions do not meet international UN guidelines. A related long-standing threat to child protection has been the common practice of sending children away as *restavèks* (Creole for "stay with") to live with others in exchange for work. An estimated 150,000 to 500,000 *restavèks* work essentially as unpaid domestic laborers, with little or no access to education or recreation and subject to physical, mental, and sexual abuse. The *restavèk* situation and the practice of institutionalizing children reflect the extreme destitution of Haitian families. Thus, the earthquake occurred against a background of economic extremity driving family separation, aggressive trafficking networks, inadequate law enforcement, and a growing global demand for adoptive children."


5)https://ayibopost.com/pointed-opinions-on-international-sanctions-announcements/

About corruption (Djems OIivier):
**Some highlights**

These measures can in no way reduce the political and financial power of the people who support the gangs in Haiti," says Djems Olivier, a doctor in geography and security expert.

"A gang leader cannot be punished because he is sanctioning himself by limiting his movements and hardly uses the services of formal institutions," adds Djems Olivier, referring to a punitive measure taken by the United Nations on 21 October 2022. This decision sets up a committee of experts who have to put together a list of people to be punished by imposing a ban on their departure and their ability to acquire lethal equipment..."

Without the strengthening of the country's institutions, especially that of the judiciary and its penitentiary system, even the arrest of gangsters is a futile endeavor.

"We have had powerful gang leaders arrested in the past, but they control their armed gangs from their prison cells," said Djems Olivier.

5)https://ocindex.net/country/haiti

**Recordkeeping info**:

6)https://pmc.ncbi.nlm.nih.gov/articles/PMC4347354/

**Some highlights**:
Empiric studies of the earthquake recovery process thus far have been sparse. Public records of healthcare facilities before the earthquake were largely incomplete, making a clear understanding of the impact of the earthquake and the ensuing recovery effort challenging.[11]Some studies have focused on crude characterization of earthquake damage using either satellite imagery or data on the few registered public hospitals in the country.[12] However, Haiti's healthcare system is a complex web of public, private-for-profit, and aid-financed facilities ranging in size from large hospitals to small community clinics, many of which were never registered with the government.[13] Demographic and Health Surveys data provide an overview of health trends in Haiti; however, existing studies have failed to capture the detail necessary to show both the earthquake's impact on healthcare provision and the status of the recovery effort.[14]

I did not find much regarding how hotel records were maintained post-earthquake. The Marriott Hotel that the lawyer asked me about during the Daubert was built after the earthquake in 2014. (here is an article about the hotel's opening)